UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                                    Chapter 11

New York Spot, Inc.,                                           Case No.  11-43785

                        Debtor.
--------------------------------------------------------x

**NOTICE OF HEARING ON APPLICATION TO LIFT THE AUTOMATIC
STAY, AND TO EXCUSE COMPLIANCE BY RECEIVER, OF HIS
TURNONVER OBLIGATIONS**

        **PLEASE TAKE NOTICE**, that a hearing will be held before the Honorable
Carla E. Craig, at the United States Bankruptcy Court, 271 Cadman Plaza, Brooklyn, New York
11201, on the 10th day of August, 2011 at 3:00 p.m., or as soon thereafter as counsel may be
heard ("the Hearing"), to consider the application of West 22nd, LLC ("Mortgagee"): (a)
pursuant to 11 U.S.C. §362(d) for an order vacating the automatic stay against New York Spot,
Inc. to permit the Mortgagee to complete its foreclosure of the real property known as 442 West
22nd Street, New York, New York, and (b) excusing Gregory Soumas, as the receiver in the
foreclosure action from his turnover obligations under section 543(d) of the Bankruptcy Code.

        **PLEASE TAKE FURTHER NOTICE,** that the exhibits to the application are
too large to attach to the application, but are available electronically on the Bankruptcy Court's
electronic filing website, and can also be obtained upon request made to the undersigned.

        **PLEASE TAKE FURTHER NOTICE**, that objections must be served upon the
undersigned and filed with the Clerk of the Bankruptcy Court, 271 Cadman Plaza East,
Brooklyn, New York  11201, together with proof of service, so as to be received at least seven
days before the Hearing.

Dated:            New York, New York
                       July 22, 2011

                                                            BACKENROTH FRANKEL & KRINSKY, LLP
                                                            Attorneys for West 22nd, LLC

                                    By:        s/Mark Frankel
                                                            489 Fifth Avenue
                                                            New York, New York 10017
                                                            (212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re                                                                    Chapter 11

New York Spot, Inc.,                                            Case No.  11-43785

                                   Debtor.

-------------------------------------------------------x


## MOTION TO LIFT THE AUTOMATIC STAY


West 22nd, LLC ("Mortgagee"), by its attorneys, Backenroth Frankel & Krinsky,

LLP, as and for its application for an order (a) granting relief from the automatic stay pursuant to

11 U.S.C. § 362(d)(2) as to the real property commonly known as 442 West 22nd Street, New

York (the "Property"), so that the Mortgagee may exercise its rights against its collateral, and (b)

excusing Gregory Soumas, as receiver (the "Receiver") from compliance with 11 U.S.C. § 543(a)

and (b)(1), respectfully represents as follows:


## BACKGROUND


1.      On May 4, 2011 ("Filing Date"), the Debtor filed a petition under Chapter

11 of the Bankruptcy Code.

2.	On or about March 7, 2007, the Debtor entered into that certain Amended and Restated Mortgage Note with Intervest National Bank ("Intervest") in the sum of One Million, Nine Hundred Twenty Thousand ($1,920,000) dollars.  The Mortgage was recorded in the office of the City Register, County of New York on July 9, 2009 as CRFN 2009000209761.  A copy of the Consolidation Agreement is annexed hereto as Exhibit A.

3.	Then, by an assignment of Mortgage dated February 11, 2011, Intervest assigned its interests to the Mortgagee.  A copy of the assignment documents is annexed hereto as Exhibit B.

4.	In addition to the Mortgagee's obligation, the Property appears to be encumbered by a subordinate mortgage in the amount of approximately $6 million arising from guarantees loans allegedly made to related entities.  The Debtor's general unsecured creditors include an alleged obligation in the amount of approximately $5.5 million representing yet other loans made to related entities and allegedly guaranteed by the Debtor.

5.	The Debtor has never filed a tax return (and appears not to have a tax identification number).  The existence of the guarantee obligations is questionable, therefore, because there is no record of those obligations on tax returns filed at a time when the Debtor did not have an ulterior motive for misrepresenting the existence of the debt.

6.      In any event, the Debtor is in default with the Mortgagee by reason of (a) its failure to pay the installments of interest and principal due May 1, 2010 and thereafter, (b) the natural expiration of the mortgage debt by its own terms on March 1, 2011, (c) the subordinate lien on the Property and (d) the accrual of unpaid real estate tax, water sewer and charges, including the post-petition accrual of such charges.

7.      On July 11, 2010, Intervest Bank, the Mortgagee's predecessor in interest commenced a foreclosure action against the Debtor, Case no 650877 in the Supreme Court of the State of New York, New York County (the "Foreclosure Action").  No answer was filed and a default judgment was entered, as well as an order directing a referee to compute (Exhibit C).

8.      In preparation for the referee computing, an affidavits of amount due was prepared by Lowell Dansker, president of Intervest Bank, a copy of which is annexed hereto as Exhibit D).  David Godbout, the Mortgagee's managing member, has brought those numbers current to the Petition Date, by affidavit also annexed hereto as part of Exhibit D.

9.      As set forth therein, $2,263,813.11  is due as of the May 4, 2011 petition date.  This amount, however, does not include shortfalls due to the Receiver and his counsel which have not yet been calculated, nor does it include post-bankruptcy charges.

10.      The Debtor attributed a $3,000,000 value to the Property in its Schedules. According to an appraisal made for the Mortgagee on July 7, 2010, a copy of which is available

from the undersigned, the value of the Property was $2,400,000 as of June 28, 2010. According to an update of that appraisal made for the Mortgagee on July 16, 2011, a copy of which is annexed hereto as Exhibit E, the value of the Property was $2,150,000 as of June 16, 2011.

11.     Accordingly, the value of the Property is less than the amount due to the Mortgagee.

## RELIEF REQUESTED HEREIN

Cause Exists to Lift the Automatic Stay

12.     By this Application, the Mortgagee moves to lift the automatic stay to permit its foreclosure to proceed, and to continue the Receiver in possession.

13.     Section 362(d)(1) provides for lifting the automatic stay for "cause, including lack of adequate protection" and section 362(d)(2) provides for lifting the automatic stay where the Debtor lacks equity in the property and the subject property is not necessary for an effective reorganization in prospect.

<u>The Mortgagee Lacks Adequate Protection</u>

14.     Adequate protection is defined as "periodic cash payments" equal to the "decrease in the value of [the secured creditor's] interest" in debtor's property, a "replacement lien" and/or such other relief that results in the secured creditor obtaining the "indubitable equivalent" of its interest in debtor's property. 11 U.S.C. § 361.

15.     In this case, the value of the Property appears to have fallen from $2.4 million to $2.15 million in the past year alone.  Moreover, the Debtor's failure to pay real estate taxes both pre-petition and post petition has only further eroded value.

16.     Thus, courts require adequate protection in the form of cash payments to the creditor to safeguard the creditor's interest in property against depreciation. In re SunCruz Casinos, LLC, 298 B.R. 833, 844 (Bankr. S.D. Fla. 2003). When the debtor fails to make adequate protection payments to its secured lender, a court may lift the stay pursuant to subsection (d)(1). In re Balco Equities Ltd. Inc., 312 B.R. 734 (Bankr. S.D.N.Y. 2004); In re Custom Designed Cabinetry & Constr., Inc., 2009 Bankr. LEXIS 594, at *11-14 (Bankr. N.D. Ill. 2009); see also In re James River Assoc., 148 B.R. 790, 796 (E.D. Va. 1992)(substantial equity cushion should be available if debtor is not making adequate protection payments to secured creditor); In re MHS Mgmt. Group, LLC, 2009 Bankr. LEXIS 3580, at *16 (Bankr. N.D.N.Y. Oct. 26, 2009) (granting creditor stay relief in single asset real estate case where debtor failed to make adequate protection payments).

17.     Even without quantifying a decline in the value of the property, a creditor may be entitled to stay relief where debtor fails to provide post-petition adequate protection payments to its secured creditor. In re Balco Equities Ltd., Inc., 312 B.R. at 749-50; In re Kaplan Breslaw Ash, LLC, 264 B.R. 309, 333 (Bankr. S.D.N.Y. 2001); In re Boca Dev. Assocs., 21 B.R. 624, 630-31 (Bankr. S.D.N.Y 1982); cf. Oligobo v. Louis (In re Oligobo), 328 B.R. 691, 652 (Bankr. E.D.N.Y 2005)(finding secured creditor adequately protected where debtor making monthly payments to creditor).

18.     Where a creditor holds both a mortgage (or deed of trust) interest and an assignment of rents as security for a debt, the creditor is also entitled to adequate protection for its interest in both the real property and the rents. In re Bear Creek Ministorage, Inc., 49 B.R. 454, 460 (Bankr. S.D. Tex. 1985).

19.     In this case, the property does not support operating expenses and debt service.  Indeed, as indicated on page 50 of the Mortgagee's July 2011 appraisal, the highest and best use of the Property is **not** an SRO hotel.  The highest and best use is as vacant to be renovated into a private residence.  To achieve that result, however, the owner must subsidize the Property during the time it takes to vacate and renovate the Property.  The Debtor is unable to carry those costs.  Accordingly, the value of the Mortgagee's collateral is declining as the unpaid claims accrue.  The Mortgagee, therefore, lacks adequate protection and that cause exists to lift the automatic stay.

20.     In addition, a bankruptcy court may grant a creditor relief from the automatic stay as to acts against a debtor's property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).

21.     A debtor lacks equity in property where the value of the property is less than the amount owed to the creditor whose debt is secured by that property. In re Global Ship Sys., LLC, 391 B.R. 193, 207 (Bankr. S.D. Ga. 2007).

22.     For property to be necessary to an effective reorganization, the debtor must be able to demonstrate "that an effective reorganization is realistically possible; the mere fact that the property is indispensible to a debtor's survival is insufficient." In re Albany Partners, Ltd., 749 F.2d 670, 673 n.6 (11th Cir. 1984); see United Sav. Asso. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375-76 (1988). Rather, the debtor is required to show that, despite creditor dissent, there is a reasonable likelihood of reorganization. In re 160 Bleeker St. Assocs.,156, B.R. 405, 411 (S.D.N.Y. 1993); In re Global Ship, 391 B.R. at 207-208; Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.), 203 B.R. 432, 444 (N.D. Ind. 1996); In re 6200 Ridge, Inc., 69 B.R. 837, 843 (Bankr. E.D. Pa. 1987).  Property in which debtor has no equity is necessary to an effective reorganization only if the debtor can show such property will fund a plan to rehabilitate the business or increases the value of other assets of the debtor. In re 6200 Ridge, 69 B.R. at 843-44.

23.     In this case, the Debtor stated at the first meeting of creditors that it understands that operating an SRO hotel is not longer feasible for the Property, and that the Debtor needs to sell refinance the Property to emerge from Chapter 11.  The Debtor, however, has never explained how it might accomplish that result.  In the meantime, the Property is on a downward slide as the Receiver, upon information and belief, lacks rental income to properly maintain the Property and pay real estate tax, water and sewer charges, and the Debtor lacks the resources to properly subsidize the Property pending redevelopment.

24.     Accordingly, the Mortgagee respectfully submits that the most prudent course of action for this case is to lift the stay to permit the foreclosure to proceed.

The Continuation of the Receiver in Possession is in the Best Interests of Creditors

25.     Sections 543(a) and (b)(1) of the Bankruptcy Code require a custodian to deliver to the trustee any property of the debtor held by such custodian and to turnover management to the Debtor.  Section 543(d)(1) of the Bankruptcy Code, however, permits the court to excuse turnover:

> after notice and a hearing, the bankruptcy court—(1) may excuse compliance with subsection (a) . . . if the interests of creditors . . . would be better served by permitting the custodian to continue in possession, custody or control.

11 U.S.C. § 543(d).

26.     The Mortgagee believes that its interests are best served by the consistent operation of the Property by the Receiver.

27.     Of particular concern to the Mortgagee, as indicated in the July 2011 appraisal, is that the highest and best use of the Property is renovation as a private residence.  In order to do that there has to be a wind down of the present use of the Property.  Accordingly, the Mortgagee seeks to avoid new tenants in the Property, and the Receiver is willing to cooperate with that objective.

28.     Accordingly, it is the best interests of all parties for the Receiver to be excused from compliance with his turnover obligations under section 543 of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, the Mortgagee respectfully requests that the Court enter an order granting the relief requested herein, and that the Court grant such other relief as may be just and proper.

Dated:       New York, New York
             July 22, 2011

                                 **BACKENROTH FRANKEL & KRINSKY, LLP**
                                 Attorneys for the Mortgagee

By:     s/Mark A. Frankel
         489 Fifth Avenue
         New York, New York 10017
         (212) 593-1100

# Exhibit A

# EXHIBIT C

## AMENDED AND RESTATED MORTGAGE NOTE

New York, New York

$1,920,000.00                                                                March 7, 2007

FOR VALUE RECEIVED, **NEW YORK SPOT INC.,** a New York corporation having an address at 3317 Avenue N, Brooklyn, New York 11234 (the "Maker"), promises to pay to **INTERVEST NATIONAL BANK** (the "Payee") or order, at One Rockefeller Plaza, Suite 400, New York, New York 10020-2002 or at such other place as may be designated in writing by the holder of this Note, the principal sum of One Million Nine Hundred Twenty Thousand and 00/100 ($1,920,000.00) Dollars, with interest thereon and payable as set forth on Schedule A annexed hereto.

IT IS HEREBY EXPRESSLY AGREED, that the said principal sum secured by this Note shall become due at the option of the holder thereof on the happening of any default or event by which, under the terms of the Mortgage (as hereinafter defined) securing this Note, said principal sum may or shall become due and payable; also, that all of the covenants, conditions and agreements contained in the Mortgage are hereby made part of this instrument.

Presentment for payment, notice of dishonor, protest and notice of protest are hereby waived.

This Note is secured by those certain mortgages as consolidated pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement made by the Maker with the Payee of even date herewith, on property located at 442 West 22nd Street, New York, New York (the "Mortgage").

This Note is given in substitution for, and consolidates, modifies, amends and restates, and as consolidated, modified, amended and restated supercedes the certain notes, bonds and other agreements (collectively, the "Original Notes") described on Schedule B attached hereto and made a part hereof, which Original Notes evidence an outstanding principal indebtedness of $969,232.86 on the date of this Note. This Note is not in payment, novation, satisfaction or cancellation of the Original Notes, or of the indebtedness evidenced and it is expressly understood and agreed that (i) this Note is given to restate the terms of the Original Notes, and that no part of the indebtedness evidenced by the Original Notes shall be discharged, cancelled or impaired by the execution and delivery of this Note and (ii) the execution and delivery of this Note shall not create any new or additional principal indebtedness.

This Note may not be changed or terminated orally.

**NEW YORK SPOT INC.**

By: _____
Yehuda Nelkenbaum, President

STATE OF NEW YORK      )
                                            )SS.:
COUNTY OF NEW YORK  )

On this 7th day of March, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Yehuda Nelkenbaum, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

STEVEN WEINRES
Notary Public State of New York
No. 02WE6076238
Qualified in Kings County
Commission Expires 06/24/2010

_____
Notary Public

## SCHEDULE A

### Payment of Indebtedness

The indebtedness evidenced by this Note shall be payable as follows:

(a) A payment of interest only calculated at the Interest Rate for the period from and including the date of this Note to and including March 7, 2007, shall be due and payable upon the execution of this Note. Thereafter, payments in accordance with paragraph (b) below, applied as provided in the Mortgage, shall be due and payable on the first day of each calendar month, commencing on May 1, 2007, and continuing thereafter on the first day of each calendar month to and including February 1, 2009, and with a final payment on March 1, 2009, on which date all outstanding principal, together with all accrued and unpaid interest and all other amounts due under the Mortgage, shall be due and payable in full. In addition, the "Fee Payment" shall be due and payable on each and every "Fee Payment Date" (as such quoted terms are defined in the Mortgage) which may arise under this Note.

(b) The monthly payment shall be $13,000.00.

(c) The Interest Rate shall be 6.5% per annum.

2

# SCHEDULE B

1. Substitute Mortgage Note dated March 5, 2007 made by from 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC (collectively, the "Mortgagor") to Wachovia Bank, National Association in the original principal sum of $969,232.86.

2. Mortgage Note dated March 7, 2007 made by New York Spot Inc. to Intervest National Bank in the principal amount of $950,767.14.

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT -- THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

# MORTGAGE NOTE

$950,767.14

New York, New York,
March 7, 2007

NEW YORK SPOT INC., a New York corporation having an address at 3317 Avenue N, Brooklyn, New York 11234

promise to pay to

Intervest National Bank having an address at One Rockefeller Plaza, Suite 400, New York, New York 10020-2002

or order, at One Rockefeller Plaza, Suite 400, New York, New York 10020-2002

or at such other place as may be designated in writing by the holder of this note, the principal sum of Nine Hundred Fifty Thousand Seven Hundred Sixty Seven and 14/100 ($950,767.14) dollars

with interest thereon to be computed from the date hereof, at the rate of six and one-half percent (6.5%) per annum and to be paid on **DEMAND.**

**IT IS HEREBY EXPRESSLY AGREED,** that the said principal sum secured by this note shall become due at the option of the holder thereof on the happening of any default or event by which, under the terms of the mortgage securing this note, said principal sum may or shall become due and payable; also, that all of the covenants, conditions and agreements contained in said mortgage are hereby made part of this instrument.

Presentment for payment, notice of dishonor, protest and notice of protest are hereby waived.

This note is secured by a mortgage made by the maker to the payee of even date herewith, on the property situate at New York County, State of New York, known as and by Street Number 442 West 22nd Street, New York, New York as said property is more particularly bounded and described in the Mortgage.

This note may not be changed or terminated orally.

NEW YORK SPOT INC.

Yehuda Nelkenbaum, President

STATE OF NEW YORK, COUNTY OF NEW YORK                    SS:

On this 7th day of March in the year 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Yehuda Nelkenbaum, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

STEVEN WEINREB
Notary Public State of New York
No. 02WE6076238
Qualified in Kings County
Commission Expires 08/24/2010

STATE OF NEW YORK, COUNTY OF NEW YORK                    SS:

On this _____ in the year _____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TITLE No. RNY-064390

LOAN No.

NEW YORK SPOT INC.

TO

INTERVEST NATIONAL BANK

Mortgage Note

Dated

**MORTGAGE CONSOLIDATION, MODIFICATION
AND EXTENSION AGREEMENT**

(And Assignment of Leases and
Rents and Security Agreement)

made by

**NEW YORK SPOT INC.,**

Mortgagor

to

**INTERVEST NATIONAL BANK,**

Mortgagee

relating to Premises at

442 West 22nd Street, New York, New York

Dated: March 7, 2007

TABLE OF CONTENTS

Page

1.  Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.  Payment of Indebtedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
3.  Payment of Impositions, Insurance Premiums, Transfer Taxes . . . . . . . . . . . . . . . . 7
4.  Deposits for Impositions, Insurance Premiums, Etc . . . . . . . . . . . . . . . . . . . . . . . . 9
5.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
6.  Damage or Destruction; Application of Insurance Proceeds . . . . . . . . . . . . . . . . . . 12
7.  Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
8.  Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
9.  Compliance with Laws, Ordinances; Environmental Matters . . . . . . . . . . . . . . . . . 18
10. Mortgagee's Right to Perform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
11. Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
12. Late Charges and Default Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
13. Right of Access and Entry; Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
14. Indemnity; Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
15. Mortgagee Not Responsible for Damage or Injury . . . . . . . . . . . . . . . . . . . . . . . . . 26
16. Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
17. Remedies Upon Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
18. Waivers; Cumulative Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
19. Transfers of the Mortgaged Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
20. Tenant Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
21. Assignment of Leases and Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
22. Payments From Deposits; Mortgagee's Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
23. Prepayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
24. Procedure for Payment at Maturity or Upon Prepayment . . . . . . . . . . . . . . . . . . . . 37
25. Reduction of Principal Balance By Insurance and Condemnation Proceeds . . . . . . . . 37
26. Junior Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
27. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
28. Mortgagor's Certificate; Statement of Balances . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
29. Financial Statements and Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
30. Lien Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
31. Good Standing of Mortgagor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
32. Partial Exculpation of Mortgagor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
33. Instruments of Further Assurance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
34. Conversion Offering Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
35. [Intentionally omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
36. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
37. 1-6 Residential Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
38. Relief From Bankruptcy Stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

SCHEDULE A
      Description of Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

SCHEDULE B
      Payment of Indebtedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

SCHEDULE C
      Mortgages Consolidated in this Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**MORTGAGE CONSOLIDATION, MODIFICATION**
**AND EXTENSION AGREEMENT**
(And Assignment of Leases and
Rents and Security Agreement)


THIS MORTGAGE CONSOLIDATION, MODIFICATION AND EXTENSION
AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT
(the "Mortgage"), made the 7th day of March, 2007 by New York Spot Inc., a New York
corporation having an address at 3317 Avenue N, Brooklyn, New York 11234 ("Mortgagor") to
Intervest National Bank, having an address at One Rockefeller Plaza, Suite 400, New York, New
York 10020-2002 ("Mortgagee").

WHEREAS, Mortgagee is the holder of the mortgages described on Schedule C annexed
hereto and the notes secured thereby.

WHEREAS, Mortgagee and Mortgagor have agreed to combine, consolidate and
coordinate the liens of said mortgages, and to modify the mortgages and the notes secured
thereby, as hereinafter set forth.

NOW, THEREFORE, in consideration of the sum of Ten ($10.00) Dollars and other good
and valuable consideration, the receipt of which is hereby acknowledged, Mortgagor and
Mortgagee hereby agree that (i) the liens of the mortgages described above are hereby combined,
consolidated and coordinated, and the mortgages and notes secured thereby are modified, so that
together they shall hereinafter constitute a single mortgage, all of the terms and provisions of
which are evidenced by this Mortgage Consolidation, Modification and Extension Agreement,
Assignment of Leases and Rents, and Security Agreement (hereinafter referred to as the
"Mortgage"), (ii) the Mortgage secures the payment of an indebtedness on the date hereof in the
principal sum of One Million Nine Hundred Twenty Thousand and 00/100
($1,920,000.00)Dollars, lawful money of the United States, to be paid with interest thereon to be
computed from the date hereof according to Paragraph 2 and the other terms and provisions of
this Mortgage, and further secures the payment of all other amounts which may be or become due
under this Mortgage and the compliance with all of the terms of this Mortgage, and (iii) the
Mortgage constitutes a lien on, and the Mortgagor hereby grants, bargains, sells, mortgages,
warrants, pledges, assigns, transfers, and conveys to Mortgagee, and grants to Mortgagee a
security interest in, the property described in the following paragraphs (a) through (j)
(collectively the "Mortgaged Property"):

(a)      the land described in Schedule "A" annexed hereto and made a part hereof;

(b)      all additional lands or estates or interests therein hereafter acquired by Mortgagor
for use in connection with the land described in (a) above, and all lands or estates or interests
therein that may, from time to time, by supplemental mortgage or additional agreement, be made
subject to the lien of this Mortgage (the land described in (a) above and the lands or estates or
interests therein described in this paragraph (b) are collectively referred to as the "Land");

(c)      all improvements, structures and buildings, and any alterations thereto or
replacements thereof, now or hereafter erected upon the Land, all fixtures, fittings, appliances,
apparatus, machinery, materials and replacements thereof (other than those articles of personal
property owned by tenants under "Leases," as defined in paragraph (d) below), now or at any
time hereafter affixed to, attached to, placed upon or used in any way in connection with the use,
enjoyment, occupancy or operation of the Land or such improvements, structures or buildings,
including without limitation furnaces, boilers, oil burners, radiators and piping, coal stokers,
plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, washtubs,
sinks, gas and electric fixtures, stoves, ranges, ovens, disposals, dishwashers, hood and fan
combinations, awnings, screens, window shades, elevators, motors, dynamos, refrigerators,
kitchen cabinets, incinerators, kitchen equipment, laundry equipment, plants and shrubbery and
all other furniture, furnishings, equipment and machinery, appliances, fittings and fixtures of
every nature whatsoever now or hereafter owned or acquired by the Mortgagor and located in or
on, or attached to, and used or intended to be used in connection with or with the operation of,
the Land, buildings, structures or other improvements, or in connection with any construction
being conducted or which may be conducted thereon, and owned by Mortgagor, and all

extensions, additions, improvements, betterments, renewals, substitutions and replacements to any of the foregoing (collectively, the "Improvements") (the Land and the Improvements are hereinafter referred to collectively as the "Premises");

(d)     any and all leases, subleases and all other occupancy agreements (written or oral), by concession, license or otherwise, for the Premises or any part thereof, now existing or hereafter entered into between Mortgagor and tenants and occupants of the Premises (the "Leases"), and all right, title and interest of the Mortgagor therein and thereunder, including cash or securities deposited thereunder to secure performance by the tenants and occupants under the Leases of their obligations thereunder, and any advanced rentals paid thereunder;

(e)     any and all furniture, furnishings, equipment and other articles of personal property, together with all replacements and renewals thereof, other than those articles of trade fixtures and other personal property owned by tenants under the Leases, now or at any time hereafter placed upon, located in or used in any way in connection with the use, enjoyment, occupancy and operation of the Premises (hereinafter collectively referred to as the "Equipment");

(f)     Mortgagor's interest in any and all agreements, contracts, certificates, licenses, permits, approvals, instruments and other documents, now or hereafter entered into pertaining to the construction, reconstruction, operation or management of the Improvements or any part thereof, and all right, title and interest of the Mortgagor therein and thereunder, including the right upon the happening of any event of default hereunder to receive and collect any sums payable to Mortgagor thereunder;

(g)     Mortgagor's interest in the franchises, permits, licenses and rights therein and thereto respecting the use, occupation and operation of the Mortgaged Property and respecting any business or activity conducted on the Premises, including, to the extent permitted by law, the name or names, if any, now or hereafter used for the Improvements, and the good will associated therewith;

(h)     Mortgagor's interest in and to the land lying in the bed of any street, road, avenue or right-of-way in front of or adjoining the Land, and any and all easements, rights-of-way, gores of land, estates, interests, hereditaments (corporeal and incorporeal), streets, ways, alleys, passages, sewer rights, water courses, water rights and powers, and all other rights, benefits, privileges and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the property described in the preceding paragraphs (a) through (g), or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Mortgagor;

(i)     any and all unearned premiums, accrued or to accrue under insurance policies now or hereafter obtained by Mortgagor, all proceeds of such insurance (including title insurance) policies, and all awards, including interest thereon, heretofore and hereafter made to Mortgagor for taking by eminent domain of the whole or any part of the property described in the preceding paragraphs (a) through (h), including any awards for change of grade of streets, which said premiums, proceeds and awards are hereby assigned to Mortgagee, which is hereby authorized to collect and receive the proceeds of such insurance policies and awards and to give proper receipts and acquittances therefor; and

(j)     any and all rents, income and other benefits to which Mortgagor may now or hereafter be entitled to from, and all proceeds of, the property described in the preceding paragraphs (a) through (i).

AND, without limiting any of the other provisions of this Mortgage, Mortgagor expressly grants to Mortgagee, as secured party, a security interest in all of those portions of the Mortgaged Property which are or may be subject to the provisions of the Uniform Commercial Code of the State in which the Premises is located and of the State in which Mortgagor was organized, applicable to secured transactions, and this Mortgage shall constitute a security agreement and financing statement for purposes of the Uniform Commercial Code.

TO HAVE AND TO HOLD the Mortgaged Property and all parts thereof unto Mortgagee, its successors and assigns forever (but subject to defeasance upon the payment of all sums at any time secured by this Mortgage), and Mortgagor hereby binds itself and its successors and assigns to warrant and forever defend title to the Mortgaged Property, unto Mortgagee and its successors and assigns against any and every person whomsoever claiming the same or any part thereof.

AND, Mortgagor covenants for the benefit of the Mortgagee as follows:

1.    Certain Definitions

For purposes of this Mortgage, the following terms shall have the following meanings:

(a)    "Additional Payment" shall mean all sums, other than Debt Service and Deposits, which may become payable by Mortgagor to Mortgagee under this Mortgage for any reason (whether or not specifically designated in this Mortgage as an Additional Payment), including but not limited to (i) any late payment charge, liquidated damages or interest charge which may be assessed under this Mortgage, (ii) any fees due to Mortgagee, or expenses of Mortgagee required to be paid by Mortgagor, under this Mortgage, (iii) any funds advanced by Mortgagee, a receiver, or any other person on Mortgagee's behalf to satisfy any obligation of Mortgagor under this Mortgage, (iv) any amount of damages, costs or expenses, including reasonable attorneys fees and disbursements, which Mortgagee may incur as a result of Mortgagor's failure to perform any of its obligations or pay any amount which it is required to pay under this Mortgage, and (v) any amount for which Mortgagee is entitled to receive indemnity from Mortgagor under this Mortgage.  All Additional Payments shall be secured by this Mortgage.

(b)    "Banking Day" shall mean a day on which both state and federally chartered banks are open for business in New York City.

(c)    "Debt Service" shall mean all payments of interest or principal which may at any time be due under the Note or this Mortgage, including the principal balance at such time as it may be or become payable in full, and the Fee Payment at such time or times as it may become payable.

(d)    "Default Rate" shall mean a rate of interest equal to 24% per annum or, if less, the maximum legal rate at the time any such interest is to be calculated.

(e)    "Deposits" shall mean all sums which Mortgagor may be required to deposit with Mortgagee for any reason under Paragraph 4.

(f)    "Fee Payment" shall mean an amount calculated as a percentage of the original principal amount of this Mortgage  ($1,920,000.00) as follows:

| if the Fee Payment Date is | Fee Payment Due |
| --- | --- |
| Prior to March 1, 2008 | 2% |
| On or after March 1, 2008 (including on or after March 1, 2009, the "maturity date") | 1% |

Notwithstanding the foregoing, provided there shall be no default under this Mortgage, there shall be no Fee Payment due during the thirty (30) day period ending with the stated Maturity Date.

(g)    "Fee Payment Date" shall mean any of the following: (i) the date on which the entire outstanding principal balance is, or is required to be, paid in full, whether at or after the scheduled maturity date, or on any earlier date by reason of a prepayment permitted under Paragraph 23 of this Mortgage; (ii) the date of any agreement to modify or extend this Mortgage

which may be executed between Mortgagor and Mortgagee (provided that this shall not imply any right to such a modification or extension); and (iii) in the case of a payment of the principal balance of this Mortgage which results from Mortgagor's default and a subsequent acceleration of the maturity of this Mortgage (whether or not followed by foreclosure), the earlier of the date of payment or the date of the judgment in foreclosure.

(h)      "Impositions" shall mean all taxes, assessments, water rates, water meter charges, sewer rents, charges for public utilities, excises, levies, license and permit fees and other governmental charges, general and special, ordinary and extraordinary, unforeseen and foreseen, of any kind and nature whatsoever (including any fines, penalties or interest due as a result of the deferred or late payment of any of the foregoing), which at any time during the term of this Mortgage may be assessed, levied, confirmed, imposed upon, or grow or become due and payable out of or in respect of, or become a lien on, the Mortgaged Property or any part thereof or any appurtenance thereto, the rent and income received by Mortgagor from tenants, or for any use or occupation of the Mortgaged Property, and such franchises as may be appurtenant to the use of the Mortgaged Property, this transaction or any document to which Mortgagor is a party, creating or transferring an interest or estate in the Mortgaged Property or any part thereof.

(i)      "Insurance Premiums" shall mean all premiums and any other payments which may be due with respect to all policies of insurance which Mortgagor may be obligated to maintain under Paragraph 5.

(j)      "Junior Mortgage" shall mean any mortgage (including a purchase money mortgage) which is a lien on the Mortgaged Property or any part thereof at any time that this Mortgage is a lien on the Mortgaged Property or any part thereof, and which is junior in priority of lien to the lien of this Mortgage.

(k)      "Mortgagee" shall mean the Persons who at any time are the record owners of this Mortgage. The term "Mortgagee" shall not include any former owner of this Mortgage or an interest therein who is no longer a record owner thereof.

(l)      "Mortgagor" shall mean the Persons executing this Mortgage as mortgagor, and in the event of any Transfer, shall mean the Persons who at any time are the record owners of the Premises.

(m)      "Note" shall mean those certain promissory note(s) as amended and restated by that certain Amended and Restated Mortgage Note dated the date hereof made by Mortgagor to Mortgagee which this Mortgage secures, as same may be hereafter modified, amended, extended, renewed or substituted.

(n)      "Person" shall mean any individual, corporation, partnership, trust, estate or other form of entity or association.

(o)      "Transfer" shall mean any of the following:

(i)      any sale, transfer, assignment (including an assignment of rents), lease, ground or master lease, mortgage (including purchase money mortgage), pledge or other encumbrance of any interest of Mortgagor in the Mortgaged Property, or of any interest of any other Person in the Mortgaged Property which is derived from Mortgagor;

(ii)      any sale, transfer, assignment, pledge or other encumbrance of any ownership interest (beneficial or otherwise) in the Mortgagor or any other Person who derives from Mortgagor an interest in the Mortgaged Property (other than by reason of death);

(iii)      the execution of any agreement, however named, or the occurrence of any event, which has the effect of transferring dominion and control of the Mortgaged Property or any part thereof to any Person other than Mortgagor, or which has the effect of transferring control of any ownership interest (beneficial or otherwise) in Mortgagor or any other person who derives from Mortgagor an interest in the Mortgaged Property.

The rental of individual apartment units or stores to separate tenants in the ordinary course of operating the Premises as a rental property shall not be deemed a Transfer. For purposes of this paragraph, "control" shall mean possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting equity interests, by contract or otherwise (such definition to have the same meaning as such definition has in Regulation Section 230.405 under the Securities Act of 1933).

(p) "Transfer Closing" shall mean the event on a Transfer Date as a result of which a Transfer occurs.

(q) "Transfer Date" shall mean the effective date of any Transfer. For this purpose, the effective date of a Transfer shall be the earliest of the date of closing, the date of delivery of any document which conveys an interest in the Mortgaged Property or Mortgagor, or the date on which dominion or control of the Mortgaged Property or part thereof, or control of an interest in Mortgagor, passes to the transferee.

(r) "Transfer Taxes" shall mean any and all federal, state and local taxes now or hereafter imposed on any Transfer, or which may be imposed on any other transfer of any interest in the Mortgaged Property (other than a transfer by Mortgagee of this Mortgage) which may be excluded from the definition of Transfer, or imposed on any gain resulting from any Transfer or such other transfer, or imposed by reason of the making or recording of this Mortgage or any modification, extension or termination of this Mortgage, or imposed in connection with any foreclosure of the Mortgaged Property by Mortgagee, but shall not include any regular federal, state or local income taxes imposed on Mortgagee's income generally. Transfer Taxes shall include, but shall not be limited to, the New York City Real Property Transfer Tax and the New York State Real Estate Transfer Tax.

2.    Payment of Indebtedness

(a) The Mortgagor covenants and agrees to pay the indebtedness evidenced by and as provided in this Mortgage. See Schedule B annexed hereto and made a part hereof for the specific payment terms of such indebtedness.

(b) Except as otherwise specifically provided in this Mortgage, all payments shall be made by Mortgagor to Mortgagee by good unendorsed check drawn in U.S. dollars on a New York banking institution which is a member of the New York Clearing House, and received by Mortgagee at its offices at or before 1:00 p.m. on a Banking Day, at the address of Mortgagee specified at the beginning of this Mortgage or furnished pursuant to the provisions of Paragraph 27.

3.    Payment of Impositions, Insurance Premiums, Transfer Taxes

(a) It shall be the obligation of Mortgagor to pay all Impositions and Insurance Premiums when due. Notwithstanding that by law any Imposition may at the option of the taxpayer be paid in installments, then except if and to the extent that Mortgagor is making Deposits under Paragraph 4 specifically allocated for such Imposition, the same shall not be paid in installments, but shall be paid by Mortgagor in full in one lump sum on the date such Imposition first becomes payable. All such payments of Impositions and Insurance Premiums shall be paid by Mortgagor by check, and Mortgagor shall obtain a receipt for payment. Mortgagor shall furnish to Mortgagee, within 10 days upon request, a copy of the bill for the Imposition or Insurance Premium, the check, and the receipt for payment. Mortgagor shall be deemed to have made payment of any item of Impositions or Insurance Premiums if Mortgagor (i) has made a Deposit under Paragraph 4 specifically allocated for such item of Impositions or Insurance Premiums, (ii) has delivered to Mortgagee a copy of the bill for such item of Impositions or Insurance Premiums no less than thirty (30) days' prior to the due date of any such Imposition or Insurance Premiums, as the case may be, (iii) has timely made all Deposits for any purpose which may be required or demanded by Mortgagee under Paragraph 4, and (iv) no event of default under this Mortgage has occurred and is continuing beyond any cure period provided in this Mortgage for such event of default. It shall be the express obligation of Mortgagor to obtain bills for all Impositions and

Insurance Premiums from the appropriate taxing authorities or insurance broker or company, as the case may be, and forward copies of such bills to Mortgagee no less than thirty (30) days' prior to the due date of any such Imposition or Insurance Premium. In the event Mortgagor pays directly any item of Imposition or Insurance Premiums, and Mortgagee makes payment of the same item from Deposits, it shall be Mortgagor's obligation to apply for any refund which may be due, and Mortgagee shall not have any obligation to apply for such refund or have any liability with respect to the double payment.

(b) It shall be the obligation of Mortgagor to pay all Transfer Taxes when due. Notwithstanding that by law any Transfer Tax may at the option of the taxpayer be paid in installments, the same shall not be paid in installments, but shall be paid by Mortgagor in full in one lump sum on the date such Transfer Tax first becomes payable. All such Transfer Taxes shall be paid by Mortgagor by unendorsed certified check of Mortgagor or unendorsed bank check, drawn in U.S. dollars on a New York banking institution which is a member of the New York Clearing House, made payable directly to the taxing authority, title company, or Mortgagee, as Mortgagee shall direct. If at any time notice is given by any taxing authority having jurisdiction that any additional mortgage tax is due on this Mortgage by reason of any Additional Payments which may become due and be secured by this Mortgage, Mortgagor shall pay such additional mortgage tax by not later than the date specified for payment in the notice from the taxing authority, or if no such date is specified, within 10 days after the date of such notice. If Mortgagor fails to pay such additional mortgage tax by such date, then Mortgagee at its option may pay any such additional mortgage tax, interest and penalties (even if a foreclosure, bankruptcy or insolvency proceeding shall have been commenced), and the amount so paid by Mortgagee shall become immediately due and payable to Mortgagee as an Additional Payment, shall be secured by this Mortgage, and shall be recoverable as part of the indebtedness secured by this Mortgage in any foreclosure, bankruptcy or insolvency proceeding.

(c) Mortgagor shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceeding diligently conducted in good faith, but only after Mortgagor has either paid such Imposition in full, or made a Deposit under Paragraph 4 specifically allocated for such Imposition, and only if Mortgagor has timely made all Deposits for any purpose which may he required or demanded by Mortgagee under Paragraph 4. Mortgagee shall be entitled to apply Deposits to the payment of such Imposition when due even though Mortgagor may be contesting such Imposition.

4.    Deposits for Impositions, Insurance Premiums, Etc.

(a) In order to more fully protect the security of this Mortgage, to insure the payment of Impositions and Insurance Premiums, and as further security for the indebtedness and other obligations secured hereby, Mortgagor shall deposit funds with Mortgagee as follows:

(i)    Mortgagor shall deposit with Mortgagee, on the first day of each and every calendar month during the term of this Mortgage, an amount, calculated as provided in this paragraph, for the payment of Impositions and Insurance Premiums. The amount of the deposit due on the first day of any calendar month shall be one-twelfth of 110% of the amount of the total payments for Impositions and Insurance Premiums which shall be due at any time during the twelve month period which begins on the first day of the following month (the "Deposit Calculation Period"). For purposes of computing the deposit, "total payments for Impositions and Insurance Premiums" as used in the preceding sentence, shall mean for each item of Impositions or Insurance Premiums, the amount estimated by Mortgagee to be necessary to pay each such item which becomes due during the Deposit Calculation Period. There shall be included in the amount due in any Deposit Calculation Period any increases in or supplemental payments of Impositions or Insurance Premiums made with respect to any previous year. It is the intention of Mortgagor and Mortgagee that on a date one month prior to the due date of any Imposition or Insurance Premium, Mortgagee shall have on hand Deposits specifically allocated to such item in an amount equal to 110% of the amount of such item due on the due date thereof. The amount of the deposit which would be due on the first day of the calendar month following the date of this Mortgage shall be due instead on the date of this Mortgage.

(ii)     If at any time Mortgagee shall not have Deposits on hand equal to the amounts computed in accordance with subparagraph (i) above (based on Mortgagee's latest estimate of the total payments for Impositions and Insurance Premiums due during a Deposit Calculation Period), Mortgagor shall deposit additional funds, within ten days after demand, in order to bring the Deposits on hand up to the amount as so computed.

(iii)     In the event Mortgagor maintains any insurance required under this Mortgage under a blanket policy, then if Mortgagor submits to Mortgagee proof reasonably satisfactory to Mortgagee that Mortgagor has paid, under such blanket policy, the Insurance Premiums for the insurance provided by such blanket policy, and if Mortgagor has made all Deposits for any purpose which may be required or demanded by Mortgagee hereunder and is not overdue (without regard to cure periods) in the payment of any Debt Service or Additional Payments due under this Mortgage, then Mortgagee shall refund to Mortgagor the amount of Deposits made with respect to the Insurance Premiums which Mortgagor has so paid under such blanket policy.

(iv)     Mortgagor shall pay to Mortgagee a sum equal to $15 for each check paid from the Deposits held by Mortgagee hereunder and $50.00 for each bank or certified check paid from the Deposits held by Mortgagee hereunder. Mortgagee shall deduct such amount from the Deposits.

(b) Mortgagee, at its option, and without notice to Mortgagor, may use the Deposits for one item of Impositions or Insurance Premiums for the payment of another, or for the payment of any amount of Debt Service which is not paid within any applicable grace period after the due date, or for the payment of any Additional Payments which are not paid on the date when due (without regard to grace periods), or for the payment of any Transfer Taxes or other amounts which Mortgagor may be required to pay to any party other than Mortgagee and which is not paid on the date when due. It is the intention of Mortgagee and Mortgagor that Mortgagee have the broadest possible power in applying Deposits, and the language of this Paragraph 4 should be interpreted as broadly as possible to permit any application of Deposits which Mortgagee may seek to make. Mortgagor grants to Mortgagee a security interest in Deposits as additional security for the obligations secured by this Mortgage, provided that such security interest shall not prevent the application of Deposits by Mortgagee in accordance with this Paragraph 4.

(c) Deposits shall bear no interest. Mortgagee shall be entitled to make payment from Deposits of any Imposition for a fiscal year of the taxing authority in one lump sum, even if such payment would thereby be made prior to the date when due. Mortgagee shall not be liable or accountable for any Deposits paid over to the appropriate taxing authority, insurance company or broker, as the case may be.

(d) Upon an assignment of this Mortgage by any Mortgagee, such Mortgagee shall have the right to pay over the balance of Deposits in its possession to the assignee, and in the event Mortgagee does so pay over such balance, such Mortgagee shall thereupon be completely released from all liability with respect to Deposits and Mortgagor shall look solely to the assignee or transferee in reference thereto. This provision shall apply to each and every transfer of such Deposits to a new assignee.

5.     Insurance

(a) Mortgagor shall, for the benefit of Mortgagee, keep the Improvements and Equipment insured under an all-risk policy, and such other hazards as Mortgagee in its reasonable discretion may notify Mortgagor to provide, and shall also provide such comprehensive general liability insurance, loss of rent insurance, boiler and machinery insurance, workers compensation insurance, disability insurance and other kinds of insurance, as Mortgagee in its reasonable discretion may notify Mortgagor to provide. All amounts and scope of coverage of all such policies, and the insurers with whom such policies are carried, shall be such as Mortgagee may specify in its reasonable discretion, and shall be increased by Mortgagor at such times and to such amounts and scope as Mortgagee may specify in its reasonable discretion.

(b) In the event of loss or claim of liability, Mortgagor will give immediate notice thereof to Mortgagee. Mortgagor shall obtain the written consent of Mortgagee, which consent shall not be unreasonably withheld or delayed, to the adjustment with insurance carriers of all losses or liability of any kind. The selection of the insurance adjuster shall be made by Mortgagor subject to the approval of Mortgagee, which shall not be unreasonably withheld or delayed. Notwithstanding anything herein contained to the contrary, Mortgagee may, but shall not be required to, make proof of loss to the insurance carrier. Mortgagor hereby appoints Mortgagee, irrevocably, as Mortgagor's attorney-in-fact, to endorse any draft for any payment under any insurance policy which is made payable to Mortgagor or to Mortgagor and Mortgagee jointly.

(c) The following requirements shall apply to the policies of insurance which Mortgagor is required to provide pursuant to Paragraph 5(a):

(i)        the aggregate deductible applicable to property insured thereunder shall not be in excess of $10,000, and there shall be no deductible applicable to any other type of loss or liability insured thereunder;

(ii)        all policies applicable to property shall provide for 100% replacement cost coverage without offset for depreciation;

(iii)        all property and rental value insurance shall be provided in an amount sufficient to prevent co-insurance;

(iv)        except for workers' compensation insurance, all policies shall name Mortgagor and Mortgagee as insured as their respective interests may appear;

(v)        except for workers' compensation and public liability insurance, all policies shall contain a standard New York form of non-contributory mortgagee clause and lender's loss payable endorsement in favor of Mortgagee;

(vi)        each policy of insurance shall include effective waivers by the insurer of all claims for insurance premiums against Mortgagee;

(vii)        each policy of insurance shall provide that any loss shall be payable to Mortgagee notwithstanding (A) any act, failure to act or negligence of or violation of any warranty, declaration or condition contained in any such policy by any named insured, (B) the occupation or use of the Mortgaged Property for purposes more hazardous than permitted by the terms of such policy, (C) any foreclosure or other action or proceeding taken by Mortgagee or any other holder of a mortgage on the Mortgaged Property pursuant to any provision of the Mortgage or such other mortgage, or (D) any change in title to or ownership of the Mortgaged Property or any portion thereof;

(viii)        each policy of insurance shall provide an endorsement that 30 days advance written notice of any cancellation, expiration, non-renewal or material change affecting the interest of Mortgagee shall be sent to Mortgagee in the manner provided in this Mortgage for notices;

(ix)        no policy of insurance of any kind shall provide for installment payments more frequently than annually;

(x)        each insurance company issuing any such policy of insurance shall (A) be organized and existing under the laws of one of the states of the United States and shall be licensed to do business as an insurance company, and authorized to issue the type of insurance policy it is issuing with respect to the Mortgaged Property, in the State of New York, (B) have a Best's rating of at least A-, VIII, and (C) be satisfactory to Mortgagee in its reasonable discretion;

(xi)        where any insurance is provided under a blanket policy, the policy shall contain an endorsement specifying the amount of the total coverage of such policy that is allocated to the Mortgaged Property and which will be payable notwithstanding the amount of

any losses with respect to any other properties which may be covered under such blanket policy; and

(xii)     each policy of insurance shall be satisfactory in all other respects to Mortgagee in its reasonable discretion.

(d) Mortgagor shall deliver to Mortgagee on the date of execution of this Mortgage Evidence of Insurance (Acord Form 27) for the insurance coverage to be provided by all policies of insurance called for pursuant to this Paragraph 5 other than general public liability insurance, and Certificate of Insurance (Acord Form 25s) for all general public liability insurance. All of the actual policies (or certified copies where coverage is provided by a blanket insurance policy) shall be delivered to Mortgagee within thirty days following the commencement of the term of this Mortgage. Mortgagor shall furnish to Mortgagee, no less than thirty days prior to the expiration of any insurance policy, Evidence of Insurance (Acord Form 27) and Certificate of Insurance (Acord Form 25s), in form satisfactory to Mortgagee, extending such insurance or providing new insurance to replace the same, and shall deliver the new insurance policy (or certified copies where coverage is provided by a blanket insurance policy) to Mortgagee within thirty days after the expiration of the old policy. Mortgagor shall pay to Mortgagee, immediately upon demand, a service fee of $100 each time that Mortgagee receives a notice of cancellation and/or notice of non-renewal of any insurance policy. Mortgagee, at its election, may deduct this charge from the Deposits.

6.     Damage or Destruction; Application of Insurance Proceeds

(a) If the Improvements or Equipment on the date of this Mortgage or thereafter erected or acquired shall be damaged or destroyed in whole or in part by any cause, Mortgagor shall give to Mortgagee immediate notice thereof, and Mortgagor, at its own cost and expense, whether or not insurance proceeds, if any, shall be sufficient or shall be made available for the purpose, shall promptly repair, replace and rebuild the same, as nearly as possible to the character and quality of the Improvements and the Equipment therein existing immediately prior to such occurrence. Mortgagee shall in no event be called upon to repair, replace or rebuild any such Improvements or Equipment, nor to pay any of the costs or expenses thereof. The work of repairing, replacing or rebuilding (which shall be deemed to include the preparation of plans where necessary) such damaged or destroyed Improvements or Equipment shall be commenced as soon as reasonably possible but in any event within 90 days from the date of any such damage or destruction, and after commencement thereof shall be expeditiously proceeded with to completion; provided that if the work of repairing, replacing or rebuilding cannot, in the exercise of diligence, be feasibly commenced within 90 days, then Mortgagor's time to commence such work shall be extended for such period of time as is reasonable and appropriate and during which Mortgagor is proceeding diligently and expeditiously. In the event any damage or destruction results in a condition dangerous to persons or property, or which is causing continued damage to the Premises or Equipment or any part thereof, the work of repairing, replacing or rebuilding shall be commenced promptly so as to remove such dangerous or damaging condition. The quality of the repairs, replacement or rebuilding shall be subject to Mortgagee's review and approval, and Mortgagor shall be deemed not to have completed the repairs, replacement or rebuilding as required by this paragraph, if Mortgagee shall have reasonably disapproved the quality thereof.

(b) (i)     In the event insurance proceeds received under any insurance policy required to be maintained by Mortgagor are less than 10% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee, such proceeds shall be made available by Mortgagee for application to the cost of repair, replacement or rebuilding, in accordance with the provisions of Paragraph 6(c) below. In the event the amount of such insurance proceeds are 10% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee or greater but less than 75% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee, then notwithstanding the provisions of Subdivision 4 of Section 254 of the New York Real Property Law, Mortgagee may, at its option and in its absolute discretion, apply all amounts recovered under any insurance policy required to be maintained by Mortgagor in any one or more of the following ways: (A) in reduction of the outstanding principal balance of this Mortgage,

regardless of whether part or all of such balance shall then be matured or not; (B) in payment of any other monetary obligation of Mortgagor under this Mortgage, or to fulfill any of the covenants of Mortgagor provided herein; or (C) to be released to Mortgagor for application to the cost of repair, replacement or rebuilding, in accordance with the provisions of Paragraph 6(c) below. However, in the event Mortgagor has not commenced the work of repairing, replacing or rebuilding within the time required under Paragraph 6(a), or in the event such work is not prosecuted diligently and expeditiously to completion, as Mortgagee shall determine in its sole discretion, then notwithstanding that Mortgagee otherwise may be required or have elected under the provisions of this Paragraph 6(b)(i) to make insurance proceeds available to Mortgagor for application to the cost of repair, replacement or rebuilding, Mortgagee at its option may elect to apply insurance proceeds instead in reduction of the outstanding principal balance of this Mortgage, and in payment of any other monetary obligation of Mortgagor under this Mortgage, and may elect to declare the entire remaining principal balance of this Mortgage and all other amounts due under this Mortgage to be immediately due and payable.

        (ii)      In the event the amount of such insurance proceeds is equal to or greater than 75% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee, then notwithstanding the provisions of Subdivision 4 of Section 254 of the New York Real Property Law, such proceeds shall be applied in reduction of the outstanding principal balance of this Mortgage, and in payment of any other monetary obligation of Mortgagor under this Mortgage, and the entire remaining principal balance of this Mortgage and all other amounts due under this Mortgage shall be immediately due and payable without notice.

      (c) In the event Mortgagee elects or is required pursuant to Paragraph 6(b) to make available insurance proceeds received and held by Mortgagee under insurance policies, for the purpose of paying towards the cost of repairs, replacement or rebuilding which Mortgagor is required to perform pursuant to Paragraph 6(a), such insurance proceeds shall be made available only in accordance with the following provisions:

        (i)      Net insurance proceeds (which shall mean net of all "Mortgagee's expenses" (as hereinafter defined)), shall be made available for payment to the parties to whom Mortgagor may employ to perform the necessary repairs, replacement or rebuilding, as such repairs, replacement or rebuilding shall progress, or to Mortgagor as Mortgagor shall pay for such repairs, replacement or rebuilding, upon the presentation to Mortgagee of a certificate of the architect in charge of such work (or if an architect is not required, the contractor in charge of such work) certifying to the satisfactory completion of the work. Such certificate shall be accompanied (as a condition to payment) by invoices for the work from the contractor (if payment is to be made directly to the contractor), or a paid receipted invoice for the work (if payment is to be made to the Mortgagor), together with copies of paid receipted invoices not previously provided to Mortgagee with respect to any prior work for which Mortgagee shall have advanced payment from net insurance proceeds.

        (ii)      The disbursement of such net insurance proceeds received by Mortgagee shall be made under a schedule of payments to be prepared by Mortgagor and approved by Mortgagee, subject to the provisions of clause (vi) below in the event insurance proceeds held by Mortgagee at any time are insufficient. However, Mortgagee may withhold from each amount so to be paid by Mortgagee 10% thereof until the work of repairing, replacing or rebuilding shall have been completed, and reasonable proof shall have been furnished to Mortgagee that no lien or liability has attached or may attach to the Mortgaged Property or any part thereof or to Mortgagee in connection with such repairs, replacement or rebuilding.

        (iii)      Mortgagor shall furnish to Mortgagee a list of the name, address and telephone number of each contractor and subcontractor who may perform any work, or furnish any materials or services, in connection with the repairs, replacement or rebuilding, and shall update such list promptly after any change in the information contained therein.

        (iv)      As used herein, "Mortgagee's expenses" shall mean all reasonable costs, expenses (including fees and other charges provided under this Mortgage) and reasonable attorneys fees and disbursements incurred by Mortgagee in the adjustment, collection or

disbursement of the insurance proceeds, or in any way arising out of the repairs, replacement or rebuilding. Mortgagee may, at any time and from time to time in its reasonable discretion, have an inspection made of the Premises by its representative as such repair, replacement and rebuilding progresses, and Mortgagor shall pay to Mortgagee a fee of $750.00 for each such inspection, such fee to be deemed part of "Mortgagee's expenses".

(v)     If in the course of such work any mechanic's or other lien or order for the payment of money shall be filed against the Mortgaged Property or any part thereof or against Mortgagee or Mortgagor, or if there shall be any overdue payment (without regard to cure periods) of any Debt Service, Additional Payment or Deposits due under this Mortgage, Mortgagee shall not be obligated to make any payment of such insurance proceeds until and unless such lien or order shall have been fully bonded, satisfied, canceled or discharged of record, and until such overdue payment of Debt Service, Additional Payment or Deposits shall have been paid.

(vi)     If the amount of such net insurance proceeds received and held by Mortgagee, shall be insufficient at any time (whether at the commencement of the work or at any time during the work), as Mortgagee shall determine in its sole discretion, for the proper and effective repair, replacement or rebuilding of such damaged or destroyed Improvements or Equipment in accordance with Paragraph 6(a), then Mortgagor shall pay all additional sums required for such repair, replacement or rebuilding, and no disbursements of net insurance proceeds held by Mortgagee shall be made until the remaining total undisbursed net insurance proceeds held by Mortgagee is at least equal to the estimated remaining unpaid cost of such repair, replacement or rebuilding. If the amount of such net insurance proceeds held by Mortgagee shall be in excess of the portion of the cost of such repairs, replacement and rebuilding required to be paid from such proceeds as provided in this Paragraph 6 (c), the excess shall be paid to and retained by Mortgagee in reduction of the outstanding principal of this Mortgage.

(vii)     An architect shall be required for all such repairs, replacement or rebuilding, except with respect to damage of less than $50,000 which does not involve any structural work, and such architect shall certify to the proper completion thereof in compliance with applicable codes and regulations. The selection of such architect shall be subject to the prior written approval of Mortgagee, not to be unreasonably withheld or delayed.

7.     Condemnation

(a) If any portion of the Premises shall be taken or condemned by any competent authority by the exercise of any right of eminent domain or in condemnation proceedings, or if the grade of any street upon which the Premises abut shall be changed by governmental action, the entire award or the aggregate of any separate awards shall be paid to Mortgagee to the extent of an amount equal to all outstanding principal under this Mortgage, all accrued and unpaid interest and all Additional Payments which may be due under this Mortgage. Mortgagor shall have no right, title, interest, claim or demand whatsoever of, in or to any portion of such award which is due to Mortgagee as provided in the preceding sentence. Mortgagor hereby assigns to Mortgagee, as collateral security and subject to subparagraphs (c) and (d) below, all of its right, title and interest in and to any such award or awards to the extent of such amount due to Mortgagee.

(b) In the case of a taking or condemnation of the whole or materially all of the Premises, Mortgagor shall continue to pay Debt Service, Additional Payments and Deposits hereunder until title shall vest and thereafter until the award is paid in connection with such taking or condemnation. In the case of a taking or condemnation of only a portion of the Premises, or if there is a change of grade of a street, there shall be no reduction or change of Additional Payments, Deposits, or the rate of Debt Service.

(c) (i)     In the event proceeds paid to Mortgagee pursuant to Paragraph 7(a) are less than $20,000, such proceeds shall be made available by Mortgagee for application to the cost of restoration and repair, in accordance with the provisions of Paragraph 7(d) below. In the event

the amount of such proceeds is $20,000 or greater but less than 75% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee, then notwithstanding any provision of applicable law, Mortgagee may, at its option and in its absolute discretion, apply proceeds paid to it pursuant to Paragraph 7(a) in any one or more of the following ways: (A) in reduction of the outstanding principal balance of this Mortgage, regardless of whether part or all of such balance shall then be matured or not; (B) in payment of any other monetary obligation of Mortgagor under this Mortgage, or to fulfill any of the covenants of Mortgagor provided herein; or (C) to be released to Mortgagor for application to the cost of restoration or repair, in accordance with the provisions of Paragraph 7(d) below. However, in the event Mortgagor has not commenced the work of restoration and repair within the time required under Paragraph 6(a), or in the event such work is not prosecuted diligently and expeditiously to completion, as Mortgagee shall determine in its sole discretion, then notwithstanding that Mortgagee otherwise may be required or have elected under the provisions of this Paragraph 7(c)(i) to make proceeds available to Mortgagor for application to the cost of restoration and repair, Mortgagee at its option may elect to apply such proceeds instead in reduction of the outstanding principal balance of this Mortgage, and in payment of any other monetary obligation of Mortgagor under this Mortgage, and may elect to declare the entire remaining principal balance of this Mortgage and all other amounts due under the Note and Mortgage to be immediately due and payable.

(ii)     In the event the amount of such proceeds is equal to or greater than 75% of the outstanding principal balance of this Mortgage on the date such proceeds are received by Mortgagee, then notwithstanding any provision of applicable law, such proceeds shall be applied in reduction of the outstanding principal balance of this Mortgage, and in payment of any other monetary obligation of Mortgagor under this Mortgage, and the entire remaining principal balance of this Mortgage and all other amounts due under this Mortgage shall be immediately due and payable without notice.

(d) If a partial taking or condemnation results in damage to any of the Improvements, Mortgagor shall restore and repair the damage to the Improvements. If the portion of the award payable to Mortgagor, if any (after Mortgagee has received the portion to which it is entitled pursuant to subparagraph (a)), is insufficient to restore and repair such damage, then such portion of the award which is paid to Mortgagee and which Mortgagee elects or is required pursuant to Paragraph 7 (c) to make available for such restoration or repair, shall be made available in the same manner, and under the same terms and conditions, as insurance proceeds may be made available for repairs, replacement or rebuilding pursuant to the provisions of Paragraph 6(c). All such restoration and repair work shall be done within the time periods, and shall be of the quality subject to Mortgagee's approval, provided for repair, replacement or rebuilding pursuant to Paragraph 6(a).

(e) In case of any governmental action, not resulting in the taking or condemnation of any portion of the Premises but creating a right to compensation therefor, such compensation shall be payable to Mortgagee to the extent of an amount equal to all outstanding principal under this Mortgage, all accrued and unpaid interest, and all Additional Payments which may be due under this Mortgage, such amounts to be applied by Mortgagee in payment of such principal, interest and Additional Payments.

(f) For purposes of this Paragraph 7, a taking of "materially all" of the Premises, as distinguished from a taking of a "portion" of the Premises, shall mean a taking of such scope that the portion of the Premises not so taken is insufficient to permit Improvements on the Premises not so taken to be restored and repaired so as to constitute a complete tenantable, rentable building.

8.     Maintenance and Repair

(a) Mortgagor, at its sole cost and expense, will take good care of the Premises, will keep the same in good order and condition, and make all necessary maintenance and repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, and unforeseen and foreseen (including any repairs required as a result of any casualty loss). When used in this

Paragraph 8, the terms "repairs" and "maintenance" shall include all necessary replacements, renewals, alterations, additions and betterments, and all such repairs and maintenance shall be completed with first class materials and workmanship, and be of a quality appropriate to the Premises and other comparable buildings in the immediate vicinity, and in all events shall be at least equal in quality and class to the original work. Mortgagor will do or cause others to do all necessary shoring of foundations and walls of the Improvements and every other act or thing for the safety and preservation thereof which may be necessary by reason of any excavation or other building operations upon any adjoining property or street, alley or passageway. Mortgagor shall also make all necessary repairs and restorations, and maintain in good and clean condition, the sidewalks, curbs and vaults on or adjoining the Premises.

(b) Mortgagor shall promptly do any maintenance or repair to the Premises, reasonably necessary to maintain the Premises in accordance with the standards set forth in subparagraph (a) above, which Mortgagee may request. All maintenance and repair work to be performed by Mortgagor hereunder shall be commenced by Mortgagor promptly after notice from Mortgagee, and shall be pursued diligently to completion, but in all cases shall be completed within 3 months after such notice or such longer period to which Mortgagee may consent, such consent not to be unreasonably withheld if the extension is reasonably necessary to complete the maintenance and repair work.

(c) An architect shall be required for all maintenance and repair work which costs $50,000 or more, or which involves structural work, and such architect shall certify to the proper completion thereof in compliance with applicable codes and regulations. The selection of such architect shall be subject to the prior written approval of Mortgagee, not to be unreasonably withheld or delayed.

9.    Compliance with Laws, Ordinances; Environmental Matters

(a) Mortgagor, at its sole cost and expense, will promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all governments and federal, state and municipal agencies, all covenants, restrictions, easements and other matters affecting title, and all present or future orders, rules and regulations of the National Board of Fire Underwriters or any other body exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary, which now or hereafter may be applicable to the Mortgaged Property or any part thereof and the sidewalks, curbs and vaults, if any, on or adjoining the Premises, or which may be applicable to the use or manner of use of the Mortgaged Property or any part thereof, or to the owners, tenants or occupants thereof, whether or not such law, ordinance, rule, regulation or requirement shall necessitate structural changes or improvements or interfere with the use and enjoyment of the Mortgaged Property. Mortgagor shall at all times have a proper, current certificate of operation for the heating system, and any garbage disposal, compactor or incinerator, on the Premises, and shall have a proper up to date certificate of occupancy for the Improvements (if required by law). Mortgagor shall likewise observe and comply with the requirements of all policies of insurance at any time in force with respect to the Mortgaged Property. Mortgagor shall obtain any and all permits which may be required with respect to any construction, repair or other work on the Premises, prior to the commencement of such work, and copies of all such permits shall be submitted to Mortgagee promptly upon receipt by Mortgagor.

(b) Mortgagee may at its option, and at Mortgagor's expense, not more than once each year, procure through a service agency tax, water, sewer rental charges, assessment, and/or state, county or municipal departmental searches (including fire, air resources, housing and building maintenance, highway and any and all other departments having jurisdiction) on the Premises. Mortgagor hereby grants to Mortgagee authority to act in its name, and for this purpose appoints Mortgagee, or any person so authorized by Mortgagee, as its attorney in fact (which power of attorney is coupled with an interest and is irrevocable and shall, to the extent permitted by law, survive any death, dissolution or legal incapacity of Mortgagor), for the purpose of accessing records of any federal, state or municipal government or agency relating to the Mortgaged Property. Mortgagor further agrees that, within ten days after request by Mortgagee, Mortgagor will execute such written authorization as Mortgagee may request for the purpose of permitting Mortgagee to access any such records.

(c) No Improvement shall be altered, removed, or demolished without the prior written consent of the Mortgagee, which consent Mortgagee may withhold in its absolute discretion, or may give upon such conditions as Mortgagee may impose in its absolute discretion. Notwithstanding the foregoing, Mortgagor may make non-structural alterations to the Premises that would not tend to decrease the value of the Mortgaged Property. All alterations permitted under this subparagraph (c) or under any other provision of this Mortgage shall be performed in a first class workmanlike manner using first class materials, and otherwise of a quality appropriate to the Premises and other comparable buildings in the immediate vicinity, and in all events, at least equal in quality and class to the original work.

(d) All lease securities (if any) of tenants of the Premises shall be treated as trust funds not to be commingled with any other funds of the Mortgagor and all such lease securities, and interest, if any, earned thereon, shall at all times be maintained, deposited and disposed of strictly in accordance with applicable legal requirements. Mortgagor shall on demand, but not more than twice in any calendar year, furnish to Mortgagee satisfactory evidence of compliance with this provision together with a verified statement of all lease securities deposited by the tenants and copies of all leases in its possession or control (provided that if Mortgagor is a cooperative corporation, it shall obtain and furnish to Mortgagee copies of all proprietary leases, even if not in its possession at the time requested).

(e) Without limiting the generality of any of the foregoing provisions of this Paragraph 9, Mortgagor, at its sole cost and expense, will prepare and file by the applicable due date all reports or forms which now or at any time in the future may be required to be prepared and/or filed with any federal, state or municipal government or agency, including without limitation the annual RPIE and DHCR filings for the Mortgaged Property, and it shall be an event of default under this Mortgage in the event it fails to prepare and file with the appropriate governmental agencies any such reports or forms on or before the date due. Mortgagor, at its sole cost and expense, shall furnish to Mortgagee a copy of the annual RPIE and DHCR filings promptly upon making such filing, as well as any other reports or forms which Mortgagee may request, such copies to be date stamped or the receipt of which otherwise acknowledged by the agency with which such reports or forms are filed.

(f) (i) As used in this subparagraph (f), "Hazardous Substances" shall mean and include those elements or compounds which are contained in the list of hazardous substances adopted from time to time by the United States Environmental Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), or which are on any list of toxic or polluting materials designated by Congress, the EPA or DEC, or which are defined as hazardous, toxic, pollutant, infectious or radioactive by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic, polluting, infectious, radioactive or other dangerous waste, substance or material, as now or at any time hereafter in effect (the "Hazardous Substance Laws").

(ii) Mortgagor covenants and agrees that (A) Mortgagor shall comply with, and insure compliance by all other parties with, all applicable Hazardous Substance Laws relating to or affecting the Mortgaged Property, and Mortgagor shall keep the Mortgaged Property free and clear of any liens imposed pursuant to any applicable Hazardous Substance Laws, all at Mortgagor's sole cost and expense; and (B) Mortgagor will at all time obtain and/or maintain all licenses, permits and/or other governmental or regulatory authorizations and approvals necessary to comply with applicable Hazardous Substance Laws relating to or affecting the Mortgaged Property or Mortgagor's use of the Mortgaged Property (the "Permits"), and Mortgagor will at all times be and remain in full compliance with the terms and provisions of the Permits.

(iii) Mortgagor hereby agrees to indemnify Mortgagee and hold Mortgagee harmless from and against any and all losses, liabilities (including strict liability), damages, injuries, expenses (including reasonable attorney's fees and disbursements), costs of any settlement or judgment and claims of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Mortgagee by any person or entity or governmental agency for, with

respect to, or as a result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, discharging or release from, the Mortgaged Property of any Hazardous Substance including, without limitation, any losses, liabilities (including strict liability), damages, injuries, expenses (including attorneys fees and disbursements), costs of any settlement or judgment or claims, asserted or arising under the Comprehensive Environmental Response, Compensation and Liability Act, any so called federal, state or local "Superfund" or "Superlien" laws, and any statute law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability, including strict liability, or standards of conduct concerning any Hazardous Substance, whether or not caused by or within the control of Mortgagor.

(iv)     If Mortgagor receives any notice of (A) the happening of any event involving the use (other than any Hazardous Substances in customary quantities appropriate for an apartment building), spill, release, leak, seepage, discharge or cleanup of any Hazardous Substance on the Mortgaged Property or in connection with Mortgagor's operations thereon or (B) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental, health or safety matter affecting Mortgagor (an "Environmental Complaint") from any person or entity (including without limitation the EPA or DEC), then Mortgagor shall immediately notify Mortgagee in writing of said notice.

(v)     Mortgagee shall have the right but not the obligation, at its sole discretion, and without limitation of Mortgagee's rights under this Mortgage, to enter onto the Mortgaged Property or to take such other actions as it deems necessary or advisable, including the appointment of a receiver of the Mortgaged Property, to cleanup, remove, resolve or minimize the impact of, or otherwise deal with any such Hazardous Substance or Environmental Complaint following receipt of any notice from any person or entity (including without limitation the EPA or DEC) asserting the existence of any Hazardous Substance or an Environmental Complaint pertaining to the Mortgaged Property or any part thereof which, if true, could result in an order, suit, lien or other action against Mortgagor and/or which, in the sole opinion of Mortgagee, could impair Mortgagee's security under this Mortgage. All costs and expenses incurred by Mortgagee in the exercise of any such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand.

(vi)     Mortgagee shall have the right to require Mortgagor to perform at Mortgagor's expense (but not more frequently than once in any 18 month period), an environmental audit and/or an environmental risk assessment of the Premises. However, if an event of default shall have occurred and be continuing under this Mortgage, then Mortgagee shall have the right to require Mortgagor to perform at Mortgagor's expense, such environmental audits and/or environmental risk assessments, without limitation on frequency, as Mortgagee may request in its absolute discretion. Promptly upon receipt of the report of any such audit or assessment, Mortgagor shall perform such remediation and make such changes in its hazardous waste management practice at the Premises as may be recommended in such report. Such audit and/or risk assessment must be performed by an environmental consultant satisfactory to Mortgagee in its absolute discretion. If Mortgagor fails to perform any such environmental audit or risk assessment within thirty (30) days of Mortgagee's written request, Mortgagee shall have the right but not the obligation to retain an environmental consultant to perform any such environmental audit or risk assessment. All costs and expenses incurred by Mortgagee in the exercise of such rights, together with interest thereon at the Default Rate, shall be secured by this Mortgage and shall be payable to Mortgagee upon demand.

(vii)     Any breach of any warranty or representation or any breach of any covenant contained in this subparagraph 9(f) shall be an event of default under this Mortgage, and shall entitle Mortgagee, without any further notice or grace period, to exercise any and all remedies provided for default in this Mortgage, or otherwise permitted by law.

(viii)     The provisions of this subparagraph 9(f) shall survive any foreclosure or the enforcement hereof, and the provisions of clause (iii) of this subparagraph 9(f) shall survive the payment of all amounts due under this Mortgage.

(g) Mortgagor represents and warrants to Mortgagee as follows: (i) no portion of the funds or proceeds which Mortgagor used to acquire the Mortgaged Property was obtained, directly or indirectly, from an illegal transaction or activity; (ii) Mortgagor has not used and shall not use or permit the Mortgaged Property or any portion thereof to be used for or in furtherance of any illegal purpose or activity, including, without limitation, any purpose or activity which would subject the Mortgaged Property (or any portion thereof) to the risk of seizure by or forfeiture to any governmental entity pursuant to any federal, state or local law; (iii) to Mortgagor's best knowledge, the funds or proceeds used by Mortgagor's immediate and remote predecessors in title to acquire the Mortgaged Property were not obtained, directly or indirectly, in whole or in part, from an illegal transaction or activity, and the Mortgaged Property has never been used by any person in connection with or in furtherance of any illegal purpose, activity or crime; and (iv) neither Mortgagor nor any disclosed or undisclosed principal of Mortgagor has been investigated with respect to, indicted for or otherwise formally charged with, or convicted of, any gambling offense, any violation of the federal narcotics laws, RICO or any crime which may subject Mortgagor's property (including, without limitation, the Mortgaged Property) to the risk of seizure by or forfeiture to any governmental entity pursuant to any federal, state or local law. Mortgagor shall deliver to Mortgagee immediately upon receipt, any notice, indictment, order, judgment or other communication relating to any pending or threatened action or proceeding in which Mortgagor's property or any part thereof (including, without limitation, the Mortgaged Property) may be subject to the risk of forfeiture to any federal, state or local government entity. Each of the following shall be an event of default, entitling Mortgagee to exercise all of its remedies for default without notice or cure period: (x) if any representation or warranty set forth above shall be untrue when made or shall subsequently become untrue; (y) the institution or threatened institution by a governmental entity (including the receipt of any notice or other communication by Mortgagor or Mortgagee from a governmental entity) of any action or proceeding seeking the forfeiture of the Mortgaged Property or any part thereof; and (z) the indictment of or the filing of formal charges by a governmental entity against, or the conviction of, Mortgagor or any disclosed or undisclosed principal of Mortgagor, or the admission by Mortgagor or any disclosed or undisclosed principal of Mortgagor that it has engaged in any crime or activity prohibited by any law which may subject the property of Mortgagor or such principal to the risk of forfeiture or seizure, including, without limitation, gambling, narcotics laws and RICO.

10.     Mortgagee's Right to Perform

(a) If Mortgagor shall at any time fail to pay any Imposition or Transfer Taxes in accordance with the provisions hereof, or to take out, pay for, maintain or deliver as and when required under this Mortgage any of the insurance policies provided for herein, or shall fail to make any other payment or perform any other act on its part to be made or performed as and when required under this Mortgage, then Mortgagee, upon five days notice to Mortgagor (except in the case of an emergency creating a risk of immediate harm to persons or property, in which case without notice) and without waiving or releasing Mortgagor from any obligation of Mortgagor contained in this Mortgage, may (but shall be under no obligation to): (i) pay any Imposition or Transfer Taxes payable by Mortgagor pursuant to the provisions hereof; or (ii) take out, pay for and maintain any of the insurance policies provided for herein; or (iii) make any other payment or perform any other act on Mortgagor's part to be made or performed. Notwithstanding the foregoing, in the event Mortgagee receives any notice of cancellation of any insurance, or receives notice of amendment or modification of any insurance such that the insurance will not meet the requirements set forth in this Mortgage, Mortgagee may immediately without notice to Mortgagor take out, pay for and maintain policies of insurance which do meet the requirements set forth in this Mortgage. Mortgagee may enter upon the Premises for any such purpose and take all such action thereon as may be necessary therefor.

(b) All sums so paid by Mortgagee and all costs and expenses (including attorney's fees and disbursements) incurred by Mortgagee in connection with the performance of any such act, together with interest thereon at the Default Rate from the respective dates of Mortgagee's making of each such payment or incurring each such cost and expense, shall constitute an Additional Payment immediately due and payable by Mortgagor to Mortgagee.

(c) Mortgagee shall not be limited in the proof of any damages which Mortgagee may claim against Mortgagor arising out of or by reason of Mortgagor's failure to provide and keep in force insurance as aforesaid, to the amount of the Insurance Premiums not paid or incurred by Mortgagor and which would have been payable for such insurance, but Mortgagee shall also be entitled to recover as damages for such breach, the uninsured amount of any loss or liability (including all costs and expenses and attorneys fees and disbursements), to the extent of any deficiency in the insurance required by the provisions of this Mortgage, suffered or incurred by reason of damage to, or destruction of, or liability arising in connection with, the Mortgaged Property, occurring during any period when Mortgagor shall have failed or neglected to provide insurance as aforesaid.

(d) Mortgagee shall have no liability, and Mortgagor waives any claim which it might be entitled to assert against Mortgagee, its employees, contractors and agents, with respect to any matter or thing resulting from any act which Mortgagee is entitled to take under this Paragraph 10, or resulting from any failure by Mortgagee to act (whether or not Mortgagee had knowledge of the condition or occurrence which required action to be taken).

11.    Liens

If any mechanic's and/or materialmen's lien is filed against the Premises on or after the date of this Mortgage, or any other lien or encumbrance is filed against the Mortgaged Property or any part thereof for any reason after the date of this Mortgage, Mortgagor shall cause such lien or encumbrance to be discharged of record by payment, bonding or otherwise, within thirty (30) days after Mortgagor is given notice thereof. Failure to so discharge of record any such lien or encumbrance or to file a bond as required by law and commence an action for a discharge in a court with competent jurisdiction within such thirty (30) day period, shall be an event of default under this Mortgage, and shall entitle the Mortgagee, at Mortgagee's option and without further notice or cure period, to exercise any and all of the remedies of Mortgagee for default provided under this Mortgage or by law. In the event Mortgagor fails to so discharge of record such lien or encumbrance within such thirty (30) day period, Mortgagee may in addition, but shall not be obligated to, advance funds, bond or otherwise provide security necessary to discharge of record such lien or encumbrance, and all sums so advanced, together with interest thereon from the date of advance to the date of payment thereof at the Default Rate, shall be payable by Mortgagor to Mortgagee on demand as an Additional Payment. Any expenses incurred by Mortgagee in connection with the examination of title to the Mortgaged Property in order to ascertain the existence of any such lien or encumbrance and/or the discharge of record thereof, shall constitute advances made by Mortgagee under the provisions of this paragraph, which shall be payable by Mortgagor to Mortgagee on demand, together with interest as aforesaid, as an Additional Payment.

12.    Late Charges and Default Interest

(a) In the event the entire outstanding principal balance hereof, together with all accrued interest and any unpaid Additional Payments, are not paid in full and received by Mortgagee at its office at or before 1:00 P.M. on the maturity date (whether such date is the scheduled maturity date hereof, or any earlier date by reason of acceleration or notice of prepayment), the rate of interest due on the outstanding principal balance hereof shall be increased to the Default Rate from and after the date on which payment of the outstanding principal balance was due. Mortgagor and Mortgagee intend that in the event of a foreclosure proceeding or a bankruptcy, insolvency or similar proceeding following acceleration, notice of prepayment or scheduled maturity, the rate of interest which shall accrue and be payable (and be secured by this Mortgage) during the pendency of such proceeding and until this Mortgage is paid in full, shall be the Default Rate.

(b) In the event any payment of Debt Service, Deposits or Additional Payments due under this Mortgage is not paid and received by Mortgagee at its office at or before 1:00 P.M. on the date which is five days after the due date (with no other grace period), a late charge of 6¢ for each $1 so overdue shall become immediately due and payable to Mortgagee as liquidated damages for failure to make prompt payment, and such charge shall be due as an Additional

Payment. In the event any such payment has not been paid and received by Mortgagee at its office at or before 1:00 P.M. on the 15th day of the month (with no grace period), an additional late charge of 2¢, for each $1 overdue shall be payable.

(c) In the event any check for any payment due under this Mortgage fails due collection, a charge of $300.00 shall become immediately due to Mortgagee to compensate Mortgagee for its administrative cost occasioned by such failure of collection.

(d) In the event any document required to be delivered by Mortgagor to Mortgagee under any provision of this Mortgage is delivered more than 30 days later than the date when due, a late charge of $100 for each day late after such 30 day period, with respect to each document which is late, shall become immediately due to Mortgagee as liquidated damages.

(e) This Paragraph 12 shall not limit Mortgagee's remedy of foreclosure for Mortgagor's default or any other remedy of Mortgagee hereunder (other than actual damages for which a payment of liquidated damages in lieu thereof is provided in this Paragraph 12), and no other remedy which Mortgagee may have shall limit Mortgagor's obligation to pay the charges provided in this Paragraph 12.

13.     Right of Access and Entry; Inspections

(a) Mortgagor will permit Mortgagee and its authorized representatives to enter the Premises at all reasonable times for the purpose of (i) inspecting the same, (ii) showing the same to prospective purchasers, tenants, or mortgagees, and (iii) making any necessary repairs thereto and performing any work therein that may be necessary by reason of Mortgagor's failure to make any such repairs or perform any such work which may be required under this Mortgage. Nothing herein shall imply any duty upon the part of Mortgagee to do any such work, and performance thereof by Mortgagee shall not constitute a waiver of Mortgagor's default in failing to perform the same.

(b) Mortgagor shall pay the cost of an annual inspection of the Premises by Mortgagee or its representative in the amount of $750.00. All inspections of the Premises by Mortgagee or its representatives shall be solely for the benefit of Mortgagee and shall create no obligation or responsibility whatsoever upon Mortgagee or its representatives to Mortgagor or any other party.

14.     Indemnity; Expenses

(a) Mortgagor will indemnify and save harmless Mortgagee against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including architects, attorneys, accountants, engineers and other professional fees and disbursements, which may be imposed upon or incurred by or asserted against Mortgagee by reason of any matter, occurrence or thing relating to Mortgagor or the Mortgaged Property. In case any action or proceeding is brought against Mortgagee by reason thereof, Mortgagor upon written notice from Mortgagee will at Mortgagor's reasonable expense resist or defend such action or proceeding by counsel selected by Mortgagee, and Mortgagor's failure to so defend shall be an event of default under this Mortgage. Mortgagee nonetheless shall be entitled to retain its own counsel and conduct its own defense, and all expenses thereof, including attorneys fees and disbursements, shall be paid by Mortgagor as an Additional Payment.

(b) If Mortgagee employs an attorney or collection agent, or otherwise incurs any expense, (i) to collect all or any Debt Service, Additional Payments, or Deposits due to Mortgagee hereunder, or (ii) to enforce any other provision hereof, or (iii) to foreclose this Mortgage or enforce other remedies to which Mortgagee may be entitled, or (iv) to represent Mortgagee in any action or proceeding (including but not limited to any bankruptcy or insolvency proceeding or any foreclosure action initiated by any other person or entity) involving Mortgagor or the Mortgaged Property, in which action or proceeding Mortgagee is named as a party, or issues relating to the priority, enforceability or collectibility of, or amounts secured by, this Mortgage are raised, or any seizure or claim of forfeiture is asserted by any federal, state or local government entity, or (v) in connection with any proposed Transfer or any other matter for which

Mortgagor may request Mortgagee's consent or other action by Mortgagee; then in any of such events the Mortgagee, in addition to all other costs and fees allowed according to law, shall be reimbursed by Mortgagor immediately for all costs, attorneys fees and disbursements, and collection agent charges incurred by Mortgagee, the same shall be paid as an Additional Payment, shall be secured by this Mortgage, and shall be recoverable by Mortgagee in any foreclosure, bankruptcy or insolvency proceeding.

## 15.    Mortgagee Not Responsible for Damage or Injury

Mortgagor is and shall be in exclusive control and possession of the Mortgaged Property as provided herein, and Mortgagee shall not in any event or for any reason whatsoever be liable for any injury or damage to any property or to any person happening on or about the Premises, nor for any injury or damage to any property of Mortgagor, or of any other Person, contained therein. The provisions hereof permitting Mortgagee to enter and inspect the Premises are made for the purpose of enabling Mortgagee to be informed as to whether Mortgagor is complying with the agreements, terms, covenants and conditions hereof, and to do such acts as Mortgagor shall fail to do, and are not intended to create any obligation or impose any responsibility on Mortgagee with respect to the Premises or any condition existing thereon or therein.

## 16.    Defaults

(a) Each of the following shall be an event of default: (i) failure to pay any Debt Service, Additional Payment, Deposit or Transfer Taxes when due; or (ii) failure to pay any Imposition or Insurance Premiums when required to be paid by the terms of this Mortgage, or in the event a notice to redeem relating to the Premises has been served in a proceeding under Article 11 of the Real Property Tax Law; or (iii) failure to exhibit to Mortgagee, within ten days after demand, receipts showing payment of all Impositions, Insurance Premiums or Transfer Taxes (except where payment of the specific item of Impositions or Insurance Premiums has been made by Mortgagee on Mortgagor's behalf from Deposits); or (iv) actual structural alteration, demolition or removal of any Improvement, or non-structural alteration of any Improvement for which Mortgagee's consent is required under Paragraph 9(c), without the prior written consent of Mortgagee; or (v) failure to comply with (and where applicable, obtain a discharge of record of) any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the Premises within sixty days from notice thereof (or, for violations existing on the date of this Mortgage, within six months after the date of this Mortgage), to the reasonable satisfaction of Mortgagee, provided that if same cannot be discharged of record within such sixty-day (or six month, as the case may be) period, it shall not be an event of default hereunder if Mortgagor shall obtain the discharge of such violation within such longer period as is reasonably necessary to obtain the discharge of record (provided that Mortgagor has completed the work necessary to correct the violation within sixty days from notice thereof, or within six months from the date of this Mortgage for violations existing on the date of this Mortgage, and is diligently pursuing the discharge of record and the failure to obtain such discharge of record is beyond the reasonable control of Mortgagor); or (vi) if on application of Mortgagee or Mortgagor two or more insurance companies lawfully doing business in the State where the Premises are located refuse to issue policies insuring the Improvements on the terms and conditions required by this Mortgage; or (vii) in the event of the removal, demolition or destruction in whole or in part of any of the Equipment, unless the same are promptly replaced by similar Equipment at least equal in quality and condition to those replaced, free from chattel mortgage, security interest or other encumbrances thereon and free from any, reservation of title thereto; or (viii) in the event of the passage of any law deducting from the value of land for the purposes of taxation, any lien thereon, or changing in any way the taxation of the mortgages or debts secured thereby for state or local purposes; or (ix) if Mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this Mortgage for which no specific event of default is provided in this Mortgage; or (x) if proceedings under any bankruptcy or insolvency law are commenced by or against Mortgagor, or if a general assignment for the benefit of creditors is made by Mortgagor or if a trustee or receiver of the property of Mortgagor be appointed and not dismissed within ninety days (except that the appointment of an administrator under Article 7-A of the New York Real Property Actions and Proceedings Law shall be an immediate event of default with no grace period in which to obtain the dismissal of

such appointment); or (xi) if Mortgagor requests or consents to any change in zoning affecting the Premises or any waiver of or exemption from enforcement of any applicable zoning requirement affecting the Premises, or materially varies the character or use of the Premises, or amends the certificate of occupancy, without in each such instance first obtaining the prior consent in writing thereto of Mortgagee, which consent may be withheld by Mortgagee for any or no reason; or (xii) if any representation or warranty made by Mortgagor or any of its affiliates, or any guarantor of this Mortgage, in the commitment letter for the Mortgage, or in any other document or information submitted to Mortgagee by Mortgagor, any such affiliate or any such guarantor in connection with such commitment letter or this Mortgage, shall have been untrue or inaccurate in any material respect when made or on the date of this Mortgage, or if Mortgagor, any such affiliate or any such guarantor has failed or fails in any material respect to perform its obligations under such commitment letter.

(b) Upon the occurrence of any event of default described in Paragraph 16(a) or in any other provision of this Mortgage, and in the case of events of default for which a notice and/or cure period is expressly set forth, upon the expiration of such notice and/or cure period without the event of default having been cured, a default shall have occurred under this Mortgage which shall entitle Mortgagee, without further notice required by Mortgagee and without any further right to cure being allowed to Mortgagor, to immediately exercise any and all of its rights provided under this Mortgage or by law for default. Mortgagor acknowledges and agrees that except where this Mortgage expressly provides that Mortgagor is entitled to notice and/or an opportunity to cure a specified event of default, each and every event of default provided in this Mortgage shall, immediately upon its occurrence, constitute a default entitling Mortgagee to exercise all of such remedies. Mortgagor further acknowledges that wherever in this Mortgage is provided that Mortgagor is entitled to notice and/or an opportunity to cure with respect to any event of default, then immediately following the satisfaction of any such notice requirement and/or the expiration of the specified cure period, without further notice, the event of default shall become a default entitling Mortgagee to exercise all of such remedies.

17.    Remedies Upon Default

(a) Upon any default under this Mortgage (after the expiration of any applicable notice and/or cure period provided in this Mortgage), all principal due under this Mortgage, all accrued interest, the Fee Payment, and all other Additional Payments shall, at the option of Mortgagee, become immediately due and payable. If following an exercise by Mortgagee of its option to declare such sums immediately due and payable, Mortgagor shall tender payment of an amount which by law otherwise would entitle Mortgagor to redeem the Mortgaged Property from foreclosure prior to a sale thereof, then Mortgagor shall not be entitled to so redeem the Mortgaged Property unless Mortgagor shall include in such tender, in addition to all accrued interest and the principal balance, the Fee Payment and all other unpaid Additional Payments.

(b) Following an exercise by Mortgagee of its option to declare such sums immediately due and payable, Mortgagee may exercise any and all rights and remedies available hereunder and at law and in equity including the right, when authorized by law, to sell the Premises by the exercise of the power of sale hereby granted to Mortgagee, and at Mortgagee's sole option to foreclose the Mortgage by a judicial proceeding or by a non-judicial proceeding in the manner prescribed in Article 14 of the Real Property Actions and Proceedings Law, as the same may be amended.

(c) In the event of a foreclosure of this Mortgage the Premises or so much thereof as may be affected by this Mortgage may be sold in one parcel, any provision of law to the contrary notwithstanding. Failure to join tenants as defendants shall not constitute any defense to the action.

(d) In the event of any foreclosure of this Mortgage, Mortgagee shall be entitled to apply any balance of Deposits held by Mortgagee under this Mortgage, against its costs, expenses and damages incurred by reason of such foreclosure of this Mortgage, and for this purpose shall be entitled to retain all such Deposits until a final determination of such costs, expenses and losses is made. Mortgagor shall also pay to Mortgagee on demand, as an Additional Payment, all

Transfer Taxes for which Mortgagor is liable under this Mortgage, and all tenant security deposits held by Mortgagor or as may be reflected in leases or by receipts held by tenants, all accrued interest thereon, and any penalties and/or expenses relating thereto, except that Mortgagor shall not be required to pay to Mortgagee any such security deposits which were lawfully applied by Mortgagor, as landlord, upon default of and vacating of the Premises by the tenant. All such Transfer Taxes, interest and penalties, if any, and other sums may be paid by a receiver appointed in the foreclosure.

(e) Nothing in this Paragraph 17 shall limit or prejudice the right of Mortgagee to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by any statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to or less than any amount of damages provided herein.

(f) Upon any default under this Mortgage (after the expiration of any applicable notice and/or cure period provided in this Mortgage), or upon the occurrence of any threatened alteration or demolition of the Mortgaged Property not permitted hereunder, or any actual or threatened waste to the Mortgaged Property, Mortgagee shall be entitled, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby (and without notice in any action to foreclose this Mortgage and in such other actions or circumstances as may be permitted by law), to the appointment of a receiver for the Mortgaged Property, whether such receivership is incidental to a proposed sale of the Mortgaged Property or otherwise. Mortgagor hereby consents to the appointment of such a receiver and will not oppose any such appointment nor the exercise by such receiver of all rights of Mortgagee and/or Mortgagor arising from or related to the Mortgaged Property and the enjoyment of all benefits therefrom, whether or not expressly provided herein.

(g) Upon any default of the Mortgagor (after the expiration of any applicable notice and/or cure period provided in this Mortgage) in complying with or performing any warranty or covenant herein, the Mortgagee may, at the Mortgagee's option, comply with or perform the same, and the cost thereof together with interest thereon at the Default Rate shall be paid by the Mortgagor to the Mortgagee on demand as an Additional Payment. If upon any default (after the expiration of any applicable notice and/or cure period provided in this Mortgage), the Mortgagee or a receiver enters upon and takes possession of the Premises, Mortgagee or such receiver shall be entitled to collect the rents therefrom and apply the same to the payment of Debt Service, Additional Payments and Deposits, and to the expenses of operating the Premises, which expenses are deemed to include without limitation, all costs of repairs and capital improvements, reasonable reserves set aside for repairs and capital improvements, management fees, receiver's fees, Impositions, Insurance Premiums and Transfer Taxes, and all other costs or expenses of any kind or nature which Mortgagee or a receiver may deem necessary or advisable to pay, or create reserves for, in connection with the Mortgaged Property. The amount, if any, by which all such expenses of operating the Premises exceed the net revenues collected from the Premises, together with interest thereon at the Default Rate shall be paid by the Mortgagor to the Mortgagee on demand as an Additional Payment. Mortgagee or such receiver shall be entitled to exercise all the rights and authority of Mortgagor in the operation of the Premises, including without limitation, leasing vacant space in the Premises, or extending or modifying the term of any lease on such terms as Mortgagee or such receiver may determine in its discretion, and to make or not to make such repairs or capital improvements as Mortgagee or such receiver deems advisable in its discretion. Mortgagee or such receiver shall have no liability to Mortgagor for any such action taken or not taken. Nothing in this subparagraph (f) shall in any way obligate Mortgagee or a receiver to advance any money to pay any expenses (including repairs or capital improvements) of the Premises, or to take any specific action in the operation of the Premises.

(h) Mortgagee may, at Mortgagee's option, foreclose this Mortgage for any portion of the debt or any other sums secured hereby which are then due and payable, subject to the continuing lien of this Mortgage for the balance of the debt not then due.

MK I:\Users\Share\Intervest\Loans\Intervest National Bank\442 West 22 Street, New York, NY\Mortgage Consolidation.v2.wpd

21

(i) With respect to any portion of the Mortgaged Property in which this Mortgage grants to Mortgagee a security interest under the Uniform Commercial Code, in addition to and without limiting any other remedies available to Mortgagee under this Mortgage or by law, Mortgagee shall be entitled to exercise all of the remedies of a secured party upon default available under the Uniform commercial Code.

18.  Waivers; Cumulative Remedies

(a) No failure by Mortgagee to insist upon the strict performance of any covenant, agreement, term or condition of this Mortgage or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Debt Service during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Mortgage to be performed or complied with by Mortgagor, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Mortgagee. No waiver of any breach shall affect or alter this Mortgage, but each and every covenant, agreement, term and condition of this Mortgage shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

(b) In the event of any breach or threatened breach by Mortgagor of any of the covenants, agreements, terms or conditions contained in this Mortgage, Mortgagee shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise, including proving actual damages, as though no other remedies were provided for in this Mortgage.

(c) Each right and remedy of Mortgagee provided for in this Mortgage shall be cumulative and shall be in addition to every other right or remedy provided for in this Mortgage or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Mortgagee of any one or more of the rights or remedies provided for in this Mortgage or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise, or be deemed a waiver, by Mortgagee of any or all other rights or remedies. Specifically, the enforcement of any provision of this Mortgage providing for payment by Mortgagor of liquidated damages, interest, costs or other charges upon the occurrence of any event of default hereunder shall not preclude Mortgagee from exercising any other remedies, including foreclosure, or proving actual damages, which it may have upon such event of default. It is also expressly agreed that Mortgagee's right to interest upon any sum in arrears owed by Mortgagor does not deprive Mortgagee of any other remedies respecting the event of default in question.

19.  Transfers of the Mortgaged Property

a. Any Transfer made or permitted by Mortgagor shall be an event of default under this Mortgage, entitling Mortgagee immediately, without notice or cure period, to exercise any or all of its remedies for default provided herein or by law.

b. Notwithstanding anything to the contrary contained herein, Mortgagee shall allow members of the Mortgagor to assign their ownership interest in Mortgagor to their immediate family members, provided that:

(i)      Mortgagee is notified of the assignment in writing at least 15 days prior to the assignment;

(ii)     the assignee provides all of the credit and financial information required by Mortgagee in connection with this Mortgage and is approved by Mortgagee.

(iii)    the assignee assumes all of the terms, conditions, obligations and liabilities of the assignor under the Commitment and Mortgage;

(iv)      Yehuda Nelkenbaum continues to control and to own a controlling interest in the Mortgagor; and

(v)      Mortgagor is in compliance with all of the terms, conditions, covenants and undertakings in this Mortgage.

For purposes of such an assignment, "control" shall mean possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting equity interests, by contract or otherwise (such definition to have the same meaning as such definition has in Regulation Section 230.405 under the Securities Act of 1933).

c.  Further, notwithstanding anything to the contrary contained herein, Mortgagee shall allow Mortgagor to sell the Mortgaged Property subject to the following provisions:

(i) Mortgagor is in compliance with all of the terms, conditions, covenants, or undertakings in the Mortgage;

(ii)      at or prior to the closing of such sale, Mortgagor shall pay a fee to Mortgagee of 1% of the outstanding principal amount of this Mortgage (this is not a Fee Payment and is not in reduction of the Mortgage);

(iii)      the purchaser and the principals of purchaser shall provide all of the credit and financial information set forth in the Commitment issued by Mortgagee and are approved by Mortgagee in Mortgagee's sole discretion;

(iv)      the purchaser and purchaser's principals meet the Mortgagee's standards for creditworthiness in Mortgagee's sole discretion (financial statements, tax returns, etc.);

(v)      the sale must be an arms-length sale to an unrelated third party;

(vi)      only one such sale is permitted during the term of the Mortgage;

(vii)      upon the sale, the purchaser's principals shall execute similar guarantees as those executed by the original Mortgagor to Mortgagee;

(viii)      the Mortgagor shall pay all of Mortgagee's costs and expenses, including, but not limited to, legal fees (whether or not the proposed sale occurs);

(ix)      the purchaser shall assume all of the terms, conditions, obligations and liabilities of Mortgagor under the Mortgage; and

(x)      the sale shall be of not less than the entire fee interest in the Premises and the entire ownership interest of Mortgagor in all of the other Mortgaged Property.

Notwithstanding the above, the right of members of Mortgagor to assign their ownership interests in Mortgagor (as set forth in subparagraph (b) above); and Mortgagor to sell the Mortgaged Property subject to the Mortgage (as set forth in subparagraph (c) above), shall expressly not be construed to permit Mortgagor or any member to pledge or otherwise encumber, in any manner whatsoever, the Mortgaged Property or any ownership interest in the Mortgaged Property or in Mortgagor.

20.    <u>Tenant Leases</u>

Reference is made to Section 291-f of the New York Real Property Law. Mortgagor covenants and agrees to each of the following provisions with respect to tenant leases:

(a) Each tenant lease made after the date of this Mortgage shall be drawn on a standard New York Real Estate Board, NYBTU or similar form, and shall contain language expressly subordinating the lease to all mortgages now or hereafter affecting the Premises. If Mortgagor at

any time is a cooperative corporation, each proprietary lease shall include the following language in a separate paragraph in the lease document (with the blank spaces filled in with the appropriate information with respect to this Mortgage): "This lease is subject and subordinate to the mortgage on the building of which the premises are a part, recorded in the office of the City Register, New York County, on _____, at Reel _____, Page _____, to each and every other mortgage which is now or hereafter may be a lien on the Mortgaged Property (as defined in such mortgage), and to any consolidation, extension, modification, or renewal of any thereof. It is intended that this subordination be self-operative, so that a written subordination executed on behalf of tenant should not be necessary to making the subordination effective. However, tenant agrees that whenever landlord or the holder of any such mortgage may request, tenant shall execute without charge a written subordination of tenant's rights under this lease to such mortgage (including any extension, modification, or renewal of any such mortgage), and the failure of tenant to deliver such subordination within seven days after request shall be a default with no grace period allowed." Mortgagor acknowledges and agrees that each such lease shall be subject and subordinate as provided in the preceding language whether or not the lease explicitly so provides.

(b) All such leases shall be made only in accordance with all applicable rent regulations. Mortgagor shall comply with all applicable orders of rent regulatory authorities, and shall promptly refund all rent or other overcharges found to be due with respect to periods on or subsequent to the date of this Mortgage, and if Mortgagor or an affiliate shall have owned the Mortgaged Property prior to the date of this Mortgage, then also with respect to such period prior to the date of this Mortgage during which Mortgagor or such affiliate owned the Mortgaged Property, and pay when due any penalties, fees or damages which may be assessed, with respect to the Premises and the tenants and leases thereof.

(c) Upon any foreclosure of this Mortgage, it is expressly agreed that Mortgagor shall deliver to Mortgagee all leases, contracts, documents, rent rolls and other records used in the operation of the Premises, together with security deposits held by Mortgagor or as reflected in tenant leases or by receipts held by tenants, and all accrued interest due thereon. Mortgagor agrees to indemnify and save Mortgagee harmless from and against any claim or lien against Mortgagee or the Mortgaged Property for the return of any security deposits and interest under any leases with tenants.

(d) Mortgagor shall not with respect to any present or future leases accept prepayment of rent prior to its due date in excess of one month.

(e) Mortgagor shall furnish to Mortgagee, within 30 days after request but not more than twice in any calendar year, a full copy of each and every residential and commercial lease and lease renewal of the Premises. Original signed counterparts of all leases shall be exhibited to Mortgagee upon request within ten days.

(f) Except as required by law, residential leases and renewals thereof shall be for a term not exceeding two years and shall be at the maximum rental permitted by law (or if less, fair market rental). Commercial leases and renewals thereof shall be for a term not to exceed ten years and at a monthly rental of not less than the highest monthly rental of the prior leasing period (or if less, fair market rental). No lease, either residential or commercial, shall contain any right by tenant to renew or extend the same. The provisions of this subparagraph (f) shall not apply to proprietary leases if Mortgagor is a cooperative corporation.

21.    <u>Assignment of Leases and Rents</u>

(a) Mortgagor hereby assigns to Mortgagee all of Mortgagor's right, title and interest as landlord under all existing and future Leases, and the rents, issues and profits of the Mortgaged Property, as further security for the payment of Debt Service, Additional Payments, Deposits and Transfer Taxes, and in the event Mortgagee exercises its rights pursuant to Paragraph 21(b), as further security for the payment of all charges and expenses of operating the Premises, and all fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property.

(b) In furtherance of the assignment provided in Paragraph 21 (a), Mortgagor hereby grants to Mortgagee the following rights and powers: (i) to enter upon and take possession of the Premises; (ii) to demand payment of and collect the rents and other amounts payable under the Leases, and to demand and enforce performance of the terms, covenants and conditions of the Leases, by legal proceedings or otherwise; (iii) to exercise all of Mortgagor's rights, interests and remedies in and under the Leases; (iv) to settle, adjust or compromise the rents and other amounts payable under the Leases, and to settle, adjust or compromise any legal proceeding brought to collect the rents and other amounts payable thereunder or to obtain performance thereof; (v) to prepare, file and sign Mortgagor's name on any proof of claim in bankruptcy, or similar document in a similar proceeding, against obligors of the Leases; (vi) to endorse the name of Mortgagor upon any payment or proceeds of the rents and other amounts payable under the Leases and to deposit the same to the account of Mortgagee; (vii) to hold, manage, lease and operate the Mortgaged Property as Mortgagee may deem proper; (viii) to make necessary capital expenditures; (ix) to apply such rents, income and profits to the payment of all charges and expenses of operating the Premises, fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property, and to the payment of Debt Service, Additional Payments, Deposits, Impositions, Insurance Premiums and Transfer Taxes due under this Mortgage; and (x) to do all acts and things necessary, in Mortgagee's sole discretion, to carry out any or all of the foregoing.

(c) In event the Mortgagor or any Person controlled by, controlling, or under common control with, Mortgagor, is an occupant of the Premises, then upon any default under this Mortgage (after the expiration of any applicable notice and/or cure period provided in this Mortgage), Mortgagor or such Person will pay monthly in advance to the Mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and reasonable rental value for the use and occupation of the Premises or of such part thereof as may be in the possession of the Mortgagor or such Person, and upon failure to make any such payment will vacate and surrender the possession of the Premises to the Mortgagee or to such receiver, and upon failure to vacate and surrender possession may be evicted by summary proceedings.

(d) The Mortgagee hereby waives the right to enter upon and to take possession of the Premises for the purposes above set forth, including the right to take possession of the Premises for the purpose of collecting said rents, issues and profits, and Mortgagor shall be entitled to collect and receive said rents, issues and profits, until the occurrence of any event of default under this Mortgage (prior to the expiration of any applicable notice and/or cure period provided in this Mortgage). Mortgagor agrees to use such rents, issues and profits in payment of Debt Service, Additional Payments and Deposits, and in payment of Impositions, Insurance Premiums, Transfer Taxes and expenses of operating the Premises, and after payment of all such amounts which are then due, Mortgagor shall be entitled to retain any balance of rents, issues and profits then collected by it. Such right of Mortgagor to collect and receive the rents, issues and profits, may be revoked by the Mortgagee upon the occurrence of any event of default upon five days' written notice. Such right of revocation by Mortgagee shall become effective whether or not any other required notice has been given or applicable cure period has expired, whether or not foreclosure has been instituted and without applying for a receiver.

22.     Payments From Deposits; Mortgagee's Liability

(a) Mortgagee shall make all payments of Impositions and Insurance Premiums for which it is holding Deposits by their respective due dates, including grace periods, if and only if each of the following conditions is met: (i) Mortgagor has timely made all Deposits for any purpose which may be required or demanded by Mortgagee under Paragraph 4; (ii) Mortgagor is not overdue (without regard to any applicable notice and/or cure period) in the payment of any Debt Service or Additional Payments due under this Mortgage, and no other event of default shall have occurred and remain uncured after any applicable notice and/or cure period; (iii) no amount advanced by Mortgagee to satisfy any obligation of Mortgagor under this Mortgage, including interest thereon computed as provided in this Mortgage, remains unpaid by Mortgagor (whether or not the failure to have paid any such amount does not yet constitute a default because of any applicable notice or cure period or otherwise); and (iv) no action to foreclose this Mortgage or to enforce this Mortgage or any other agreement relating thereto shall be pending.

(b) Notwithstanding anything in this Mortgage which might otherwise be construed to the contrary, in no event shall Mortgagee at any time be liable to Mortgagor for any damages, costs or expenses in excess of Mortgagee's equity in this Mortgage. All judgments against Mortgagee or any of its principals or agents shall be enforced against said equity and not against any other present or future asset of Mortgagee or any of its principals or agents. Mortgagor hereby waives any rights Mortgagor may now or hereafter have to have recourse against such present or future assets. If Mortgagee fails to pay any payments of Impositions or Insurance Premiums for which it is holding adequate Deposits, or any other payment for which Mortgagee is or may become responsible with respect to the Mortgaged Property, Mortgagor, as its sole and exclusive remedy, may pay any such payment which Mortgagee has so failed to pay to the Person to whom due and may deduct the amount so paid from the next regular installments of Debt Service and/or Deposits, as the case may be, due hereunder.

(c) Whenever in this Mortgage or as a matter of law it is provided that Mortgagee's consent or approval shall not be unreasonably withheld or the actions of Mortgagee shall be reasonable, the remedy of Mortgagor, in the event Mortgagor shall claim or establish that Mortgagee has unreasonably withheld such consent or approval or has acted unreasonably, shall be limited to injunctive relief or declaratory judgment, and in no such event shall Mortgagor be entitled to obtain, nor shall Mortgagee be liable for, a money judgment.

23.    Prepayment

This Mortgage may be prepaid in full, but not in part, at any time upon 30 days prior written notice, provided, however, that the Fee Payment shall be due upon the Fee Payment Date arising as a result of such prepayment. Upon the giving of notice of prepayment, the Mortgage is due and payable in full on the date specified in such notice as if such date were the maturity date specified herein. Notwithstanding the foregoing, Mortgagor shall be permitted to withdraw such notice once during the term of this Mortgage without any penalty or premium.

24.    Procedure for Payment at Maturity or Upon Prepayment

Mortgagor shall pay to Mortgagee or its designated agent at maturity or upon prepayment permitted under Paragraph 23 the unpaid principal balance hereof, accrued interest thereon, the Fee Payment and all then due and unpaid Additional Payments. Payment at maturity or upon prepayment permitted under Paragraph 23 shall be made as follows: (i) only by unendorsed certified check or unendorsed bank cashier's check drawn in U.S. dollars to the order of Mortgagee or such agent on a New York banking institution which is a member of the New York Clearing House, and received by Mortgagee or such agent at its offices at or before 1:00 p.m. on a Banking Day, at the address of Mortgagee specified at the beginning of this Mortgage or furnished pursuant to the provisions of Paragraph 27; or (ii) at Mortgagee's sole option, by wire transfer and received in Mortgagee's bank account at or before 1:00 P.M. on a Banking Day. Payment shall include interest computed to and including the date of delivery of the check in payment or the date of receipt of the wire.

In the case of payment at maturity or upon prepayment permitted under Paragraph 23(a), upon the receipt of such payment by Mortgagee, Mortgagee shall deliver to Mortgagor, at Mortgagor's election, either (i) a satisfaction of this Mortgage (which may by its terms provide for discharge of all of Mortgagee's obligations hereunder from and after the date of delivery thereof), or (ii) an assignment of this Mortgage without recourse and in such form as Mortgagee shall determine in its sole discretion]. All taxes and expenses in connection with the satisfaction or assignment of this Mortgage, together with the fees and disbursements of Mortgagee's attorney for preparation of necessary documents and attendance at the Mortgage payoff closing, shall be paid by Mortgagor, and shall be deemed an Additional Payment due and payable with the payment being made on this Mortgage. Mortgagor shall advise Mortgagee in writing of the date, time and place scheduled for the payoff closing.

25.    Reduction of Principal Balance By Insurance and Condemnation Proceeds

In the event the unpaid principal balance of this Mortgage is reduced by the Mortgagee or a receiver applying insurance proceeds or condemnation awards in reduction thereof, or by prepayments made by Mortgagor with the prior written consent of Mortgagee, then notwithstanding such reduction, Debt Service shall continue to be payable in accordance with the terms of this Mortgage, and the amount of such reduction shall be applied against payments coming due under this Mortgage in the inverse order of their maturity.

### 26. Junior Mortgages

Mortgagor shall not place any Junior Mortgage on the Mortgaged Property or any part thereof, or otherwise create a security interest in or encumber the Mortgaged Property or any part thereof. Mortgagor shall not permit the Mortgaged Property or any part thereof to be cross-collateralized with any other property, whether owned by Mortgagor or by any other Person. Any breach of any provision of this Paragraph 26 shall be an event of default under this Mortgage, and shall entitle Mortgagee, without any notice or grace period, to exercise any and all remedies provided for default in this Mortgage or otherwise permitted by law.

### 27. Notices

(a) Whenever it is provided herein that notice, demand, request or other communication shall or may be given to or served upon either of the parties by the other, and whenever either of the parties shall desire to give or serve upon the other any notice, demand, request or other communication with respect hereto or the Mortgaged Property, each such notice, demand, request or other communication shall be in writing and, any law or statute to the contrary notwithstanding, shall be effective for any purpose only if given or served as follows:

(i)     If by Mortgagee, by mailing the same to Mortgagor by certified or registered mail postage prepaid, return receipt requested, or by receipted delivery by a nationally recognized reputable overnight courier service, addressed to Mortgagor at the address set forth at the beginning of this Mortgage, or at such other address as Mortgagor may from time to time designate by like notice.

(ii)    If by Mortgagor, by mailing the same to Mortgagee by registered or certified mail, postage prepaid, return receipt requested, or by receipted delivery by a nationally recognized reputable overnight courier service, addressed to Mortgagee at the address set forth at the beginning of this Mortgage, or at such other address as Mortgagee may from time to time designate by like notice.

(iii)   Every notice, demand, request or other communication hereunder shall be deemed to have been given or served (a) by registered or certified mail, postage prepaid, return receipt requested, 72 hours after the time that the same shall be deposited in the United States mail, postage prepaid, in the manner aforesaid and (b) if by a nationally recognized reputable overnight carrier service, the next Banking Day.

(b) Mortgagor shall pay to Mortgagee immediately upon demand a service fee of $25 each time that Mortgagee elects to use for any reason, certified or registered mail, by hand delivery or recognized overnight carrier. Mortgagee, at its election, may deduct this charge from the Deposits.

(c) Mortgagor hereby designates Aaron M. Feinberg, Esq., 1777 East 10th Street, Brooklyn, New York 11223, as agent for service of process, service upon whom shall be deemed service upon Mortgagor.

### 28. Mortgagor's Certificate: Statement of Balances

(a) Mortgagor shall, without charge, at any time and from time to time, within ten days after request by Mortgagee, certify by written instrument, duly executed, acknowledged and delivered to Mortgagee or any other Person specified by Mortgagee: (i) that this Mortgage is unmodified and in full force and effect or, if there have been any modifications or release of

security from this Mortgage, that the same is in full force and effect as modified, and stating the modifications and describing any security released; (ii) whether or not there are then existing any set-offs or defenses against the Mortgage debt or the enforcement of any of the agreements, terms, covenants or conditions of this Mortgage upon the part of Mortgagor to be performed or complied with, and, if so, specifying the same; and (iii) the amount of the debt secured by this Mortgage, the outstanding principal balance, the rate of interest, and the date to which interest has been paid. Mortgagor's failure to provide such certificate within such ten day period shall be an event of default hereunder, and shall entitle Mortgagee to exercise any or all of its remedies for default provided hereunder or by law if such event of default is not cured within ten days after notice is given by Mortgagee.

(b) Mortgagee shall be entitled, at any time and from time to time, to send to Mortgagor a statement setting forth the balance of Deposits then held by Mortgagee. If Mortgagor does not dispute such balances by written notice to Mortgagee given within sixty days after the date Mortgagee sends the statement to Mortgagor, then Mortgagor shall be deemed to admit the correctness of such balances and of all disbursements of Deposits by Mortgagee which are reflected on such statement, and Mortgagor shall thereafter have no right to contest such balances or the correctness of any such disbursements, by legal proceedings or otherwise.

29.    Financial Statements and Other Information

(a) (i)        Prior to March 31 of each calendar year, Mortgagor shall furnish to Mortgagee a balance sheet, statement of income and expense, and statement of changes in financial condition and/or stockholders equity of Mortgagor which shall, if Mortgagor is not a cooperative corporation, be sworn to by a principal of the Mortgagor, and if Mortgagor is a cooperative corporation, be certified by an independent certified public accountant and accompanied by such accountant's opinion, in each case stating that such financial statements present fairly the information shown therein in conformity with generally accepted accounting principles.

(ii)        At any time and from time to time, but not more than once in any calendar year, within 60 days after a written request therefor has been made, Mortgagor shall furnish to Mortgagee such other financial statements for the Mortgaged Property as Mortgagee shall specify in such request. Such statements shall be for the calendar year set forth in such request. Mortgagor shall also furnish within 10 days after written request, but not more than twice in any calendar year, a current rent schedule of the Mortgaged Premises certified by Mortgagor or its agent setting forth the name of each tenant, space occupied, monthly rent, arrears, lease security and lease expiration date.

(b) In the event the Mortgaged Property is conveyed to a cooperative corporation, such statement and rent schedule of Mortgagor shall include pertinent information with regard to the cooperative corporation including, without limitation, the names and addresses of the tenant-shareholder of each apartment, the identity of the apartments whose shares are deemed "unsold shares" under the plan of cooperative conversion, the names of and rental paid by and lease expiration dates of the tenants in possession of such apartments whose shares are deemed "unsold shares", the identity of any apartment which is being sublet by the tenant-shareholder and the name of and rental paid by the sublessee and the sublease expiration date, the current annual budget, the apartments which have been sold since the previous statement and the price and terms of each sale, the current maintenance or rent payable by each tenant-shareholder and the details of any impositions or assessments levied upon tenant-shareholders.

(c) Mortgagor shall give prompt notice to Mortgagee of any actions or proceedings instituted by or against Mortgagor in any federal or state court or by any governmental department, agency or instrumentality, or any such actions or proceedings threatened against Mortgagor, affecting the Mortgaged Property or which, if adversely determined, would have a material adverse effect upon Mortgagor's business, assets or condition, financial or other, or upon the lien of this Mortgage. Any notice so given shall specify what action Mortgagor is taking or proposes to take with respect thereto and shall include a copy of any documents relevant thereto.

30. Lien Law

Mortgagor agrees, in compliance with Section 13 of the Lien Law, that Mortgagor will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

31. Good Standing of Mortgagor

If Mortgagor is a corporation, partnership, limited liability company or trust, it shall keep in effect its existence and rights as a corporation, partnership, limited liability company, or trust under the laws of the state of its incorporation or formation and its right to own property and transact business in the state in which the Premises are situated during the entire time that it has any interest in the Mortgaged Property or any part thereof. For all periods during which title or beneficial title to the Mortgaged Property or any part thereof shall be held by a partnership, trust, corporation or association subject to corporate franchise taxes, income taxes, license or other fees or taxes, or any taxes similar to any thereof, Mortgagor shall file returns for such taxes or license or other fees with the proper authorities, bureaus or departments and it shall pay, when due and payable and before interest or penalties are due thereon, all such taxes or license or other fees owing by Mortgagor to the United States, to such state of incorporation or formation and to the state in which the Premises are situated and any political subdivision thereof. Upon written request of Mortgagee not more than once a year, Mortgagor shall within 15 days supply evidence satisfactory to Mortgagee of the good standing of Mortgagor in the state of its formation (and if different, in the State of New York).

32. [Intentionally omitted]

33. Instruments of Further Assurance, Etc.

At any time and from time to time, upon Mortgagee's reasonable written request, Mortgagor shall make, execute and deliver or cause to be made, executed and delivered to Mortgagee and, where appropriate, shall cause to be recorded or filed and from time to time thereafter to be re-recorded or refiled at such time and in such offices and places as shall be deemed desirable by Mortgagee, without charge to Mortgagee (but Mortgagee shall bear the costs of filing or recording), any and all such further mortgages, instruments of further assurance, certificates, UCC financing statements, and other documents as Mortgagee may consider necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve the obligations of Mortgagor under this Mortgage, and the lien of this Mortgage. Upon any failure by Mortgagor to do so, Mortgagee may make, execute, record, file, re-record or refile any and all such mortgages, instruments, certificates and documents for and in the name of Mortgagor, and Mortgagor hereby irrevocably appoints Mortgagee the agent and attorney-in-fact of Mortgagor to do so, and the cost of doing the same, including attorneys fees and disbursements, shall be payable by Mortgagor.

34. Conversion Offering Plans

In the event of the submission to the Attorney General (or other authority with whom a filing may be required to be made) of a plan, preliminary prospectus, plan amendment or other similar documents relating to conversion of the Mortgaged Property to cooperative ownership, Mortgagor shall immediately deliver to Mortgagee five copies of any such plan, prospectus and other documents so submitted for filing, and shall further immediately deliver to Mortgagee, upon submission to the Attorney General (or other authority) thereof, five copies of any amendments submitted for filing to any such plan, prospectus and other documents, and five copies of any plan, prospectus, amendments or other documents accepted for filing by the Attorney General (or other authority). Mortgagor shall also promptly furnish to Mortgagee any additional documents or information which Mortgagee may reasonably request relating to the proposed conversion to cooperative ownership. In the event that any such plan, prospectus, amendments, documents or information have not been delivered within fifteen days after the

submission of the same to the Attorney General (or other authority), or Mortgagee's request, as the case may be, then in addition to and without in any way waiving any other remedies, Mortgagee shall be entitled to procure copies of such documents on its own, and the cost thereof, including any fees and disbursements of legal counsel, shall be immediately due and payable by Mortgagor as an Additional Payment.

35.   [Intentionally omitted]

36.   Miscellaneous

(a) Any payment of Debt Service, Additional Payments or Deposits due from Mortgagor to Mortgagee shall not be considered timely made when due unless it shall be actually received by Mortgagee no later than 1:00 p.m. in New York City on the date when due. Any references to a time of day in this Mortgage shall be Eastern Standard Time or Eastern Daylight Time, as applicable.

(b) Mortgagor shall pay to Mortgagee on the date hereof, and on each anniversary of the date hereof, a service charge calculated per tax lot included in the Mortgaged Property, on the original principal amount of this Mortgage, as follows: (i) principal amount $1,000,000 or less - $250 for the first tax lot plus $125 for each additional tax lot; (ii) principal amount more than $1,000,000 and $2,500,000 or less - $350 for the first tax lot plus $175 for each additional tax lot; (iii) principal amount more than $2,500,000 and $5,000,000 or less - $500 for the first tax lot plus $250 for each additional tax lot; and (iv) principal amount more than $5,000,000 - $650 for the first tax lot plus $325 for each additional tax lot. Mortgagee shall deduct the service charge from the Deposits being held by Mortgagee. There shall be no proration of this charge on the maturity date or the date of (or by reason of) any prepayment.

(c) In the event the holder at any time of this Mortgage shall sell, transfer or assign this Mortgage, such holder shall be and hereby is entirely discharged, released and relieved of all covenants, obligations and liabilities of Mortgagee hereunder as of the date of such sale, transfer or assignment, provided that such holder shall continue to be entitled to the benefit of all indemnities by Mortgagor in favor of Mortgagee provided in this Mortgage.

(d) There shall be no merger of this Mortgage with the fee estate in the Mortgaged Property by reason of the fact that this Mortgage or any interest therein may be held, directly or indirectly, by or for the account of any Person or Persons who shall own the fee estate in the Mortgaged Property, or any interest therein. No such merger shall occur unless and until Mortgagee and Mortgagor shall join in a written instrument effecting such merger.

(e) Nothing in this Mortgage shall require Mortgagor to pay any interest, liquidated damages or any other charge which might be construed as interest in an amount which would subject Mortgagee to any penalty or permit any declaration of invalidity of this Mortgage under any applicable usury or other law. In the event any payment of interest or any other amount which might be construed as interest pursuant to this Mortgage would subject Mortgagee to such a penalty or permit any such declaration of invalidity, then such payments of interest, liquidated damages or other charges required to be made by the Mortgagor shall not be greater than the highest amount which, if construed as interest, would be authorized under applicable law without penalty.

(f) All interest due hereunder shall be calculated on the basis of a 360 day year for the actual number of days elapsed.

(g) All payments received by Mortgagee under this Mortgage shall be applied, unless another provision of this Mortgage explicitly provides otherwise with respect to a particular payment, first to interest then due and payable, then to Deposits then due and payable, then to Additional Payments then due and payable, and then to principal.

(h) No grant by Mortgagor to Mortgagee of any power of attorney provided in this Mortgage shall be construed as in any way relieving Mortgagor of the obligation to execute the

document or perform the act which Mortgagee is authorized by such power of attorney to execute or perform in Mortgagor's name.

(i) In any case where Mortgagor may be required pursuant to the terms of this Mortgage to furnish any document, statement, notice or writing of any kind, such document, statement, notice or writing, at the election of Mortgagee, shall be furnished in the form reasonably specified or supplied by Mortgagee.

(j) This Mortgage contains the entire agreement between the parties with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written, with respect thereto. This Mortgage cannot be changed or terminated orally, but only by an instrument in writing executed by Mortgagee and Mortgagor.

(k) If any term or provision of this Mortgage or the application thereof to any person or circumstance shall, to any extent be invalid or unenforceable, the remainder of this Mortgage, or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Mortgage shall be valid and be enforced to the fullest extent permitted by law.

(l) Each and every power of attorney granted in this Mortgage (i) shall be deemed to be coupled with an interest, is irrevocable, and shall survive the death, disability, incompetency or bankruptcy (to the maximum extent permitted by law) of Mortgagor, and (ii) shall be exercisable by each and every Person who at any time may be the Mortgagee, shall constitute a power of attorney granted by each and every Person who at any time may be the Mortgagor, and shall continue to be binding upon and effective with respect to any Person who was and is no longer the Mortgagor to the extent that Mortgagee may need to execute documents or take action in such Person's name with respect to the Mortgaged Property.

(m) Mortgagor waives trial by jury and the right to interpose any set-off or counterclaim whatsoever, in any action or proceeding to enforce any one or more of the provisions of this Mortgage, and agrees not to seek consolidation or obtain a joint trial of any action or proceeding in which Mortgagor shall make a claim against Mortgagee of any nature or description.

(n) Mortgagor hereby submits to the jurisdiction of the Supreme Court of the State of New York for any action or claim brought by the Mortgagee pursuant to this Mortgage, and agrees to accept service by ordinary, registered or certified mail, whether or not return receipt is requested, sent to Mortgagor at its address for notices as provided in this Mortgage.

(o) If Mortgagor shall be more than one Person, then all of the covenants and agreements of Mortgagor in this Mortgage shall be the joint and several covenants of each such Person.

(p) Mortgagee shall charge, and Mortgagor shall pay upon demand, a fee of $100.00 each time Mortgagee responds to any credit or payment verification, deposit verification or other request for information by or about Mortgagor, and a fee of $100.00 each time a request to Mortgagee is made to provide a payoff letter or an amendment to a payoff letter with respect to this Mortgage, which fees may, at Mortgagee's option, be deducted from the Deposits.

(q) Mortgagee, at Mortgagee's sole option and without any obligation to do so, may, at any time during the term of this Mortgage order an appraisal of the Mortgaged Property. All costs associated with such appraisal are the expense of Mortgagor, and shall be paid by Mortgagor on demand, or at Mortgagee's sole option, deducted from the Deposits held hereunder. Mortgagor will cooperate with the appraiser in promptly providing access to the Mortgaged Property and in promptly supplying such information with respect to the Mortgaged Property as the appraiser may request.

(r) Paragraph captions contained in this Mortgage are inserted only as a matter of convenience and for reference and in no way define, limit, or extend or describe the scope of this Mortgage or the intent of any provision hereof.

(s)   The masculine gender shall include the feminine and neuter genders, and the singular shall include the plural.

(t)  This Mortgage may be executed in several counterparts and all so executed shall constitute one Mortgage, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the same counterparts.

(u)  This Mortgage shall be governed by, and construed in accordance with the laws of the State of New York.

(v)  The agreements, terms, covenants and conditions herein shall run with the land and shall bind and inure to the benefit of Mortgagee and Mortgagor and their respective heirs, personal representatives, successors and, except as otherwise provided herein, their assigns.

37.   **1-6 Residential Units**

This Mortgage does not  covers real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential dwelling units each having their own separate cooking facilities.

38.   **Relief From Bankruptcy Stay**

Mortgagor agrees that, in the event that Mortgagor, any guarantor of the Note or any of the persons or parties constituting Mortgagor or a guarantor of the Note shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended ("Bankruptcy Code"), (ii) be the subject of any order for relief issued under the Bankruptcy Code, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (v) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Mortgagee shall thereupon be entitled and Mortgagor irrevocably consents to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to Mortgagee as provided for herein, in the Note, other loan documents delivered in connection herewith and as otherwise provided by law, and Mortgagor hereby irrevocably waives any right to object to such relief and will not contest any motion by Mortgagee seeking relief from the automatic stay, and acknowledges that no reorganization in bankruptcy is feasible.

Mortgagor waives its exclusive right pursuant to Section 1121(b) of the Bankruptcy Code to file a plan of reorganization and irrevocably consents to Mortgagee filing a plan immediately upon the entry of an order for relief if an involuntary petition is filed against Mortgagor or upon the filing of a voluntary petition by Mortgagor. In the event that Mortgagee shall move pursuant to Section 1121(d) of the Bankruptcy Code for an order reducing the 120-day exclusive period, Mortgagor shall not object to any such motion and Mortgagor waives any rights Mortgagor may have pursuant to Section 108(b) of the Bankruptcy Code.

IN WITNESS WHEREOF, this instrument has been duly executed by the Mortgagor and the Mortgagee.

**NEW YORK SPOT INC.**

By: _____
Yehuda Nelkenbaum, President


**INTERVEST NATIONAL BANK**

By: _____
Lowell S. Dansker, Chief Executive Officer


STATE OF NEW YORK    )
                          )SS.:
COUNTY OF NEW YORK  )

On this 7th day of March, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Yehuda Nelkenbaum, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

STEVEN WEINREB
Notary Public State of New York
No. 02WE6076228
Qualified in Kings County
Commission Expires 06/24/2010


STATE OF NEW YORK    )
                          )SS.:
COUNTY OF NEW YORK  )

On this 27th day of February, 2007, before me, the undersigned, a Notary Public in and for said State, personally appeared Lowell S. Dansker, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

SALLY YI WANG
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WA6140675
Qualified in Queens County
My Commission Expires January 30, 2010

SCHEDULE A

Description of Land

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situated in the 16th Ward of the City of New York, known and distinguished on a map of certain lands belonging to Clement C. Moore at Greenwich, in the City of New York, recorded in the Register's Office of the City and County of New York, in Liber 235 of Conveyances Pages 556 and 557 by the number 389 and bounded northeastwardly in front by 22nd Street, southeastwardly by Lot number 390 on said map, southwestwardly by the center line of the block between 21st and 22nd Street, and northwestwardly by lot number 388 on said map. Containing in width, in front and rear 24 feet 9 inches, more or less, and in length on each side, 98 feet 8 inches more or less, said premises being distant 375 feet northwestwardly from 9th Avenue.

BEING known as 442 West 22nd Street and designated as Block 719 Lot 66.

Also known as:

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point distant 400.4 feet southeasterly from the corner formed by the intersection of the Southerly side of West 22nd Street and the Easterly side of 10th Avenue;

RUNNING THENCE southeasterly on West 22nd Street, 25 feet;

THENCE southwesterly parallel with 10th Avenue, 98.9 feet

THENCE northwesterly parallel with West 22nd Street, 25 feet;

THENCE northeasterly parallel with 10th Avenue, 98.9 feet to the point or place of BEGINNING.

## SCHEDULE B

### Payment of Indebtedness

The indebtedness evidenced by this Mortgage shall be payable as follows:

(a)     A payment of interest only calculated at the Interest Rate for the period from and including the date of this Mortgage to and including March 7, 2007 shall be due and payable upon the execution of this Mortgage.  Thereafter, payments in accordance with paragraph (b) below, applied as provided in this Mortgage, shall be due and payable on the first day of each calendar month, commencing on May 1, 2007, and continuing thereafter on the first day of each calendar month to and including February 1, 2009, and with a final payment on March 1, 2009, on which date all outstanding principal, together with all accrued and unpaid interest and all other amounts due under this Mortgage, shall be due and payable in full.  In addition, the Fee Payment shall be due and payable on each and every Fee Payment Date which may arise under this Mortgage.

(b) The monthly payment shall be $13,000.00.

(c) The Interest Rate shall he 6.5% per annum.

7

Mortgages Consolidated in this Agreement

1.  Substitute Mortgage dated March 5, 2007, from 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC (collectively, the "Mortgagor") to Wachovia Bank, National Association in the original principal sum of $969,232.86 and submitted for recording in the Office of the City Register, County of New York and covering the premises known as 442 West 22nd Street, New York, New York as more fully described therein pursuant to a Splitter and Modification Agreement dated as of March 5, 2007, between the Mortgagor and the Assignor and submitted for recording in the Office of said Register, the Mortgage was split and severed from the mortgage(s) described below:

The outstanding principal balance of such Mortgage is $969,232.86

A.  Mortgage made by 406-10-12 Realty Corp. to American Savings and Loan Association in the original principal amount of $450,000.00 dated March 27, 1991 and recorded April 2, 1991 Reel 1772 Page 1358 in the Office of the City Register, County of New York.

Said mortgage A was assigned by American Savings and Loan Association to New York Federal Savings Bank by an Assignment of Mortgage dated April 30, 1993 and recorded May 12, 1993 in Reel 1970 Page 249 in the Office of said Register.

B.  Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $100,000.00 dated March 27, 1991 and recorded April 2, 1991 in Reel 1772 Page 1348 in the Office of said Register.

C.  Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $50,000.00 dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 464 in the Office of said Register.

The foregoing mortgages B and C were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 473 in the Office of said Register to form a single lien in the amount of $150,000.00.

The foregoing mortgages B and C, as consolidated, were extended pursuant to an Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 255 in the Office of said Register.

The foregoing mortgages B and C, as consolidated and extended, were assigned by Arthur Weyhe to New York Federal Savings Bank by an Assignment of Mortgage dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 252 in the Office of said Register.

D.  Blanket Mortgage made by 406-10-12 Realty Corp. to New York Federal Savings Bank in the original principal amount of $162,462.06 dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 262 in the Office of said Register.

The foregoing mortgages A through D were consolidated pursuant to a Blanket Mortgage Modification and Consolidation Agreement by and between 406-10-12 Realty Corp. and New York Federal Savings Bank dated

May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 276 in the Office of said Register to form a single lien in the amount of $750,000.00.

The foregoing mortgages A through D, as consolidated, were assigned by Flushing Savings Bank, FSB (successor by merger to New York Federal Savings Bank) to Marine Midland Bank by an Assignment of Mortgage dated 3/31/98 and recorded 10/23/98 in Reel 2737 Page 2232 in the Office of said Register.

E.     Multifamily Mortgage, Assignment of Rents and Security Agreement made by 406-10-12 Realty Corp. to Marine Midland Bank in the original principal amount of $450,000.00 dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2236 in the Office of said Register.

The foregoing mortgages A through E were consolidated pursuant to an Assumption Consolidation, Modification and Extension Agreement by and between 406-10-12 Realty Corp. and Marine Midland Bank dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2251 in the Office of said Register to form a single lien in the amount of $1,200,000.00.

The foregoing mortgages A through E, as consolidated, were assigned by HSBC Bank USA, formerly known as Marine Midland Bank to Intervest Corporation of New York by an Assignment of Mortgage dated October 1, 1999 and recorded November 15, 1999 in Reel 2991 Page 1548 in the Office of said Register.

F.     Mortgage made by 400 West 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $140,000.00 dated June 4, 1982 and recorded June 8, 1982 in Reel 625 Page 509 in the Office of said Register.

Said mortgage F was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1665 in the Office of said Register.

G.     Mortgage made by 400 West 22nd St. Corp. to Citibank, N.A. in the original principal amount of $12,147.00 dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1672 in the Office of said Register.

The foregoing mortgages F and G were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 West 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1704 in the Office of said Register to form a single lien in the amount of $140,000.00.

The foregoing mortgages F and G, as consolidated, were assigned by Citibank, N.A. to Lockport Savings Bank by an Assignment of Mortgage dated May 20, 1986 and recorded June 6, 1986 in Reel 1072 Page 1640 in the Office of said Register.

H.     Mortgage made by 400 W. 22 St. Corp. to Lockport Savings Bank in the original principal amount of $171,084.39 dated May 21, 1986 and recorded June 6, 1986 in Reel 1072 Page 1635 in the Office of said Register.

The foregoing mortgages F, G, and H were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between Lockport Savings Bank and 400 W. 22 St. Corp. dated May 21, 1986 and recorded July 11, 1986 in Reel 1087 Page 1493 in the Office of said Register to form a single lien in the amount of $300,000.00.

The foregoing mortgages F, G and H, as consolidated, were assigned by Lockport Savings Bank to Home Savings of America, F.A. by an Assignment of Mortgage dated December 14, 1988 and recorded January 23, 1989 in Reel 1525 Page 1562 in the Office of said Register.

I.    Mortgage made by 400 W. 22d St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $75,000.00 dated August 13, 1986 and recorded August 20, 1986 in Reel 1106 Page 737 in the Office of said Register.

Said mortgage I was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22 St. Corp. dated November 1, 1987 and recorded December 22, 1897 in Reel 1336 Page 1953 in the Office of said Register.

Said mortgage I, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1569 in the Office of said Register.

J.    Mortgage made by 400 W. 22 St. Corp. and 132 9th Ave, Corp. to Dominion Financial Corporation in the original principal amount of $200,000.00 dated February 13, 1987 and recorded February 18, 1987 in Reel 1191 Page 897 in the Office of said Register.

Said mortgage J was assigned by Dominion Financial Corporation to Home Savings of America F.A., by an Assignment of Mortgage dated December 22, 1988 and recorded January 23, 1989 in Reel 1525 Page 1571 in the Office of said Register.

K.    Mortgage made by 400 West 22nd St. Corp., to Harry Steiner Defined Benefit Trust (Rollover Account) as to an undivided 16% Interest, Harry Steiner Defined Benefit Trust as to an undivided 24% Interest, Seymour Eskenazi as to an undivided 30% Interest, Robert E . Felsher, D.D.S., P.C. Retirement Trust as to an undivided 30% Interest in the original principal amount of $125,000.00 dated August 4, 1988 and recorded August 18, 1988 in Reel 1451 Page 1210 in the Office of said Register.

Said mortgage was assigned by Harry Steiner Defined Benefit Trust (Rollover Account), Harry Steiner Defined Benefit Trust, Seymour Eskenazi, and Robert E. Felsher, D.D.S., P.C., Retirement Trust; to Home Savings of America, F.A. by an Assignment of Mortgage dated December 21, 1988 and recorded January 23, 1989 in Reel 1525 Page 1558 in the Office of said Register.

L.    Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $191,253.00 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1101 in the Office of said Register.

The foregoing mortgages F through L were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1430 in the Office of said Register to form a single lien in the amount of $812,500.00.

The foregoing mortgages F through L, as consolidated, were assigned by Home Savings of America, FSB, successor in interest, either by merger or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 and recorded March 10, 1994 in Reel 2066 Page 2411 in the Office of said Register.

The foregoing mortgages F through L, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1595 in the Office of said Register.

The foregoing mortgages F through L, as consolidated, assigned and modified, were further assigned by Coolidge-New York Equities Limited Partnership successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2335 in the Office of said Register.

M.     Mortgage and Security Agreement and Assignment of Leases and Rents made by 400 W. 22 St. Corp. to Coolidge New York Equities Limited Partnership in the original principal amount of $120,000.00 dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1652 in the Office of said Register.

Said mortgage M was assigned by Coolidge-New York Equities Limited Partnership, successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 and recorded June 18, 1999 in Reel 2896 Page 2343 in the Office of said Register.

Said mortgage M, as assigned, was further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 646 in the Office of said Register.

N.     Mortgage made by Goldwep Realty Corp. to Murgoal Corporation in the original amount of $50,000.00 September 15, 1969 and recorded September 17, 1969 in Reel 151 Page 875 in the Office of said Register.

Said mortgage N was assigned by Murgoal Corporation to Edward N. Goldey and Anna Morris Goldey by an Assignment of Mortgage dated October 20, 1969 and recorded November 10, 1969 in Reel 155 Page 1997 in the Office of said Register.

Said mortgage N was further assigned by Edward N. Goldey and Richard N. Goldey, as Executor of the Estate of Anna Morris Goldey, Deceased to Eugene G. King by an Assignment of Mortgage dated November 15, 1972 and recorded December 27, 1972 in Reel 263 Page 800 in the Office of said Register in Reel 263 Page 800.

Said mortgage N was further assigned by Eugene G. King to Prudential Savings Bank by an Assignment of Mortgage dated June 27, 1978 and recorded July 5, 1978 in Reel 444 Page 407 in the Office of said Register.

O.     Mortgage made by 400 West Enterprises, Inc. to Mid-Central Properties, Ltd. in the original amount of $71,500.00 dated March 15, 1971 and recorded March 16, 1971 in Reel 199 Page 206 in the Office of said Register.

Said mortgage O was assigned by Mid-Central Properties, Ltd. to Zurich Capital Co. Ltd. by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1850 in the Office of said Register.

Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to American Bank & Trust Company by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1852 in the Office of said Register.

Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to Zurich Capital Co. by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 717 in the Office of said Register.

Said mortgage O, as assigned, was further assigned by Zurich Capital Co. to American Bank & Trust Company by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 721 in the Office of said Register.

Said mortgage O, as assigned, was further assigned by Bank Leumi Trust Company of New York, as successor to American Bank & Trust Company and Zurich Capital Co. to Prudential Savings Bank by an Assignment of Mortgage dated June 26, 1978 and recorded July 5, 1978 in Reel 444 Page 405 in the Office of said Register.

The foregoing mortgages N and O were assigned by Emigrant Savings Bank, successor by merger to Prudential Savings Bank to Citibank, N.A., by an Assignment of Mortgage dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1667 in the Office of said Register.

P.  Mortgage made by 400 W. 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $60,000.00 dated July 14, 1983 and recorded July 22, 1983 in Reel 703 Page 1075 in the Office of said Register.

Said mortgage was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1670 in the Office of said Register.

The foregoing mortgages N, O and P were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 W. 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1687 in the Office of said Register to form a single lien in the amount of $95,000.00.

The foregoing mortgages N, O and P, as consolidated, were assigned by an Citibank, N.A. to Home Savings of America, F.A. by an Assignment of Mortgage dated January 9, 1989 and recorded January 23, 1989 in Reel 1525 Page 1564 in the Office of said Register.

Q.  Mortgage made by 400 W. 22 St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $200,000.00 dated October 21, 1986 and recorded October 22, 1986 in Reel 1133 Page 355 in the Office of said Register.

Said mortgage Q was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22nd St. Corp. dated November 1, 1987 and recorded December 22, 1987 in Reel 1336 Page 1948 in the Office of said Register.

Said mortgage Q, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage

dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1567 in the Office of said Register.

R.     Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $225,583.58 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1097 in the Office of said Register.

The foregoing mortgages N through R were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1465 in the Office of said Register to form a single lien in the amount of $500,000.00.

The foregoing mortgages N through R, as consolidated, were assigned by Home Savings of America, FSB, successor in interest or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 recorded March 10, 1994 in Reel 2066 Page 2418 in the Office of said Register.

The foregoing mortgages N through R, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W. 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1707 in the Office of said Register.

The foregoing mortgage N through R as consolidated, assigned and modified, were further assigned by Coolidge-New York Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2347 in the Office of said Register.

The foregoing mortgages N through R were further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 632 in the Office of said Register.

S.     Mortgage made by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $530,937.75 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 227 in the Office of said Register.

Said mortgage S was assigned by Paul Matusow to New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 18, 1999 and recorded September 22, 1999 in Reel 2957 Page 2054 in the Office of said Register.

Said mortgage S, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1243 in the Office of said Register.

T.     Mortgage made by Baychester Shopping Center, Inc. to Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten in the original principal amount of $160,500.00 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 253 in the Office of said Register.

Said mortgage T was assigned by Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten to

New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 1, 1999 and recorded September 22, 1999 in Reel 2957 Page 2044 in the Office of said Register.

Said mortgage T, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated September 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1239 in the Office of said Register.

U.  Mortgage by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $298,562.50 dated July 21, 1999 and recorded September 15, 1999 in Reel 2954 Page 25 in the Office of said Register.

The foregoing mortgages S through U were consolidated pursuant to a Consolidation, Modification and Extension Agreement by and between Paul Matusow and Baychester Shopping Center, Inc. dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1247 in the Office of said Register to form a single lien in the amount of $999,000.00.

The foregoing mortgages S through U, as consolidated, were assigned by Paul Matusow to Intervest Corporation of New York by an Assignment of Mortgage dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1273 in the Office of said Register.

V.  Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $3,359,610.07 dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1281 in the Office of said Register.

The foregoing mortgages A through V were consolidated pursuant to a Mortgage Consolidation, Modification, Spreader and Extension Agreement by and between West 22nd Street Properties, LLC and Intervest Corporation of New York dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1296 in the Office of said Register to form a single lien in the amount of $6,500,000.00.

The foregoing mortgages A through V, as consolidated, were assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 5, 2001 and recorded January 31, 2002 in Reel 3441 Page 1951 in the Office of said Register.

W.  Building Loan Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $600,000.00 made dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1366 in the Office of said Register.

Said mortgage W was assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1964 in the Office of said Register.

X.  Mortgage by West 22nd Street Properties, LLC to The Roslyn Savings Bank in the original principal amount of $1,898,522.23 dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1969 in the Office of said Register.

The foregoing mortgages A through X were consolidated pursuant to a Consolidated, Amended and Restated Mortgage, Security Agreement and Assignment of Leases and Rents by and between West 22nd Street Properties, LLC and The Roslyn Savings Bank dated December 14, 2001 and

recorded January 31, 2002 County in Reel 3441 Page 1984 in the Office of said Register to form a single lien in the amount of $8,250,000.00.

The foregoing mortgages A through X, as consolidated, were assigned by New York Community Bank, successor by merger to The Roslyn Savings Bank by an Assignment of Mortgage dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530144 in the Office of said Register.

Y.  Mortgage and Security Agreement made by 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC to Wachovia Bank, National Association in the original principal amount of $1,791,171.09 dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530145 in the Office of said Register.

The foregoing mortgages A through Y were consolidated pursuant to a Consolidation, Modification and Extension and Amended and Restated Mortgage and Security Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530146 in the Office of said Register to form a single lien in the amount of $10,000,000.00.

The foregoing mortgages A through Y, as consolidated, were split and modified pursuant to a Splitter and Modification Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated February 27, 2007 and previously submitted for recording in the Office of said Register.

which Substitute Mortgage was assigned by Assignment of Mortgage dated March 5, 2007 made by Wachovia Bank, National Association to NCC Holdings, LLC and intended to be recorded in the Office of said Register;

which Substitute Mortgage was further assigned by Assignment of Mortgage dated March 7, 2007 made by NCC Holdings, LLC to Intervest National Bank and intended to be recorded in the Office of said Register;

2.  Mortgage dated March 7, 2007 made by New York Spot, Inc. to Intervest National Bank in the principal amount of $950,767.14 and intended to be recorded in the Office of said Register simultaneously herewith.

# MORTGAGE CONSOLIDATION, MODIFICATION AND EXTENSION AGREEMENT
### (And Assignment of Leases and Rents
### and Security Agreement)

| | |
|---|---|
| DATE: | March 7, 2007 |
| MORTGAGOR: | New York Spot Inc. |
| MORTGAGEE: | Intervest National Bank |
| ADDRESS OF PROPERTY: | 442 West 22nd Street New York, New York |

Section 302, Block 719, Lot 66
City of New York, County of New York

Record and Return to:

Intervest National Bank
One Rockefeller Plaza - Suite 400
New York, New York 10020-2002

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2009070600165001001EEF64

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 24 |
|---|---|---|
| **Document ID: 2009070600165001** | Document Date: 03-01-2009 | Preparation Date: 07-06-2009 |
| Document Type: AGREEMENT | | |
| Document Page Count: 21 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| (HOLD FOR PICK-UP: LENNY) | (HOLD FOR PICK-UP: LENNY) |
| RELIABLE ABSTRACT CO. LLC. | INTERVEST NATIONAL BANK |
| 4203 13TH AVENUE 2ND FLOOR RNY-064390 | ONE ROCKEFELLER CENTER, SUITE 400 |
| BROOKLYN, NY 11219 | NEW YORK, NY 10020 |
| 718-438-0786 | |
| jacob@reliableabstract.net | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 719 | 66 | Entire Lot | 442 WEST 22ND STREET |

Property Type: APARTMENT BUILDING

### CROSS REFERENCE DATA

CRFN: 2007000168027

x  Additional Cross References on Continuation Page

### PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| NEW YORK SPOT INC. | INTERVEST NATIONAL BANK |
| 3317 AVENUE N | ONE ROCKEFELLER PLAZA, SUITE 400 |
| BROOKLYN, NY 11234 | NEW YORK, NY 10020 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 1,867,158.41 | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | 255 | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | |
| NYCTA: | $ | 0.00 | Recorded/Filed  07-09-2009 16:07 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | |
| TOTAL: | $ | 0.00 | **2009000209761** | |
| Recording Fee: | $ | 142.00 | | |
| Affidavit Fee: | $ | 8.00 | | |

*City Register Official Signature*



2009070600165001001CEDE4

| | | |
|---|---|---|
| Document ID: 2009070600165001 | Document Date: 03-01-2009 | Preparation Date: 07-06-2009 |
| Document Type: AGREEMENT | | |

**CROSS REFERENCE DATA**
CRFN: 2007000168026

| | | | | | | |
|---|---|---|---|---|---|---|
| MANHATTAN | Year: | 1991 | Reel: | 1772 | Page: | 1358 |
| MANHATTAN | Year: | 1993 | Reel: | 1970 | Page: | 249 |
| MANHATTAN | Year: | 1991 | Reel: | 1772 | Page: | 1348 |
| MANHATTAN | Year: | 1991 | Reel: | 1773 | Page: | 464 |
| MANHATTAN | Year: | 1991 | Reel: | 1773 | Page: | 473 |
| MANHATTAN | Year: | 1993 | Reel: | 1970 | Page: | 255 |
| MANHATTAN | Year: | 1993 | Reel: | 1970 | Page: | 252 |
| MANHATTAN | Year: | 1993 | Reel: | 1970 | Page: | 262 |
| MANHATTAN | Year: | 1993 | Reel: | 1970 | Page: | 276 |
| MANHATTAN | Year: | 1998 | Reel: | 2737 | Page: | 2232 |
| MANHATTAN | Year: | 1998 | Reel: | 2737 | Page: | 2236 |
| MANHATTAN | Year: | 1998 | Reel: | 2737 | Page: | 2251 |
| MANHATTAN | Year: | 1999 | Reel: | 2991 | Page: | 1548 |
| MANHATTAN | Year: | 1982 | Reel: | 625 | Page: | 509 |
| MANHATTAN | Year: | 1984 | Reel: | 832 | Page: | 1665 |
| MANHATTAN | Year: | 1984 | Reel: | 832 | Page: | 1672 |
| MANHATTAN | Year: | 1984 | Reel: | 832 | Page: | 1704 |
| MANHATTAN | Year: | 1986 | Reel: | 1072 | Page: | 1640 |
| MANHATTAN | Year: | 1986 | Reel: | 1072 | Page: | 1635 |
| MANHATTAN | Year: | 1986 | Reel: | 1087 | Page: | 1493 |
| MANHATTAN | Year: | 1989 | Reel: | 1525 | Page: | 1562 |
| MANHATTAN | Year: | 1986 | Reel: | 1106 | Page: | 737 |
| MANHATTAN | Year: | 1987 | Reel: | 1336 | Page: | 1953 |
| MANHATTAN | Year: | 1989 | Reel: | 1525 | Page: | 1569 |
| MANHATTAN | Year: | 1987 | Reel: | 1191 | Page: | 897 |
| MANHATTAN | Year: | 1989 | Reel: | 1525 | Page: | 1571 |
| MANHATTAN | Year: | 1988 | Reel: | 1451 | Page: | 1210 |
| MANHATTAN | Year: | 1989 | Reel: | 1525 | Page: | 1558 |
| MANHATTAN | Year: | 1989 | Reel: | 1532 | Page: | 1101 |
| MANHATTAN | Year: | 1989 | Reel: | 1568 | Page: | 1430 |
| MANHATTAN | Year: | 1994 | Reel: | 2066 | Page: | 2411 |
| MANHATTAN | Year: | 1994 | Reel: | 2163 | Page: | 1595 |
| MANHATTAN | Year: | 1999 | Reel: | 2896 | Page: | 2343 |
| MANHATTAN | Year: | 1999 | Reel: | 2989 | Page: | 646 |
| MANHATTAN | Year: | 1969 | Reel: | 151 | Page: | 875 |
| MANHATTAN | Year: | 1969 | Reel: | 155 | Page: | 1997 |
| MANHATTAN | Year: | 1972 | Reel: | 263 | Page: | 800 |
| MANHATTAN | Year: | 1978 | Reel: | 444 | Page: | 407 |
| MANHATTAN | Year: | 1971 | Reel: | 199 | Page: | 206 |
| MANHATTAN | Year: | 1975 | Reel: | 354 | Page: | 1850 |
| MANHATTAN | Year: | 1975 | Reel: | 354 | Page: | 1852 |



2009070600165001001CEDE4

| | | |
|---|---|---|
| Document ID: 2009070600165001 | Document Date: 03-01-2009 | Preparation Date: 07-06-2009 |
| Document Type: AGREEMENT | | |

**CROSS REFERENCE DATA**

| | | | | |
|---|---|---|---|---|
| MANHATTAN | Year: 1975 | Reel: 357 | Page: 717 |
| MANHATTAN | Year: 1975 | Reel: 357 | Page: 721 |
| MANHATTAN | Year: 1978 | Reel: 444 | Page: 405 |
| MANHATTAN | Year: 1984 | Reel: 832 | Page: 1667 |
| MANHATTAN | Year: 1983 | Reel: 703 | Page: 1075 |
| MANHATTAN | Year: 1984 | Reel: 832 | Page: 1670 |
| MANHATTAN | Year: 1984 | Reel: 832 | Page: 1687 |
| MANHATTAN | Year: 1989 | Reel: 1525 | Page: 1564 |
| MANHATTAN | Year: 1986 | Reel: 1133 | Page: 355 |
| MANHATTAN | Year: 1987 | Reel: 1336 | Page: 1948 |
| MANHATTAN | Year: 1989 | Reel: 1525 | Page: 1567 |
| MANHATTAN | Year: 1989 | Reel: 1532 | Page: 1097 |
| MANHATTAN | Year: 1989 | Reel: 1568 | Page: 1465 |
| MANHATTAN | Year: 1994 | Reel: 2066 | Page: 2418 |
| MANHATTAN | Year: 1994 | Reel: 2163 | Page: 1707 |
| MANHATTAN | Year: 1999 | Reel: 2896 | Page: 2347 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 632 |
| MANHATTAN | Year: 1994 | Reel: 2090 | Page: 227 |
| MANHATTAN | Year: 1999 | Reel: 2957 | Page: 2054 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1243 |
| MANHATTAN | Year: 1994 | Reel: 2090 | Page: 253 |
| MANHATTAN | Year: 1999 | Reel: 2957 | Page: 2044 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1239 |
| MANHATTAN | Year: 1999 | Reel: 2954 | Page: 25 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1247 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1273 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1281 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1296 |
| MANHATTAN | Year: 2002 | Reel: 3441 | Page: 1951 |
| MANHATTAN | Year: 1999 | Reel: 2989 | Page: 1366 |
| MANHATTAN | Year: 2002 | Reel: 3441 | Page: 1964 |
| MANHATTAN | Year: 2002 | Reel: 3441 | Page: 1969 |
| MANHATTAN | Year: 2002 | Reel: 3441 | Page: 1984 |

**CRFN:** 2004000530144
**CRFN:** 2004000530145
**CRFN:** 2004000530146
**CRFN:** 2007000146958
**CRFN:** 2007000168028
**CRFN:** 2007000168029
**CRFN:** 2007000168030
**CRFN:** 2007000168031

# NOTE AND MORTGAGE MODIFICATION AND EXTENSION AGREEMENT

NEW YORK SPOT INC.

and

INTERVEST NATIONAL BANK

DATE:             as of March 1, 2009

MORTGAGOR:        New York Spot Inc.

MORTGAGEE:        Intervest National Bank

ADDRESS OF        442 West 22nd Street
PROPERTY:         New York, New York

Block 719, Lot 66
City of New York, County of New York

Record and Return to:

Intervest National Bank
One Rockefeller Plaza, Suite 400
New York, New York 10020-2002

# NOTE AND MORTGAGE
## MODIFICATION AND EXTENSION AGREEMENT

THIS NOTE AND MORTGAGE MODIFICATION AND EXTENSION AGREEMENT (this "Agreement") is dated July ___, 2009, effective as of March 1, 2009 by and between NEW YORK SPOT INC., a New York corporation having an address at 3317 Avenue N, Brooklyn, New York 11234 (the "Mortgagor") and INTERVEST NATIONAL BANK, having an address at One Rockefeller Plaza, Suite 400, New York, New York 10020-2002 (the "Mortgagee").

## W I T N E S S E T H :

WHEREAS, the Mortgagee is the owner and holder of those certain mortgages as set forth on Exhibit A annexed hereto and made a part hereof (which mortgages, as now exist, and as the same are herein, and may hereafter, from time to time, be extended or modified are hereinafter collectively referred to as the "Mortgage"), and of the notes more particularly described therein and secured thereby (the notes are hereinafter collectively referred to as the "Note"); and

WHEREAS, the Mortgage is now a lien upon the property described on Exhibit B annexed hereto and made a part hereof in the outstanding principal sum, as of the date hereof, of One Million Eight Hundred Sixty-Seven Thousand One Hundred Fifty-Eight and 41/100 Dollars ($1,867,158.41) (which outstanding sum takes into account amortization that was part of the monthly installment due on June 1, 2009 which was paid by Mortgagor along with interest through May 31, 2009) the sum now outstanding under the Note and the Mortgage; and

WHEREAS, the Mortgagee and the Mortgagor have mutually agreed to modify the terms of the Mortgage and the Note in the manner hereinafter set forth.

NOW, THEREFORE, in consideration of the sum of ONE AND 00/100 ($1.00) DOLLAR and other valuable consideration each to the other in hand paid, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Mortgage.

2.      Mortgagor represents, warrants and agrees with the Mortgagee as follows:

     (a)     The principal sum of One Million Eight Hundred Sixty-Seven Thousand One Hundred Fifty-Eight and 41/100 Dollars ($1,867,158.41) (which outstanding sum takes into account amortization that was part of the monthly installment due on June 1, 2009, which was paid by Mortgagor) is now due and owing on the Note and the Mortgage, without offsets or defenses.

     (b)     Each of the Note and the Mortgage is in full force and effect and has not

been modified.

(c) The Note and the Mortgage have been duly authorized, executed and delivered by the Mortgagor and constitute legal, valid and binding obligations of the Mortgagor, enforceable against the Mortgagor in accordance with their respective terms.

(d) The Mortgage is a valid first mortgage lien in favor of the Mortgagee on the Mortgaged Property, securing the indebtedness evidenced by the Note.

(e) The Mortgagor is the sole owner of the Mortgaged Property, and except for the Mortgage no mortgage or other lien encumbers the Mortgaged Property.

3. Commencing on the date hereof, the terms and provisions of Schedule A of the Note are modified as set forth on Exhibit C hereof.

4. Commencing on the date hereof, the terms and provisions of Schedule B of the Mortgage are modified as set forth on Exhibit D hereof.

5. Paragraph 1(f) of the Mortgage is hereby deleted in its entirety and the following paragraph is substituted in lieu thereof:

"(f) The 'Fee Payment' shall mean an amount calculated as a percentage of the outstanding principal balance of this Mortgage as follows:

| if the Fee Payment Date is | Fee Payment Due |
|---|---|
| Prior to March 1, 2010 | 2% |
| On or after March 1, 2010 (including on or after March 1, 2011 (the "Maturity Date") | 1% |

Notwithstanding the foregoing, provided there shall be no default under this Mortgage, in the event this Mortgage is paid in full during the thirty (30) day period ending with the stated Maturity Date, no Fee Payment shall be due during the thirty (30) day period ending with the stated Maturity Date.".

6. Prior to executing this Agreement, Mortgagor has paid to Mortgagee the Extension Fee due in the amount of $28,157.31.

8. Mortgagee has waived the Fee Payment due in connection with this Agreement in the amount of $19,200.00; provided, however, that such waiver shall not diminish the amount of the Fee Payment which shall be due in full upon the next Fee Payment Date.

I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

9. Mortgagor shall pay to Mortgagee the attorneys' fees due in connection with this Agreement in the amount of $5,500.00, of which $3,500.00 has been paid and $2,000.00 is due upon execution of this Agreement.

10. Mortgagor's representations and warranties set forth in the Note, the Mortgage and the other documents executed and delivered in connection with the Note and the Mortgage are true and correct as of the date hereof as though made on the date hereof.

11. The terms hereof may not be waived, changed, modified, terminated or discharged orally, but by an agreement in writing signed by the party against whom enforcement of such waiver, change, modification, termination and discharge is sought.

12. Whenever in the Note or the Mortgage reference is made to the "Note" or the "Mortgage", the same shall mean the Note or the Mortgage, as the case may be, as modified and amended by this Agreement and as may hereafter be modified or amended. To the extent that the terms, covenants and conditions of the Mortgage or the Note shall conflict with those set forth herein, the terms, covenants and conditions of the Mortgage and the Note hereby are and shall be superseded and replaced by the terms, covenants and conditions set forth herein, and the Mortgagor agrees to comply with and be subject to all of the terms, covenants and conditions of the Mortgage and the Note, as modified hereby.

13. Mortgagor shall be responsible for and shall pay to the Mortgagee upon demand all of the Mortgagee's costs and expenses in connection with this Agreement including, without limitation, the Mortgagee's attorneys' fees and disbursements.

14. Except as hereinabove expressly provided, all of the terms, covenants and provisions of the Note and of the Mortgage shall be and remain in full force and effect.

15. This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

[signature and acknowledgment page follows]

I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

NEW YORK SPOT INC.

By: _____
Yehuda Nelkenbaum
President

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On this /st day of July in the year 2009, before me, a Notary Public in and for said State, personally appeared YEHUDA NELKENBAUM, before me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

[signature and acknowledgment page follows]

**SEAL**

Aaron M. Feinberg
Notary Public No. 24-4834238
Qualified Kings County, NY
Comm. Expires June 30, 2011

INTERVEST NATIONAL BANK

By: _____
Lowell S. Dansker
Chairman and Chief Executive Officer

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

On this 2nd day of July in the year 2009, before me, a Notary Public in and for said State, personally appeared LOWELL S. DANSKER, before me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

**SALLY YI WANG**
**NOTARY PUBLIC-STATE OF NEW YORK**
No. 01WA6140675
Qualified in Queens County
My Commission Expires January 30, 2010

SEAL

## EXHIBIT A

### Schedule of Mortgages

1.    Substitute Mortgage dated March 5, 2007, from 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC (collectively, the "Mortgagor") to Wachovia Bank, National Association in the original principal sum of $969,232.86 and recorded on April 2, 2007 in CRFN 2007000168027 in the Office of the City Register, County of New York (the "Office") and covering the premises known as 442 West 22nd Street, New York, New York as more fully described therein pursuant to a Splitter and Modification Agreement dated as of March 5, 2007, between the Mortgagor and the Assignor and recorded on April 2, 2007 in the Office in CRFN 2007000168026, the Mortgage was split and severed from the mortgage(s) described below:

    A.    Mortgage made by 406-10-12 Realty Corp. to American Savings and Loan Association in the original principal amount of $450,000.00 dated March 27, 1991 and recorded April 2, 1991 Reel 1772 Page 1358 in the Office of the City Register, County of New York.

        Said mortgage A was assigned by American Savings and Loan Association to New York Federal Savings Bank by an Assignment of Mortgage dated April 30, 1993 and recorded May 12, 1993 in Reel 1970 Page 249 in the Office.

    B.    Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $100,000.00 dated March 27, 1991 and recorded April 2, 1991 in Reel 1772 Page 1348 in the Office.

    C.    Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $50,000.00 dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 464 in the Office.

        The foregoing mortgages B and C were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 473 in the Office to form a single lien in the amount of $150,000.00.

        The foregoing mortgages B and C, as consolidated, were extended pursuant to an Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 255 in the Office.

        The foregoing mortgages B and C, as consolidated and extended, were assigned by Arthur Weyhe to New York Federal Savings Bank by an

Assignment of Mortgage dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 252 in the Office.

D.    Blanket Mortgage made by 406-10-12 Realty Corp. to New York Federal Savings Bank in the original principal amount of $162,462.06 dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 262 in the Office.

The foregoing mortgages A through D were consolidated pursuant to a Blanket Mortgage Modification and Consolidation Agreement by and between 406-10-12 Realty Corp. and New York Federal Savings Bank dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 276 in the Office to form a single lien in the amount of $750,000.00.

The foregoing mortgages A through D, as consolidated, were assigned by Flushing Savings Bank, FSB (successor by merger to New York Federal Savings Bank) to Marine Midland Bank by an Assignment of Mortgage dated 3/31/98 and recorded 10/23/98 in Reel 2737 Page 2232 in the Office.

E.    Multifamily Mortgage, Assignment of Rents and Security Agreement made by 406-10-12 Realty Corp. to Marine Midland Bank in the original principal amount of $450,000.00 dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2236 in the Office.

The foregoing mortgages A through E were consolidated pursuant to an Assumption Consolidation, Modification and Extension Agreement by and between 406-10-12 Realty Corp. and Marine Midland Bank dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2251 in the Office to form a single lien in the amount of $1,200,000.00.

The foregoing mortgages A through E, as consolidated, were assigned by HSBC Bank USA, formerly known as Marine Midland Bank to Intervest Corporation of New York by an Assignment of Mortgage dated October 1, 1999 and recorded November 15, 1999 in Reel 2991 Page 1548 in the Office.

F.    Mortgage made by 400 West 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $140,000.00 dated June 4, 1982 and recorded June 8, 1982 in Reel 625 Page 509 in the Office.

Said mortgage F was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1665 in the Office.

G.  Mortgage made by 400 West 22nd St. Corp. to Citibank, N.A. in the original principal amount of $12,147.00 dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1672 in the Office.

> The foregoing mortgages F and G were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 West 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1704 in the Office to form a single lien in the amount of $140,000.00.

> The foregoing mortgages F and G, as consolidated, were assigned by Citibank, N.A. to Lockport Savings Bank by an Assignment of Mortgage dated May 20, 1986 and recorded June 6, 1986 in Reel 1072 Page 1640 in the Office.

H.  Mortgage made by 400 W. 22 St. Corp. to Lockport Savings Bank in the original principal amount of $171,084.39 dated May 21, 1986 and recorded June 6, 1986 in Reel 1072 Page 1635 in the Office.

> The foregoing mortgages F, G, and H were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between Lockport Savings Bank and 400 W. 22 St. Corp. dated May 21, 1986 and recorded July 11, 1986 in Reel 1087 Page 1493 in the Office to form a single lien in the amount of $300,000.00.

> The foregoing mortgages F, G and H, as consolidated, were assigned by Lockport Savings Bank to Home Savings of America, F.A. by an Assignment of Mortgage dated December 14, 1988 and recorded January 23, 1989 in Reel 1525 Page 1562 in the Office.

I.  Mortgage made by 400 W. 22d St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $75,000.00 dated August 13, 1986 and recorded August 20, 1986 in Reel 1106 Page 737 in the Office.

Said mortgage I was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22 St. Corp. dated November 1, 1987 and recorded December 22, 1897 in Reel 1336 Page 1953 in the Office.

> Said mortgage I, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1569 in the Office.

J.  Mortgage made by 400 W. 22 St. Corp. and 132 9th Ave, Corp. to Dominion Financial Corporation in the original principal amount of $200,000.00 dated

I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

February 13, 1987 and recorded February 18, 1987 in Reel 1191 Page 897 in the Office

> Said mortgage J was assigned by Dominion Financial Corporation to Home Savings of America F.A., by an Assignment of Mortgage dated December 22, 1988 and recorded January 23, 1989 in Reel 1525 Page 1571 in the Office.

K.  Mortgage made by 400 West 22nd St. Corp., to Harry Steiner Defined Benefit Trust (Rollover Account) as to an undivided 16% Interest, Harry Steiner Defined Benefit Trust as to an undivided 24% Interest, Seymour Eskenazi as to an undivided 30% Interest, Robert E . Felsher, D.D.S., P.C. Retirement Trust as to an undivided 30% Interest in the original principal amount of $125,000.00 dated August 4, 1988 and recorded August 18, 1988 in Reel 1451 Page 1210 in the Office.

> Said mortgage was assigned by Harry Steiner Defined Benefit Trust (Rollover Account), Harry Steiner Defined Benefit Trust, Seymour Eskenazi, and Robert E. Felsher, D.D.S., P.C., Retirement Trust, to Home Savings of America, F.A. by an Assignment of Mortgage dated December 21, 1988 and recorded January 23, 1989 in Reel 1525 Page 1558 in the Office.

L.  Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $191,253.00 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1101 in the Office.

> The foregoing mortgages F through L were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1430 in the Office to form a single lien in the amount of $812,500.00.

> The foregoing mortgages F through L, as consolidated, were assigned by Home Savings of America, FSB, successor in interest, either by merger or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 and recorded March 10, 1994 in Reel 2066 Page 2411 in the Office.

> The foregoing mortgages F through L, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1595 in the Office.

-9-

The foregoing mortgages F through L, as consolidated, assigned and modified, were further assigned by Coolidge-New York Equities Limited Partnership successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2335 in the Office.

M. Mortgage and Security Agreement and Assignment of Leases and Rents made by 400 W. 22 St. Corp. to Coolidge New York Equities Limited Partnership in the original principal amount of $120,000.00 dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1652 in the Office.

Said mortgage M was assigned by Coolidge-New York Equities Limited Partnership, successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 and recorded June 18, 1999 in Reel 2896 Page 2343 in the Office.

Said mortgage M, as assigned, was further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 646 in the Office.

N. Mortgage made by Goldwep Realty Corp. to Murgoal Corporation in the original amount of $50,000.00 September 15, 1969 and recorded September 17, 1969 in Reel 151 Page 875 in the Office.

Said mortgage N was assigned by Murgoal Corporation to Edward N. Goldey and Anna Morris Goldey by an Assignment of Mortgage dated October 20, 1969 and recorded November 10, 1969 in Reel 155 Page 1997 in the Office.

Said mortgage N was further assigned by Edward N. Goldey and Richard N. Goldey, as Executor of the Estate of Anna Morris Goldey, Deceased to Eugene G. King by an Assignment of Mortgage dated November 15, 1972 and recorded December 27, 1972 in Reel 263 Page 800 in the Office in Reel 263 Page 800.

Said mortgage N was further assigned by Eugene G. King to Prudential Savings Bank by an Assignment of Mortgage dated June 27, 1978 and recorded July 5, 1978 in Reel 444 Page 407 in the Office.

I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

O.   Mortgage made by 400 West Enterprises, Inc. to Mid-Central Properties, Ltd. in the original amount of $71,500.00 dated March 15, 1971 and recorded March 16, 1971 in Reel 199 Page 206 in the Office.

> Said mortgage O was assigned by Mid-Central Properties, Ltd. to Zurich Capital Co. Ltd. by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1850 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to American Bank & Trust Company by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1852 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to Zurich Capital Co. by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 717 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. to American Bank & Trust Company by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 721 in the Office.

> Said mortgage O, as assigned, was further assigned by Bank Leumi Trust Company of New York, as successor to American Bank & Trust Company and Zurich Capital Co. to Prudential Savings Bank by an Assignment of Mortgage dated June 26, 1978 and recorded July 5, 1978 in Reel 444 Page 405 in the Office

> The foregoing mortgages N and O were assigned by Emigrant Savings Bank, successor by merger to Prudential Savings Bank to Citibank, N.A., by an Assignment of Mortgage dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1667 in the Office

P.   Mortgage made by 400 W. 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $60,000.00 dated July 14, 1983 and recorded July 22, 1983 in Reel 703 Page 1075 in the Office

> Said mortgage was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1670 in the Office.

> The foregoing mortgages N, O and P were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 W. 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded

September 18, 1984 in Reel 832 Page 1687 in the Office to form a single lien in the amount of $95,000.00.

The foregoing mortgages N, O and P, as consolidated, were assigned by an Citibank, N.A. to Home Savings of America, F.A. by an Assignment of Mortgage dated January 9, 1989 and recorded January 23, 1989 in Reel 1525 Page 1564 in the Office.

Q.   Mortgage made by 400 W. 22 St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $200,000.00 dated October 21, 1986 and recorded October 22, 1986 in Reel 1133 Page 355 in the Office.

Said mortgage Q was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22nd St. Corp. dated November 1, 1987 and recorded December 22, 1987 in Reel 1336 Page 1948 in the Office.

Said mortgage Q, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1567 in the Office.

R.   Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $225,583.58 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1097 in the Office.

The foregoing mortgages N through R were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1465 in the Office to form a single lien in the amount of $500,000.00.

The foregoing mortgages N through R, as consolidated, were assigned by Home Savings of America, FSB, successor in interest or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 recorded March 10, 1994 in Reel 2066 Page 2418 in the Office.

The foregoing mortgages N through R, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W. 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1707 in the Office.

The foregoing mortgage N through R as consolidated, assigned and modified, were further assigned by Coolidge-New York Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2347 in the Office.

The foregoing mortgages N through R were further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 632 in the Office.

S.    Mortgage made by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $530,937.75 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 227 in the Office.

Said mortgage S was assigned by Paul Matusow to New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 18, 1999 and recorded September 22, 1999 in Reel 2957 Page 2054 in the Office.

Said mortgage S, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1243 in the Office.

T.    Mortgage made by Baychester Shopping Center, Inc. to Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten in the original principal amount of $160,500.00 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 253 in the Office.

Said mortgage T was assigned by Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten to New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 1, 1999 and recorded September 22, 1999 in Reel 2957 Page 2044 in the Office.

Said mortgage T, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated September 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1239 in the Office.

U.    Mortgage by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $298,562.50 dated July 21, 1999 and recorded September 15, 1999 in Reel 2954 Page 25 in the Office.

The foregoing mortgages S through U were consolidated pursuant to a Consolidation, Modification and Extension Agreement by and between Paul Matusow and Baychester Shopping Center, Inc. dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1247 in the Office to form a single lien in the amount of $999,000.00.

The foregoing mortgages S through U, as consolidated, were assigned by Paul Matusow to Intervest Corporation of New York by an Assignment of Mortgage dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1273 in the Office.

V.   Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $3,359,610.07 dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1281 in the Office.

The foregoing mortgages A through V were consolidated pursuant to a Mortgage Consolidation, Modification, Spreader and Extension Agreement by and between West 22nd Street Properties, LLC and Intervest Corporation of New York dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1296 in the Office to form a single lien in the amount of $6,500,000.00.

The foregoing mortgages A through V, as consolidated, were assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 5, 2001 and recorded January 31, 2002 in Reel 3441 Page 1951 in the Office.

W.   Building Loan Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $600,000.00 made dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1366 in the Office.

Said mortgage W was assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1964 in the Office.

X.   Mortgage by West 22nd Street Properties, LLC to The Roslyn Savings Bank in the original principal amount of $1,898,522.23 dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1969 in the Office.

The foregoing mortgages A through X were consolidated pursuant to a Consolidated, Amended and Restated Mortgage, Security Agreement and Assignment of Leases and Rents by and between West 22nd Street Properties, LLC and The Roslyn Savings Bank dated December 14, 2001

I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

and recorded January 31, 2002 County in Reel 3441 Page 1984 in the Office to form a single lien in the amount of $8,250,000.00.

The foregoing mortgages A through X, as consolidated, were assigned by New York Community Bank, successor by merger to The Roslyn Savings Bank by an Assignment of Mortgage dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530144 in the Office.

Y.    Mortgage and Security Agreement made by 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC to Wachovia Bank, National Association in the original principal amount of $1,791,171.09 dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530145 in the Office.

The foregoing mortgages A through Y were consolidated pursuant to a Consolidation, Modification and Extension and Amended and Restated Mortgage and Security Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530146 in the Office to form a single lien in the amount of $10,000,000.00.

The foregoing mortgages A through Y, as consolidated, were split and modified pursuant to a Splitter and Modification Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated February 27, 2007 and recorded on March 20, 2007 in CRFN 2007000146958 in the Office.

which Substitute Mortgage was assigned by Assignment of Mortgage dated March 5, 2007 made by Wachovia Bank, National Association to NCC Holdings, LLC and recorded on April 2, 2007 in CRFN 2007000168028 in the Office;

which Substitute Mortgage was further assigned by Assignment of Mortgage dated March 7, 2007 made by NCC Holdings, LLC to Intervest National Bank and recorded on April 2, 2007 in CRFN 2007000168029 in the Office; and

2.    Mortgage dated March 7, 2007 made by New York Spot, Inc. to Intervest National Bank in the principal amount of $950,767.14 and recorded on April 2, 2007 in CRFN 2007000168030 in the Office.

Which Mortgages 1 and 2 were consolidated to form a single lien in the amount of $1,920,000.00 by Mortgage Consolidation, Modification and Extension Agreement (And Assignment of Leases and Rents and Security Agreement) made by and between New York Spot Inc. and Intervest National Bank dated March 7, 2007 and recorded on April 2, 2007 in CRFN 2007000168031 in the Office.

# EXHIBIT B

## Description of Property



I:\Users\Share\Intervest\Loans\Modification and or Extensions\Intervest National Bank\442 W 22nd St, New York, NY - 2009 Extension\Note & Mortgage Modification Agmt v4.doc

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------x
INTERVEST NATIONAL BANK

                    Plaintiff,        Index No. 650877/10

**ASSIGNMENT AND
ASSUMPTION OF
CAUSE OF ACTION**

       -against-

NEW YORK SPOT INC., YEHUDA NELKENBAUM
NCC CAPITAL, LLC, NEW YORK STATE,
NEW YORK CITY, CHARLES NEISS, NEW YORK
CITY DEPT OF HOUSING PRESERVATION &
DEVELOPMENT, ANDREW THOMPSON, NEW YORK
CITY ENVIRONMENTAL CONTROL BOARD
JOHN DOE #1" through JOHN DOE #60"
inclusive, the true names of said
defendants being unknown to plaintiff,
the parties being intended to be those
persons having or claiming an interest
in the mortgaged premises described in
the complaint by virtue of being
tenants, occupants, owners, judgment
creditors, or lienors of any type or
nature, and/or their heirs, successors,
or assigns in all or part of said
premises,

               Defendants.
----------------------------------------x

      **FOR VALUE RECEIVED,** INTERVEST NATIONAL BANK, Plaintiff

("Assignor") does hereby assign to WEST 22^ND^ LLC, all of

Assignor's right, title and interest in and to the subject

matter of the above-entitled action and the cause of action

alleged in the complaint, which action was filed in the Supreme

Court of the State of New York, County of NEW YORK and does

hereby authorize and consent that the Assignee be substituted as

plaintiff, as and if necessary, and proceed with the said action

as plaintiff in Assignor's place and to take all steps and

execute all papers necessary for the continuation of said action and to receive and collect the proceeds and benefits of said action whether by way of settlement, judgment, payment, collection or otherwise, and Assignee herewith accepts the foregoing assignment and assumes all of the obligations and liabilities as plaintiff in said action.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand as of the 11th Day of February, 2011

**ASSIGNOR:**
INTERVEST NATIONAL BANK

BY: Lowell S. Dansker, Chief Executive Officer

**ASSIGNEE:**
WEST 22ND LLC

BY: David Godbout, its Managing Member

- 44 -

STATE OF NEW YORK, COUNTY OF NEW YORK    ss:

On the 11th day of February in the year 2011, before me, the undersigned, personally appeared Lowell S. Dansker, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

CHARLES GOLIN
Notary Public, State of New York
No. 02GO5020830
Qualified in Queens County
Commission Expires Nov. 25, 6/14/14


STATE OF NEW YORK, COUNTY OF NEW YORK    ss:

On the 11th day of February in the year 2011, before me, the undersigned, personally appeared David Godbout, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MINLI CHEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CH6172951
Qualified in Queens County
My Commission Expires August 20, 2011

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2011021801118001001EC882

## RECORDING AND ENDORSEMENT COVER PAGE

| | | |
|---|---|---|
| **Document ID: 2011021801118001** | Document Date: 02-11-2011 | Preparation Date: 02-22-2011 |

Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 14

| PRESENTER: | RETURN TO: |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE CO. | COMMONWEALTH LAND TITLE INSURANCE CO. |
| RETURN TO GREGG OR FERNANDO | (PICK-UP) |
| 140 EAST 45TH STREET, 22ND FLOOR | GOODWIN PROCTER LLP |
| NEW YORK, NY 10017 | THE NEW YORK TIMES BUILDING; 620 EIGHTH |
| 212-949-0100 | AVENUE |
| gregoryshaw@cltic.com / NY110151M | NEW YORK, NY 10018 |

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 719 | 66 | Entire Lot | 442 WEST 22ND STREET |

**Property Type:** APARTMENT BUILDING

## CROSS REFERENCE DATA

**CRFN:** 2007000168027

x Additional Cross References on Continuation Page

## PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| INTERVEST NATIONAL BANK | WEST 22ND LLC |
| ONE ROCKEFELLER PLAZA, SUITE 400 | C/O EINIG & BUSH, LLP, 420 LEXINGTON AVENUE, |
| NEW YORK, NY 10020 | SUITE 2320 |
| | NEW YORK, NY 10170 |

## FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | |
| MTA: | $ | 0.00 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 0.00 | |
| Recording Fee: | $ | 110.00 | |
| Affidavit Fee: | $ | 0.00 | |

**RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK**

Recorded/Filed 03-02-2011 11:20
City Register File No.(CRFN):
**2011000075793**

*Annette M. Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2011021801118001001CCA02

| | | |
|---|---|---|
| **Document ID: 2011021801118001** | Document Date: 02-11-2011 | Preparation Date: 02-22-2011 |

Document Type: ASSIGNMENT, MORTGAGE

---

**CROSS REFERENCE DATA**
**CRFN:** 2007000168026
**CRFN:** 2007000168030
**CRFN:** 2007000168031
**CRFN:** 2009000209761

# ASSIGNMENT OF MORTGAGE

Block 719, Lot 66
442 West 22nd Street
New York, New York

## ASSIGNMENT OF NOTE AND MORTGAGE

KNOW ALL MEN BY THESE PRESENTS: That INTERVEST NATIONAL BANK (the "Assignor"), having an address at One Rockefeller Plaza, Suite 400, New York, NY 10020, in consideration of Ten Dollars ($10.00) and other good and valuable considerations, received from or on behalf of WEST 22ND LLC (the "Assignee"), having an office at c/o Einig & Bush, LLP, 420 Lexington Avenue, Suite 2320, New York, New York 10170, does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee all of its right, title and interest in and to the following:

See Schedule A annexed hereto.

Together with the notes described in said mortgages, and the moneys due and to grow due thereon with the interest.

Said mortgages have not been further assigned.

This assignment is not subject to Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

This assignment is being made without recourse, representation or warranty, express or implied.

This assignment shall inure to the benefit of the successors and assigns of the Assignor and the Assignee, and shall be binding upon the successors and assigns of the Assignor and the Assignee.

TO HAVE AND TO HOLD the same unto the Assignee, its legal representatives, successors and assigns forever.

IN WITNESS WHEREOF, the Assignor has executed this assignment as of the 11th day of February, 2011.

ASSIGNOR:
INTERVEST NATIONAL BANK

By: _____
Name: Lowell S. Dansker
Title: Chief Executive Officer

State of New York

                      ss:

County of New York

On the 11th day of February in the year 2011 before me, the undersigned, personally appeared Lowell S. Dansker personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed, the instrument.

CHARLES GOLIN
Notary Public, State of New York
No. 02GO5020830
Qualified in Queens County
Commission Expires Nov. 29, 19

6/14/14

SEAL

RECORD & RETURN TO:

Goodwin|Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn: Ross D. Gillman, Esq.

## SCHEDULE A TO ASSIGNMENT OF MORTGAGE

### Schedule of Mortgages

1.      Substitute Mortgage dated March 5, 2007, from 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC (collectively, the "Mortgagor") to Wachovia Bank, National Association in the original principal sum of $969,232.86 and recorded on April 2, 2007 in CRFN 2007000168027 in the Office of the City Register, County of New York (the "Office") and covering the premises known as 442 West 22nd Street, New York, New York as more fully described therein pursuant to a Splitter and Modification Agreement dated as of March 5, 2007, between the Mortgagor and the Assignor and recorded on April 2, 2007 in the Office in CRFN 2007000168026, the Mortgage was split and severed from the mortgage(s) described below:

A.      Mortgage made by 406-10-12 Realty Corp. to American Savings and Loan Association in the original principal amount of $450,000.00 dated March 27, 1991 and recorded April 2, 1991 Reel 1772 Page 1358 in the Office of the City Register, County of New York.

Said mortgage A was assigned by American Savings and Loan Association to New York Federal Savings Bank by an Assignment of Mortgage dated April 30, 1993 and recorded May 12, 1993 in Reel 1970 Page 249 in the Office.

B.      Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $100,000.00 dated March 27, 1991 and recorded April 2, 1991 in Reel 1772 Page 1348 in the Office.

C.      Mortgage made by 406-10-12 Realty Corp. to Arthur Weyhe in the original principal amount of $50,000.00 dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 464 in the Office.

The foregoing mortgages B and C were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated March 27, 1991 and recorded April 4, 1991 in Reel 1773 Page 473 in the Office to form a single lien in the amount of $150,000.00.

The foregoing mortgages B and C, as consolidated, were extended pursuant to an Extension Agreement by and between 406-10-12 Realty Corp. and Arthur Weyhe dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 255 in the Office.

The foregoing mortgages B and C, as consolidated and extended, were assigned by Arthur Weyhe to New York Federal Savings Bank by an

Assignment of Mortgage dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 252 in the Office.

D.   Blanket Mortgage made by 406-10-12 Realty Corp. to New York Federal Savings Bank in the original principal amount of $162,462.06 dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 262 in the Office.

> The foregoing mortgages A through D were consolidated pursuant to a Blanket Mortgage Modification and Consolidation Agreement by and between 406-10-12 Realty Corp. and New York Federal Savings Bank dated May 6, 1993 and recorded May 12, 1993 in Reel 1970 Page 276 in the Office to form a single lien in the amount of $750,000.00.

> The foregoing mortgages A through D, as consolidated, were assigned by Flushing Savings Bank, FSB (successor by merger to New York Federal Savings Bank) to Marine Midland Bank by an Assignment of Mortgage dated 3/31/98 and recorded 10/23/98 in Reel 2737 Page 2232 in the Office.

E.   Multifamily Mortgage, Assignment of Rents and Security Agreement made by 406-10-12 Realty Corp. to Marine Midland Bank in the original principal amount of $450,000.00 dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2236 in the Office.

> The foregoing mortgages A through E were consolidated pursuant to an Assumption Consolidation, Modification and Extension Agreement by and between 406-10-12 Realty Corp. and Marine Midland Bank dated April 6, 1998 and recorded October 23, 1998 in Reel 2737 Page 2251 in the Office to form a single lien in the amount of $1,200,000.00.

> The foregoing mortgages A through E, as consolidated, were assigned by HSBC Bank USA, formerly known as Marine Midland Bank to Intervest Corporation of New York by an Assignment of Mortgage dated October 1, 1999 and recorded November 15, 1999 in Reel 2991 Page 1548 in the Office.

F.   Mortgage made by 400 West 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $140,000.00 dated June 4, 1982 and recorded June 8, 1982 in Reel 625 Page 509 in the Office.

> Said mortgage F was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1665 in the Office.

G.  Mortgage made by 400 West 22nd St. Corp. to Citibank, N.A. in the original principal amount of $12,147.00 dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1672 in the Office.

> The foregoing mortgages F and G were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 West 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1704 in the Office to form a single lien in the amount of $140,000.00.

> The foregoing mortgages F and G, as consolidated, were assigned by Citibank, N.A. to Lockport Savings Bank by an Assignment of Mortgage dated May 20, 1986 and recorded June 6, 1986 in Reel 1072 Page 1640 in the Office.

H.  Mortgage made by 400 W. 22 St. Corp. to Lockport Savings Bank in the original principal amount of $171,084.39 dated May 21, 1986 and recorded June 6, 1986 in Reel 1072 Page 1635 in the Office.

> The foregoing mortgages F, G, and H were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between Lockport Savings Bank and 400 W. 22 St. Corp. dated May 21, 1986 and recorded July 11, 1986 in Reel 1087 Page 1493 in the Office to form a single lien in the amount of $300,000.00.

> The foregoing mortgages F, G and H, as consolidated, were assigned by Lockport Savings Bank to Home Savings of America, F.A. by an Assignment of Mortgage dated December 14, 1988 and recorded January 23, 1989 in Reel 1525 Page 1562 in the Office.

I.  Mortgage made by 400 W. 22d St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $75,000.00 dated August 13, 1986 and recorded August 20, 1986 in Reel 1106 Page 737 in the Office.

Said mortgage I was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22 St. Corp. dated November 1, 1987 and recorded December 22, 1897 in Reel 1336 Page 1953 in the Office.

> Said mortgage I, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1569 in the Office.

J.  Mortgage made by 400 W. 22 St. Corp. and 132 9th Ave, Corp. to Dominion Financial Corporation in the original principal amount of $200,000.00 dated

February 13, 1987 and recorded February 18, 1987 in Reel 1191 Page 897 in the Office

> Said mortgage J was assigned by Dominion Financial Corporation to Home Savings of America F.A., by an Assignment of Mortgage dated December 22, 1988 and recorded January 23, 1989 in Reel 1525 Page 1571 in the Office.

K.  Mortgage made by 400 West 22nd St. Corp., to Harry Steiner Defined Benefit Trust (Rollover Account) as to an undivided 16% Interest, Harry Steiner Defined Benefit Trust as to an undivided 24% Interest, Seymour Eskenazi as to an undivided 30% Interest, Robert E . Felsher, D.D.S., P.C. Retirement Trust as to an undivided 30% Interest in the original principal amount of $125,000.00 dated August 4, 1988 and recorded August 18, 1988 in Reel 1451 Page 1210 in the Office.

> Said mortgage was assigned by Harry Steiner Defined Benefit Trust (Rollover Account), Harry Steiner Defined Benefit Trust, Seymour Eskenazi, and Robert E. Felsher, D.D.S., P.C., Retirement Trust, to Home Savings of America, F.A. by an Assignment of Mortgage dated December 21, 1988 and recorded January 23, 1989 in Reel 1525 Page 1558 in the Office.

L.  Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $191,253.00 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1101 in the Office.

> The foregoing mortgages F through L were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1430 in the Office to form a single lien in the amount of $812,500.00.

> The foregoing mortgages F through L, as consolidated, were assigned by Home Savings of America, FSB, successor in interest, either by merger or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 and recorded March 10, 1994 in Reel 2066 Page 2411 in the Office.

> The foregoing mortgages F through L, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1595 in the Office.

The foregoing mortgages F through L, as consolidated, assigned and modified, were further assigned by Coolidge-New York Equities Limited Partnership successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2335 in the Office.

M.     Mortgage and Security Agreement and Assignment of Leases and Rents made by 400 W. 22 St. Corp. to Coolidge New York Equities Limited Partnership in the original principal amount of $120,000.00 dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1652 in the Office.

Said mortgage M was assigned by Coolidge-New York Equities Limited Partnership, successor to Coolidge-Home Equities Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 and recorded June 18, 1999 in Reel 2896 Page 2343 in the Office.

Said mortgage M, as assigned, was further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 646 in the Office.

N.     Mortgage made by Goldwep Realty Corp. to Murgoal Corporation in the original amount of $50,000.00 September 15, 1969 and recorded September 17, 1969 in Reel 151 Page 875 in the Office.

Said mortgage N was assigned by Murgoal Corporation to Edward N. Goldey and Anna Morris Goldey by an Assignment of Mortgage dated October 20, 1969 and recorded November 10, 1969 in Reel 155 Page 1997 in the Office.

Said mortgage N was further assigned by Edward N. Goldey and Richard N. Goldey, as Executor of the Estate of Anna Morris Goldey, Deceased to Eugene G. King by an Assignment of Mortgage dated November 15, 1972 and recorded December 27, 1972 in Reel 263 Page 800 in the Office in Reel 263 Page 800.

Said mortgage N was further assigned by Eugene G. King to Prudential Savings Bank by an Assignment of Mortgage dated June 27, 1978 and recorded July 5, 1978 in Reel 444 Page 407 in the Office.

O. Mortgage made by 400 West Enterprises, Inc. to Mid-Central Properties, Ltd. in the original amount of $71,500.00 dated March 15, 1971 and recorded March 16, 1971 in Reel 199 Page 206 in the Office.

> Said mortgage O was assigned by Mid-Central Properties, Ltd. to Zurich Capital Co. Ltd. by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1850 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to American Bank & Trust Company by an Assignment of Mortgage dated October 31, 1975 and recorded November 5, 1975 in Reel 354 Page 1852 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. Ltd. to Zurich Capital Co. by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 717 in the Office.

> Said mortgage O, as assigned, was further assigned by Zurich Capital Co. to American Bank & Trust Company by an Assignment of Mortgage dated November 12, 1975 and recorded December 9, 1975 in Reel 357 Page 721 in the Office.

> Said mortgage O, as assigned, was further assigned by Bank Leumi Trust Company of New York, as successor to American Bank & Trust Company and Zurich Capital Co. to Prudential Savings Bank by an Assignment of Mortgage dated June 26, 1978 and recorded July 5, 1978 in Reel 444 Page 405 in the Office

> The foregoing mortgages N and O were assigned by Emigrant Savings Bank, successor by merger to Prudential Savings Bank to Citibank, N.A., by an Assignment of Mortgage dated August 20, 1984 and recorded September 18, 1984 in Reel 832 Page 1667 in the Office

P. Mortgage made by 400 W. 22nd St. Corp. to Dominion Financial Corporation in the original principal amount of $60,000.00 dated July 14, 1983 and recorded July 22, 1983 in Reel 703 Page 1075 in the Office

> Said mortgage was assigned by Dominion Financial Corporation to Citibank, N.A. by an Assignment of Mortgage dated August 16, 1984 and recorded September 18, 1984 in Reel 832 Page 1670 in the Office.

> The foregoing mortgages N, O and P were consolidated and extended pursuant to a Consolidation and Extension Agreement by and between 400 W. 22nd St. Corp. and Citibank, N.A. dated August 20, 1984 and recorded

September 18, 1984 in Reel 832 Page 1687 in the Office to form a single lien in the amount of $95,000.00.

The foregoing mortgages N, O and P, as consolidated, were assigned by an Citibank, N.A. to Home Savings of America, F.A. by an Assignment of Mortgage dated January 9, 1989 and recorded January 23, 1989 in Reel 1525 Page 1564 in the Office.

Q.   Mortgage made by 400 W. 22 St. Corp. to Harry Steiner and Minnie Steiner in the original principal amount of $200,000.00 dated October 21, 1986 and recorded October 22, 1986 in Reel 1133 Page 355 in the Office.

Said mortgage Q was extended pursuant to an Extension Agreement by and among Harry Steiner, Minnie Steiner and 400 W. 22nd St. Corp. dated November 1, 1987 and recorded December 22, 1987 in Reel 1336 Page 1948 in the Office.

Said mortgage Q, as extended, was assigned by Harry Steiner and Minnie Steiner to Home Savings of America, F.A. by an Assignment of Mortgage dated December 19, 1988 and recorded January 23, 1989 in Reel 1525 Page 1567 in the Office.

R.   Mortgage made by 400 W. 22 St. Corp. to Home Savings of America, F.A. in the original principal amount of $225,583.58 dated January 10, 1989 and recorded February 7, 1989 in Reel 1532 Page 1097 in the Office.

The foregoing mortgages N through R were consolidated pursuant to a Consolidation and Spreader Agreement by and between 400 W. 22 St. Corp. and Home Savings of America, F.A. dated January 10, 1989 and recorded May 2, 1989 in Reel 1568 Page 1465 in the Office to form a single lien in the amount of $500,000.00.

The foregoing mortgages N through R, as consolidated, were assigned by Home Savings of America, FSB, successor in interest or name change, to Home Savings of America, F.A. to Coolidge-Home Equities Limited Partnership by an Assignment of Mortgage dated February 18, 1994 recorded March 10, 1994 in Reel 2066 Page 2418 in the Office.

The foregoing mortgages N through R, as consolidated and assigned, were modified pursuant to an Amended and Restated Mortgage and Security Agreement and Assignment of Leases and Rents by and between 400 W. 22 St. Corp. and Coolidge New York Equities Limited Partnership dated July 1, 1994 and recorded December 14, 1994 in Reel 2163 Page 1707 in the Office.

The foregoing mortgage N through R as consolidated, assigned and modified, were further assigned by Coolidge-New York Limited Partnership to Atlantic Bank and Trust Company by an Assignment of Mortgage dated January 27, 1999 recorded June 18, 1999 in Reel 2896 Page 2347 in the Office.

The foregoing mortgages N through R were further assigned by Capital Crossing Bank (formerly known as Atlantic Bank and Trust Company) to Intervest Corporation of New York by an Assignment of Mortgage dated October 5, 1999 and recorded November 10, 1999 in Reel 2989 Page 632 in the Office.

S.     Mortgage made by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $530,937.75 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 227 in the Office.

Said mortgage S was assigned by Paul Matusow to New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 18, 1999 and recorded September 22, 1999 in Reel 2957 Page 2054 in the Office.

Said mortgage S, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1243 in the Office.

T.     Mortgage made by Baychester Shopping Center, Inc. to Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten in the original principal amount of $160,500.00 dated April 29, 1994 and recorded May 9, 1994 in Reel 2090 Page 253 in the Office.

Said mortgage T was assigned by Adele Samuelson, Barry Berkowitz, Irwin Berkowitz, Myra Rosen, Barbara Weingarten and Clifford Weingarten to New Millennium Holdings, Inc. by an Assignment of Mortgage dated June 1, 1999 and recorded September 22, 1999 in Reel 2957 Page 2044 in the Office.

Said mortgage T, as assigned, was further assigned by New Millennium Holdings, Inc. to Paul Matusow by an Assignment of Mortgage dated September 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1239 in the Office.

U.     Mortgage by Baychester Shopping Center, Inc. to Paul Matusow in the original principal amount of $298,562.50 dated July 21, 1999 and recorded September 15, 1999 in Reel 2954 Page 25 in the Office.

The foregoing mortgages S through U were consolidated pursuant to a Consolidation, Modification and Extension Agreement by and between Paul Matusow and Baychester Shopping Center, Inc. dated July 21, 1999 and recorded November 10, 1999 in Reel 2989 Page 1247 in the Office to form a single lien in the amount of $999,000.00.

The foregoing mortgages S through U, as consolidated, were assigned by Paul Matusow to Intervest Corporation of New York by an Assignment of Mortgage dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1273 in the Office.

V.    Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $3,359,610.07 dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1281 in the Office.

The foregoing mortgages A through V were consolidated pursuant to a Mortgage Consolidation, Modification, Spreader and Extension Agreement by and between West 22nd Street Properties, LLC and Intervest Corporation of New York dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1296 in the Office to form a single lien in the amount of $6,500,000.00.

The foregoing mortgages A through V, as consolidated, were assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 5, 2001 and recorded January 31, 2002 in Reel 3441 Page 1951 in the Office.

W.    Building Loan Mortgage made by West 22nd Street Properties, LLC to Intervest Corporation of New York in the original principal amount of $600,000.00 made dated October 7, 1999 and recorded November 10, 1999 in Reel 2989 Page 1366 in the Office.

Said mortgage W was assigned by Intervest Corporation of New York to The Roslyn Savings Bank by an Assignment of Mortgage dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1964 in the Office.

X.    Mortgage by West 22nd Street Properties, LLC to The Roslyn Savings Bank in the original principal amount of $1,898,522.23 dated December 14, 2001 and recorded January 31, 2002 in Reel 3441 Page 1969 in the Office.

The foregoing mortgages A through X were consolidated pursuant to a Consolidated, Amended and Restated Mortgage, Security Agreement and Assignment of Leases and Rents by and between West 22nd Street Properties, LLC and The Roslyn Savings Bank dated December 14, 2001

and recorded January 31, 2002 County in Reel 3441 Page 1984 in the Office to form a single lien in the amount of $8,250,000.00.

The foregoing mortgages A through X, as consolidated, were assigned by New York Community Bank, successor by merger to The Roslyn Savings Bank by an Assignment of Mortgage dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530144 in the Office.

Y.     Mortgage and Security Agreement made by 327-329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, and 442 West 22nd Street LLC to Wachovia Bank, National Association in the original principal amount of $1,791,171.09 dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530145 in the Office.

The foregoing mortgages A through Y were consolidated pursuant to a Consolidation, Modification and Extension and Amended and Restated Mortgage and Security Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated July 22, 2004 and recorded August 25, 2004 in CRFN 2004000530146 in the Office to form a single lien in the amount of $10,000,000.00.

The foregoing mortgages A through Y, as consolidated, were split and modified pursuant to a Splitter and Modification Agreement by and among 329 West 22nd Street LLC, 331 West 22nd Street LLC, 400 West 22nd Street LLC, 402 West 22nd Street LLC, 406 West 22nd Street LLC, 410-412 West 22nd Street LLC, 442 West 22nd Street LLC and Wachovia Bank, National Association dated February 27, 2007 and recorded on March 20, 2007 in CRFN 2007000146958 in the Office.

which Substitute Mortgage was assigned by Assignment of Mortgage dated March 5, 2007 made by Wachovia Bank, National Association to NCC Holdings, LLC and recorded on April 2, 2007 in CRFN 2007000168028 in the Office;

which Substitute Mortgage was further assigned by Assignment of Mortgage dated March 7, 2007 made by NCC Holdings, LLC to Intervest National Bank and recorded on April 2, 2007 in CRFN 2007000168029 in the Office; and

2.     Mortgage dated March 7, 2007 made by New York Spot, Inc. to Intervest National Bank in the principal amount of $950,767.14 and recorded on April 2, 2007 in CRFN 2007000168030 in the Office.

Which Mortgages 1 and 2 were consolidated to form a single lien in the amount of $1,920,000.00 by Mortgage Consolidation, Modification and Extension Agreement (And Assignment of Leases and Rents and Security Agreement) made by and between New York Spot Inc. and Intervest National Bank dated March 7, 2007 and recorded on April 2, 2007 in CRFN 2007000168031 in the Office.

Which mortgages as consolidated were modified and extended by Note and Mortgage Modification and Extension Agreement, dated July 1, 2009, effective as of March 1, 2009 and recorded in said Office on July 9, 2009 in CRFN 2009000209761, in the reduced principal amount of $1,867,158.41.

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **Milton A. Tingling**
_Justice_

PART 44

Intervest National Bank

- v -

N.Y.S. Inc.

INDEX NO. 650877/10

MOTION DATE _____

MOTION SEQ. NO. 002

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion: ☐ Yes ☑ No

Upon the foregoing papers, it is ordered that this motion

_The motion to appoint a referee to ascertain and compute is granted on default_

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: 4/7/11 _____ m a T

J.S.C.

Check one: ☐ FINAL DISPOSITION ☐ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST ☐ REFERENCE

At an IAS Part 44 of the Supreme
Court of the State of NEW YORK,
held in and for the County of
New York at the Courthouse thereof,
on the 8ᵗʰ day of Apr, 2011.

P R E S E N T : MILTON A. TINGLING

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------X
INTERVEST NATIONAL BANK

                    Plaintiffs,          Index No. 650877/10

          - against -

NEW YORK SPOT INC., YEHUDA NELKENBAUM,
NCC CAPITAL, LLC, NEW YORK STATE,
NEW YORK CITY, CHARLES NEISS, NEW YORK
CITY DEPT OF HOUSING PRESERVATION &
DEVELOPMENT, ANDREW THOMPSON, NEW YORK
CITY ENVIROMENTAL CONTROL BOARD
JOHN DOE #1" through "JOHN DOE #60",
inclusive, the true names of said
 defendants being unknown to plaintiff,
the parties being intended to be those
persons having or claiming an interest
in the mortgaged premises described in
the complaint by virtue of being
tenants, occupants, owners, judgment
creditors, or lienors of any type or
nature, and/or their heirs, successors,
or assigns in all or part of said
premises,                    Defendants.
----------------------------------X

     Upon the summons and complaint herein and due proof that all
the defendants have been duly served with said summons, or have
voluntarily appeared in this action except for JOHN DOE # 1
through JOHN DOE # 60 and YEHUDA NELKENBAUM, so that no other
defendants are entitled to notice hereof; none of the other
defendants are infants incompetents or absentees and that since
the filing of the lis pendens, the complaint herein has not been
amended so as to make new parties to the action or so as to
embrace real property other than that described in the original

complaint, or so as to extend the plaintiff's claim against the liened premises.

AND upon the Notice of Motion dated January 28, 2011 for the relief, affirmation of Michael R. Bush, attorney for the plaintiff, dated January 28, 2011 and upon all proceedings heretofore had herein, and all the papers on file in this action, it is,

ORDERED, that this application, be and it is hereby in all respects granted and that upon confirmation of the Referee's Report of Amount Due the plaintiff have judgment for the relief demanded in the complaint; and it is further

ORDERED, that this action be and the same hereby is referred to Michael Roberts , Esq., of 401 Broadway N·Y) 10013 (212) 226 - 4925 as Referee, to ascertain and compute the amount due to the plaintiff for principal and interest or otherwise, upon the note and mortgage being foreclosed in this action, to take proof of the facts and circumstances stated in the complaint and to examine the plaintiff or its agents on oath as to any payments which may have been made, or in lieu thereof, to do so on documentary evidence and affidavits submitted to said Referee, and to examine and report whether the mortgaged premises should be sold in one parcel, and that on the coming in of the Referee's Report and the confirmation thereof, and a supplemental affirmation of regularity, plaintiff have final judgment of foreclosure and sale, and for costs, disbursements and allowances allowed by law, and that the said Referee make his report herein with all convenient speed; and it is further

ORDERED, that the action is discontinued against YEHUDA NELKENBAUM, and it is further

ORDERED, that YEHUDA NELKENBAUM and "JOHN DOE #1" through "JOHN DOE #60", inclusive, including the descriptive language qualifying said defendants, be and they hereby are dropped from this action as party defendants; and it is further

ORDERED, that the caption of the instant action is hereby amended accordingly to reflect said amendment and deletion of party defendants, along with the descriptive language qualifying said "JOHN DOE" defendants, and that the Clerk of the County of New york be and hereby is directed to amend the Notice of Pendency to reflect the aforesaid amendments, without prejudice to the proceedings heretofore had herein, nunc pro tunc to July r 18, 2010, so that the caption now reads:

INTERVEST NATIONAL BANK

            Plaintiffs,          Index No. 650877/10

    - against -

NEW YORK SPOT INC.,
NCC CAPITAL, LLC, NEW YORK STATE,
NEW YORK CITY, CHARLES NEISS, NEW YORK
CITY DEPT OF HOUSING PRESERVATION &
DEVELOPMENT, ANDREW THOMPSON, NEW YORK
CITY ENVIRONMENTAL CONTROL BOARD
                                             X

E N T E R :

_____
          J. S. C.

# Exhibit D

**EINIG & BUSH, LLP**
*Attorneys at Law*
*420 Lexington Avenue*
*New York, NY 10170*
*(212) 983-8866*

STEVEN L. EINIG
MICHAEL R. BUSH
TAMAR GOLDFISCHER

*TELECOPIER (212) 983-1050*

*ALL ADMITTED IN NY and NJ*

June 10, 2010

<u>Certified Mial, Regular Mail & Telefax 718 758-3513</u>
New York Spot Inc.
3317 Avenue N
Brooklyn, New York 11234

Re:    *$1,920,000.00 Loan made by Intervest National Bank and secured by a First Mortgage on certain property located at 442 West 22nd Street, New York, New York (the "Mortgaged Property")*

Dear Sir or Madam:

Reference is made to that certain loan (the "**Loan**") made by Intervest National Bank ("**Lender**") to New York Spot Inc., a New York corporation ("**Borrower**") which Loan is evidenced by that certain Amended and Restated Mortgage Note dated as of March 7, 2007 made by Borrower, as borrower, to and for the benefit of Lender, as lender, in the principal amount of $1,920,000.00 (the "**Note**"), and secured by, among other things, that certain Mortgage, Consolidation, Modification and Extension Agreement (And Assignment of Leases and Rents) dated March 7, 2007 by and between Borrower, as mortgagor, and Lender, as mortgagee (the "**Mortgage**") and certain other documents, including the Note and Mortgage Modification and Extension Agreement dated as of March 1, 2009)) executed and delivered by Borrower in connection with the Loan, (collectively with the Note and Mortgage, the "**Loan Documents**").

As counsel to Intervest National Bank, who holds the first Mortgage on the above referenced premises, we advise you that by reason of your failure to pay your monthly payments and the placement of a Junior Mortgage(as defined in the Mortgage) on the premises, Lender has elected to declare the entire mortgage indebtedness immediately due and payable. Formal demand is hereby made upon you for the payment of the principal balance together with interest, late charges, fee payment, any escrow advances and all fees, costs and disbursements incurred.

Please contact this office for the amount necessary to payoff the loan. Please be advised that this office has been instructed to take all steps necessary to protect our client's interest including but not limited to commencing a foreclosure action.

Very truly yours,

MICHAEL R. BUSH

cc: Yehuda Neckelbaum(by certified mail, regular mail and Telefax
    Aaron M. Feinberg, Esq.(by Telefax 718 382-1091and regular mail)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------X
INTERVEST NATIONAL BANK,

                              Plaintiff,       Index No. 650877/10

              - against -                      **AFFIDAVIT**
NEW YORK SPORT INC., ET. AL.,
                              Defendants.
----------------------------------------X
STATE OF NEW YORK )
COUNTY OF NEW YORK)  ss.:

      LOWELL DANSKER, being duly sworn, deposes and says:

      1.   I am the Chief Executive Officer of INTERVEST NATIONAL
BANK, who has assigned that certain Mortgage Consolidation,
Modification and Extension Agreement (And Assignment of Leases
and Rents and Security Agreement) dated March 7, 2007, in the
original principal amount of $1,920,000.00, made by New York Spot
Inc., to Intervest National Bank, and recorded in the Office of
the City Register of the City of New York, New York County, on
April 2, 2007 as CRFN 2007000168031, and the notes secured
thereby, to West 22nd LLC, by an assignment of mortgage dated
February 11, 2011.

      2.   I   have   personal   knowledge   of   the   facts   and
circumstances set forth herein or have derived such knowledge
from the books and records maintained in the usual and ordinary
course of business, with respect to the mortgage being assigned.

      3.   The following amounts are stated to be due and owing as
per said books and records:

      4.   The outstanding principal balance due on the mortgage
is $1,849,427.95. Interest at the pre-acceleration rate of 6.5%
from April 1, 2010 to July 16, 2010, on the then principal
balance of $1,850,393.32, is $35,748.70. Interest at the post
acceleration rate of 24% per annum ($1,232.95 per diem) from July
17, 2010 to February 10, 2011 is $257,686.55.  Intervest has
advanced $6,198.01 to the receiver for the payment of property
insurance and utility service.  Therefore, based upon said books
and records, the total amount due under the mortgage as of

1

February 10, 2011, is $2,149,061.21.

    5.    Since the commencement of this action, no principal payments have been made on the subject mortgage by the owner of the equity of redemption, or by anyone else on its behalf. Therefore, the outstanding principal balance due on the mortgage as herein above set forth has not been reduced from the amount alleged in the complaint in this action.

_____
LOWELL DANSKER

Sworn to before me this
_____ day of May, 2011

_____
Notary Public

STEPHEN HELMAN
NOTARY PUBLIC, State of New York
No. 31 02HE6122992
Qualified in New York County
Commission Expires Feb. 28, 2013

STEPHEN HELMAN
NOTARY PUBLIC, State of New York
No. 31 02HE6122992
Qualified in New York County
Commission Expires Feb. 28, 2013

2

David Godbout, being duly sworn, deposes and says:

1.    I am the manager of West 22nd, LLC assignee of Intervest National Bank Corporation herein, and have personal knowledge of the facts and circumstances derived from the business records kept in the ordinary course of business by West 22nd, LLC and Intervest National bank, as set forth herein with respect to the mortgage being foreclosed.

2.    The outstanding principal balance due on the first mortgage is presently $1,849,427.95. Interest at the preacceleration rate of 6.5% from April 1, 2010 to July 16, 2010 is $35,748.70. Interest at the post maturity rate of 24.0% per annum on the outstanding principal balance from July 17, 2010 to May 4, 2011 is $358,788.45 ($1,232.95 per diem).

3.    Pursuant to the affidavit of Lowell Dansker annexed hereto Intervest National Bank had advanced $6,198.01 to the Receiver and West 22nd, LLC advance, on the Receiver's behalf, the the sum of $1,445 for a Con Edison deposit.

4.    Attorneys fees in the foreclosure action were $12,205.00. Such fees are recoverable pursuant to the mortgage document.

5.    Therefore the total amount due plaintiff on the Mortgage for Principal, Interest, Attorneys' fees, and advances as of September 15, 2010 is $2,263,813.11.

_____

DAVID GODBOUT

Sworn to before me this
    day of May 2011.

_____

Notary Public

# Exhibit E

**APPRAISAL REPORT OF A**
**SINGLE ROOM OCCUPANCY BUILDING AT:**

**442 WEST 22ND STREET**
**NEW YORK, NY 10011**

**DATE OF VALUE: JUNE 16, 2011**

**DATE OF REPORT: JULY 21, 2011**

**FOR:**

**MR. DAVID GODBOUT**
**MANAGING PARTNER**
**WEST 22ND LLC**
**770 BROADWAY, 2ND FLOOR**
**NEW YORK, NY 10003**

**BY:**

**CAPITAL APPRAISAL SERVICES, INC.**
**19-02 WHITESTONE EXPRESSWAY**
**SUITE 304**
**WHITESTONE, NEW YORK 11357**

# CAPITAL APPRAISAL SERVICES, INC.

*Real Estate Appraisers and Consultants*

*Arthur Chiaramonte, MAI*
*Anthony N. Troiano, SRA*

July 21, 2011

Mr. David Godbout
Managing Partner
West 22nd LLC
770 Broadway, 2nd Floor
New York, NY 10003

Re:    Appraisal of a Single Room Occupancy building @
442 West 22nd Street
New York, NY 10011

Dear Mr. Godbout:

In accordance with our assignment, we have performed an appraisal report in self-contained format of 442 West 22nd Street. The purpose of the report is to estimate the "as is" Market Value of the Leased Fee Interest of the subject as of June 16, 2011, the date of inspection. The appraisal states our opinion of the property's Market Value subject to varying Assumptions and Limiting Conditions set forth in the accompanying report. The physical inspection (Anthony N. Troiano, SRA) and analysis that form the basis of the report have been conducted by the undersigned.

The subject realty is located on the south side of West 22nd Street between Ninth and Tenth Avenues, in the Chelsea section of Manhattan, City, County, and State of New York. The total lot area is 2,469+ square feet (SF) and the site is improved with a four-story and cellar, walk-up single room occupancy (SRO) building constructed circa 1900. The building is currently utilized as a rooming house and contains 5,000+ square feet of gross building area with 23 one-room units. There are five single rooms on the first floor and six single rooms on the second, third and fourth floors. At the time of inspection there were ten vacant units and six of the remaining thirteen units are occupied by tenants who are in arrears. The improvements are in average condition although the vacant rooms are in need of repairs and upgrades. According to the zoning regulations in relation to the subject property, the current improvements are a legal and conforming use.

An inspection of the site and neighborhood was conducted, and all available data affecting the property's value was analyzed. All approaches were considered, however, only the Sales and Income Approaches were utilized. The Cost Approach is not applicable in this case. The Income Approach was given most weight in formulating a value conclusion since this property type is typically bought as an investment for the cash flow it produces. The Sales Approach was used and also given some weight.

As a result of our investigations and subject to the enclosed assumptions and limiting conditions, the "as is" Market Value of the Leased Fee Interest of the subject as of June 16, 2011, is:

**TWO MILLION ONE HUNDRED FIFTY DOLLARS - ($2,150,000)**

The report was prepared to meet the specific requirements of the client (West 22nd LLC) for the purposes stated herein. The intended use is to assist the client with the asset valuation for potential court proceedings on the subject realty. No reliance is to be placed upon it for any other purpose. To develop the opinion of value, the appraiser performed an appraisal process as defined by the Uniform Standards of Professional Practice. A copy of our report follows and forms an integral part of the valuation.

Our appraised value is under the Extraordinary Assumption that the rents provided to the appraiser by the client are the actual rents being collected and legally allowable and that the six tenants who are in arrears will pay their rent and/or vacate their unit.

We previously appraised the subject on 1/5/07 and on 6/28/10 for a different client/intended user.

Please Note: The subject property is located on a block that has Landmark status and is subject to NYC Landmark regulations when completing façade maintenance/renovations.

Respectfully submitted,

CAPITAL APPRAISAL SERVICES, INC.

Christina Pae
N.Y. State Residential Real
Estate Appraiser #45-48535

Anthony N. Troiano, SRA
N.Y. State Certified General
Real Estate Appraiser #46-4937

# TABLE OF CONTENTS

SUMMARY OF SALIENT FACTS AND CONCLUSIONS_____1
CERTIFICATE OF APPRAISAL_____2
ASSUMPTIONS AND LIMITING CONDITIONS _____4
EXTRAORDINARY ASSUMPTION _____5
PURPOSE, DATE, INTENDED USE AND INTENDED USER OF THE APPRAISAL_____6
PROPERTY RIGHTS APPRAISED_____6
IDENTIFICATION OF THE PROPERTY _____6
SALES HISTORY_____6
ESTIMATED MARKETING AND EXPOSURE TIME _____6
MARKET VALUE DEFINED _____6
SCOPE OF WORK _____7
PHOTOGRAPH _____8
AREA MAP_____10
MANHATTAN & NEW YORK CITY REGIONAL ANALYSIS _____11
IMMEDIATE AREA MAP_____29
NEIGHBORHOOD ANALYSIS _____30
MARKET TRENDS _____32
SANBORN MAP_____35
TAX MAP _____36
FLOOD MAP _____37
PROPERTY DESCRIPTION - SITE ANALYSIS _____38
ZONING MAP _____39
ZONING ANALYSIS _____40
INTERIOR PHOTOGRAPHS_____41
IMPROVEMENT ANALYSIS _____48
REAL ESTATE TAXES _____49
HIGHEST AND BEST USE _____50
THE APPRAISAL PROCESS _____52
SALES COMPARISON APPROACH _____53
MAP OF COMPARABLE SALES _____60
COMPARABLE SALES GRID _____61
ANALYSIS OF ADJUSTMENTS _____62
INCOME APPROACH _____63
RENT ROLL _____64
PROFORMA _____65
DISCUSSION OF INCOME/EXPENSES _____66
CAPITALIZATION RATE_____68
RECONCILIATION & CONCLUSIONS OF VALUE _____71
ADDENDA _____72

Qualifications of Anthony N. Troiano, SRA
Qualifications of Christina Pae
Client's Engagement Letter
Rent Roll from 2011 and Expense Estimates
Deed with Legal Description
Certificate of Occupancy (C/O)

# SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| Address: | 442 West 22nd Street<br>New York, NY 10011 |
| Date of Valuation: | July 21, 2011 |
| Interest Appraised: | Leased Fee Interest |
| Section/Block/Lot: | 3/719/66 |
| Census Tract: | 89.0 |
| Ownership: | Current owner of record is New York Spot Inc. |
| Type of Property: | A four-story 23 room SRO building built circa 1900. |
| Gross Building Area: | 5,000$\underline{+}$ SF GBA above grade & 1,250$\underline{+}$ SF of cellar space. |
| Plot Size: | 25' x 98.75' = 2,469$\underline{+}$ SF |
| Zoning: | R7B Residential District |
| Highest and Best Use: | <u>As Vacant</u>: To construct a one or two-family townhouse.<br><u>As Improved</u>: Current use as a SRO building. |
| Estimated 2011/12 RE Taxes: | $47,542/year ($9.51/SF above grade) |

## VALUATION SUMMARY

| | |
|---|---|
| The "As Is" Market Value Via the<br>Sales Comparison Approach is: | $2,000,000 |
| The "As Is" Market Value Via<br>The Income Approach is: | $2,150,000 |
| **"As Is" Appraised Value is:** | **$2,150,000** ($430/SF, $93,478/unit, 7.9 GRM) |

# CERTIFICATE OF APPRAISAL

The undersigned do hereby certify that, except as otherwise noted in this appraisal report:

1.   We have no present or prospective interest or personal interest in the real estate that is the subject of this appraisal report.  Neither the employment to make the appraisal nor the compensation is contingent upon the value conclusion reached.

2.   We have no bias with respect to the property that is the subject of this appraisal report or to the parties involved.

3.   To the best of our knowledge and belief, the statements of fact contained in this appraisal report, upon which the analyses, opinions, and conclusions expressed herein are based, are true and correct.

4.   The reported analysis, opinions and conclusions are limited only by the reported assumptions and limiting conditions and is our personal, impartial and unbiased professional analyses, opinions and conclusions.

5.   The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

6.   The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

7.   No one other than the undersigned provided significant real property appraisal assistance or has prepared the analyses, opinions, and conclusions concerning real estate that are set forth in this appraisal report.

8.   Our engagement for completing the assignment was not contingent upon developing or reporting predetermined results. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction of value that favors the cause of the client, the amount of value opinion, the attainment of a specific result or the occurrence of a subsequent event directly related to the intended use of this appraisal.

9.   No change of any item of the appraisal report shall be made by anyone other than the appraisers and the appraisers shall have no responsibility for any such unauthorized change.

10.   That this appraisal has been prepared in compliance with regulations of the Federal Home Loan Bank Board, Office of Thrift Supervision, the Financial Institutions Reform Recovery and Enforcement Act of 1989 (FIRREA), and the Office of Comptroller of the Currency.

11.   Anthony N. Troiano, SFA has made a personal inspection of the property that is the subject of this report.  Christina Pae has not inspected the subject property.

12.   That Anthony N. Troiano, SRA is currently NYS Certified as Real Estate General Appraiser and Christina Pae is a NYS Certified as Real Estate Appraiser. As of the date of this report, Anthony N. Troiano, SRA has completed the continuing education program of the Appraisal Institute and is therefore continuing education completed.

13. That Anthony N. Troiano, SRA and Christina Pae certify that they are competent and fully qualified to prepare appraisals of the subject property type.

14. In addition to compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), the undersigned appraisers hereby certify that:

> The information contained in this report is specific to the needs of the client and for the intended use stated in this report. The appraisal was performed for the intended use and user as stated within the report in accordance with our scope of work. The appraiser is not responsible for unauthorized use of this report;

> data on current revenues, expenses and vacancies for the subject have been analyzed and reported where applicable (if the subject is income-producing real estate);

> any personal property, fixtures, or intangible items that are not real property but are included in the appraisal have been identified and separately valued if required, and that the impact of their inclusion or exclusion on the estimate of market value has been discussed in this report; and,

> if any information required or deemed pertinent to the completion of an appraisal was unavailable, the fact and the effort to obtain the information have been disclosed and explained in this report.

July 21, 2011    Date

Christina Pae
N.Y. State Residential Real
Estate Appraiser #45-48535

Anthony N. Troiano, SRA
N.Y. State Certified General
Real Estate Appraiser #46-4937

# ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is made subject to the following assumptions and limiting conditions:

No survey was made therefore dimensions of the land are taken from records believed to be accurate however no responsibility is assumed for their accuracy. Any sketch or identified survey included in this report is only for the purpose of assisting the reader to visualize the property.

The submission of this report does not require future testimony or appearance in court or before any public agency without special arrangements for that eventuality.

One of the signatories of this report is a Member of the Appraisal Institute. The bylaws and regulations of the Institute require the member to control the use and distribution of any report signed by such Member.

Therefore, except as hereinafter provided, the party for whom this appraisal was prepared may distribute copies of it, in the report's entirety, to such third parties as may be selected by the party for whom this appraisal was prepared; however, selected portions of this report shall not be given to third parties without prior written consent of the signatories.

Neither all nor any part of this appraisal shall be disseminated to the general public by the use of advertising media, public relations media, news media, sales media or other media for public communication without prior written consent of the signatories of this appraisal report.

As per prior agreement, the Client agrees that this appraisal shall not be quoted or referred to in any report or financial statement of the Client or in any document filed with any governmental agency without the written consent of the appraiser. If the client is a governmental agency, it may be utilized in accordance with the specific agreements made between the client and Capital Appraisal Services, Inc.

No responsibility is assumed for matters legal in character or nature, nor matters of survey or of engineering. In the existing structures, no responsibility is assumed as to the physical soundness or mechanical adequacy of the realty, except those items specifically mentioned.

The property is appraised as if free and clear, with no adverse easement, encroachments, restriction, etc., unless otherwise stated. No opinion is rendered as to the title, which is presumed to be good and held in Fee Simple. No violations are assumed to exist. No liability is assumed regarding the existence, if any, for mineral deposits or their influence on value.

The conclusions and recommendations presented in this report were reached based on our analysis of the information available to us from public records, published data sources, subject ownership and principals active in the market. The data in this report has been secured from sources that are believed reliable, but no liability is accepted as to their validity. Where applicable, prudent management and operations are assumed. We assume the information provided is correct, accurate and reliable.

Our conclusions assume that overall economic conditions remain at a stable to moderate growth rate. Any unforeseen adverse economic conditions that may occur could impact the subject development.

A formal engineering study of the building was not prepared. While we cannot certify to the physical soundness or the mechanical adequacy of the structure, from what we have observed, we suspect no serious deficiencies. Based on the age and condition of the improvements, we forecast a remaining economic life beyond the typical holding period.

This appraisal was made for the purpose stated and should not be used for any other purpose.

The findings, forecast, projections, assumptions or conclusions contained in this report are the opinions of the appraiser. They are not intended, nor should they be construed as an assurance that an event or series of events will or will not occur.

The distribution, if any, of the total valuation in this report between land and the improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal, and are invalid if so used.

The heating, electrical, plumbing and other mechanical systems of the property are assumed to be efficient, functionally adequate and in operating order. The subject property, unless otherwise stated is presumed to be free of hazardous or toxic materials. The appraiser has no professional training in this area and makes no representations as such.

The value reported herein applies only to real property interest being appraised and does not apply with equal validity to any other property interest. The value of the real property interest being appraised plus the value of any other property interest(s) may or may not equal the value of the Fee Simple interest in the real estate that is the subject of this appraisal.

The appraisers are not aware as to the existence of asbestos. Asbestos surveys are a specialized field requiring advanced training that the appraisers are not skilled in, and do not represent themselves to be.

The appraisers are not aware of any adverse sub-soil condition and/or the existence of any hazardous waste materials and make no representation in this regard unless otherwise noted in this report.

## <u>EXTRAORDINARY ASSUMPTION</u>

The subject is appraised under the following Extraordinary Assumptions:

1) The rent roll provided is accurate and the rents are being collected unless otherwise noted;
2) The condition of the rooms not inspected is rentable.
3) The six tenants in arrears will begin to pay rent or will vacate the premises.

An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. An extraordinary assumption may be used in an assignment only if:

- It is required to properly develop credible opinions and conclusions;
- The appraiser has a reasonable basis for the extraordinary assumption;
- Use of the extraordinary assumption results in a credible analysis; and
- The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions.

(USPAP, 2011)

## PURPOSE, DATE, INTENDED USE AND INTENDED USER OF THE APPRAISAL

The purpose of this assignment is to estimate the "as is" Market Value of the Leased Fee Interest of the subject as of June 16, 2011, the date of inspection. The report is intended for the use of the client and intended user, West 22nd LLC and/or the appropriate courts. The appraisers are aware that the intended use of this appraisal is for asset valuation and for potential court proceedings on the subject realty.

## PROPERTY RIGHTS APPRAISED

The subject is tenant-occupied and rent regulated. Therefore, it is appraised on the basis of a Leased Fee Interest. The Appraisal of Real Estate, thirteenth edition 2008, page 114, defines a Leased Fee Interest as: "The ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires."

## IDENTIFICATION OF THE PROPERTY

The subject realty is located on the south side of West 22nd Street between 9th and 10th Avenues in the Chelsea Section of the Borough of Manhattan, City and State of NY. It is known by the street address of 442 West 22nd Street and on the NY County Tax Map as Section 3, Block 719, Lot 66.

## SALES HISTORY

According to public records, the subject is owned by New York Spot Inc. The subject was sold by 442 West 22nd Street, LLC to the current owner on March 5, 2007 for $1,750,000. 442 West 22nd Street, LLC acquired the property from West 22nd Properties, LLC on July 22, 2004 for $1,250,000. It was reported that there was a sale contract dated November 7, 2006 for $3,000,000. However, this deal was not consummated and the property was instead sold for $1,750,000. There have been no other recorded transfers of the subject property for the last four years.

## ESTIMATED MARKETING AND EXPOSURE TIME

Based on market conditions prevailing, as of the date of valuation and the position of the subject in relation to the market, we would anticipate a sale of the subject property within four to eight months. The Price Waterhouse Coopers'1st Quarter 2011, Investor Survey reports a marketing between 0 and 18 months with an average of 6.0 months for the National Apartment Market. This is if marketed under the terms of market value as defined in this report, assuming an effective marketing program. Our value assumes the subject was exposed to the market for four to eight months prior to the date of valuation.
.

## MARKET VALUE DEFINED

Market Value is defined as: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller are each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.   Buyer and Seller are typically motivated;

2.  Both parties are well-informed or well-advised & acting in what they consider their own best interests;
3.  A reasonable time is allowed for exposure in the open market;
4.  Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

## SCOPE OF WORK

The data contained in this report was obtained from the public records and knowledgeable agents, real estate brokers and principles active in the area of the subject. There was a physical inspection of the property, which included inspecting most vacant units, a few occupied units, the common areas, the basement, the roof and the yard. Comps Inc., deeds, other public records, real estate articles and principals were used to uncover and verify comparable sales. To the best of our knowledge, the most representative sales were uncovered. Owners, managing agents, appraisers and leasing agents were utilized to obtain comparable rents. The Income, Sales Comparison and Cost Approaches were all considered. The Highest and Best Use of the subject is its current use as an SRO.

The Income Approach provides the most reliable indicator of value for the subject since it is occupied by multiple tenants. The property would typically be purchased by an investor based on the cash flow it produces. Adjusted market rents are utilized to determine the subject's relation to market and to calculate vacancy and collection loss along with the development of the capitalization and discount rates. Expenses were determined from comparative buildings, public record and industry standards. A capitalization rate was determined via the Mortgage-Equity technique, sales analysis and comparison to competing rates of return. A direct capitalization approach was performed in order to estimate a value via this approach as it is the most reliable method when appraising properties such as the subject.

The Sales Comparison Approach is considered to provide a reliable indication of value for the subject, as it is a direct reflection of market activity. The market area was researched over the past two years to uncover sales of similar buildings. The price per square foot, price per unit and Gross Rent Multiplier (GRM) were all considered. The price per square foot is given most weight, as it can be more accurately determined. The GRM was used as supporting indicators. The most representative sales were utilized. Adjustments were made for salient differences between and a price per square foot is reconciled based on the subject's relation to the market.

The Cost Approach, which analyzes land value, replacement cost and depreciation, was not utilized in this case. The subject is +/-100 years old and depreciation and obsolescence estimates are subjective for buildings that have not been recently constructed.

**PHOTOGRAPH**
Front Views of Subject
(Taken June 16, 2011 by Anthony N. Troiano, SRA)





# **PHOTOGRAPHS**
## Street Scenes Facing East and West





# AREA MAP



# MANHATTAN & NEW YORK CITY REGIONAL ANALYSIS

<u>General</u>

The subject property is located in the Borough of Manhattan, New York City, at the southern tip of New York State. Manhattan, officially known as New York County, joins with the Bronx, Brooklyn, Queens and Staten Island to form one of the largest cities in the country. New York City is an important national and international economic, political and cultural center. Manhattan is situated between the Hudson and East Rivers and is 2.5 miles wide at its widest point, and 12 miles long. New York City's cultural amenities are world renown. The City offers many attractions for a variety of age groups. From the theaters on Broadway to the Central Park Zoo, there is something for everyone in New York City. The diverse public transportation system enables easy access throughout the City to all cultural activities.

New York City has a highly diverse economic base. The greatest area of economic activity is in the City's finance, insurance and real estate sectors. Several of the top 500 largest firms in the Country are located in Manhattan. Downtown Manhattan is marked by Wall Street and has been dominated historically by the financial industry including brokerage firms, two stock exchanges, bank institutions, international trade companies and large corporate law firms. Midtown is home for several large companies in the fields of advertising, communications and real estate. Other industries include fashion, retailing, tourism and conventions. The high tech industry has also seen growth in the area with Internet companies occupying an increasing percentage of office space.

<u>Transportation</u>

As a transportation center, New York is served by three major airports with all major carriers providing service to destinations throughout the world. The two NYC airports alone handled 68.4 million passengers annually as of 2006, up from approximately 58 million in 2000. This was an 18% increase from 2000 and more impressive, up 32% from 2001, rebounding from the effects of 9/11. Travel continued to increase and was reported as 72.7 million as of 2007, up 6.3% from the prior year. The weak dollar had helped international tourism into the area. However, due to the recession, travel declined with 70.9 million passengers reported as of 2008, down from 2007 but still above 2006 figures. Travel appears to have stabilized in 2009 with 69 million passengers reported, slightly above the 2006 figures and only slightly below 2008. Travel has increased in 2010 and Mayor Bloomberg recently indicated more people visited NYC in 2010 than in any other year. Through October 2010, there were 59 million passengers reported with travel at JFK up slightly (0.9%) from the prior year with LaGuardia travel up more significantly (+8.8%). Travel at LaGuardia is about ½ of JFK travel.

Two major railroad terminals provide rail linkage for freight, as well as commuter service, from neighboring communities to areas throughout the Country. The City's renowned harbor and shipyards, together with Port Elizabeth in Newark, New Jersey, accommodate a large volume of cargo ships daily. Passenger cruise ship lines have expanded from Manhattan and also now depart from Red Hook, Brooklyn. The City's major highways, bridges and tunnels provide access through and around New York. The FDR Drive on the east and the Henry Hudson Parkway and the West Side Drive on the west ring Manhattan.

The mass transit bus and subway system provides excellent access to almost all neighborhoods in all boroughs. Overall NYC subway ridership reportedly reached a 37 year high in 2006. It continued to increase with the MTA reporting ridership 137 million in April 2008. However, due to the economic slowdown, ridership has decreased slightly and was reported as 135 million in April 2009 and 131.3 million in July 2010, down 1.1% from the prior year. However, in conjunction with the improving economy and lower unemployment ridership increased to 135.6 million in November 2010, up 4.7%

from the prior year.  Bus ridership in Manhattan was reported to have decreased 6.7% from 2003-2008, the only borough that saw a decrease.

Population/Households/Age

New York City's population has increased over the past 20+ years reversing the decline that occurred in the 1970's.  According to 2000 census data, the population of New York City increased to 8,008,278, a 9.4% gain from 1990.  The increase in the city accounted for over 2/3 of the population gain for the entire state, which grew at a 5.5% rate over the 1990's.  The increase during the 1990's was above the 3.5% increase that occurred in the 1980's.  The city finally exceeded the 7.8 million counted in 1970.  Much of this increase can be attributed to the large growth in the economy, especially the financial fields during the 1980's and 1990's.  In addition, there has been an influx of immigrants to all areas of the city.

There has been a trend toward working couples and young professionals, already familiar with the City, to return from the suburbs and maintain a home closer to their place of business.  In addition, many foreign investors and diplomats have made Manhattan their residence.  There has been a significant amount of new construction and renovations occurring in the borough over the past 20 years.  During the 1980's, Manhattan followed the overall growth of the city increasing 4.1% to 1,487,536 as of 1990.  The 2000 census figures indicated the population increased 3.3% to 1,537,195, below the 9.4% overall gain for the city.  It seems as though growth should have been much larger based on the significant amount of new construction which has occurred over the past ten years. One reason could be the recent trend in the borough of combining units for larger living spaces. This would reduce the overall number of households in the borough and force some residents to move to other areas.

The US Census Department produced an update of the 2000 census called the American Community Survey.  The estimate of population for New York City as of July 2004 was 8,168,338, up 2% from 2000.  The population of Manhattan was projected to have increased 3.5% from 2000, above the city average, to 1,590,911 as of July 2004.  The 3.5% growth was the second highest of any borough (Staten Island had 4.4%).  Percentage wise, Manhattan has already exceeded the growth that occurred in the 1990's.  STDB Online estimated Manhattan's population to be 1,643,382 as of 2010, up 6.9% from 2000 with a population estimate of 8,398,347 (+4.9%) for NYC.  STDB Online projected the state to have increased 3.0% from 2000 to 2010.  2010 census data is just being released and preliminary indications are that NYS increased at a lower rate, 2.1%, than what STDB had projected.  Data for New York City and the boroughs is not yet available.  The nation's population increased 9.7% from 2000 to 2010, the lowest reported growth since the Great Depression.  The large growth in population correlated to the large amount of new residential construction that has gone on in the borough over the past 10 years.

Manhattan households increased 3.1% over the 1990's to 738,644 as of the 2000 census figure.  This is slightly less than the 6.3% statewide growth and 7.2% citywide growth.  STDB Online estimated the borough's households to be 776,506 as of 2010, up 5.1% from 2000, again outpacing the 3.8% increase for the city and the 2.9% increase for the state.  However, household growth did fall below its population growth.  As per the 2000 census, the average household size was estimated at 2.0, which was the lowest in the city by far, but an increase from the 1990 figure of 1.8. STDB Online estimated the household size to be 2.03 as of 2010, much less than the citywide figure of 2.62.

Manhattan's median age of 39.8 as of 1990 was the highest in the city. The median age as per the 2000 census was 35.7, much lower than in 1990, and similar to Queens (35.4) and Staten Island (35.9).  STDB Online projected a large increase in median age as of 2010 to 37.7.   The median age of the city was estimated to have increased to 35.5.  Clearly, Manhattan is the oldest of the five boroughs.  The 2000 data

indicated that 60.8% were between the prime working ages of 25-64 (60.6% in 1990). This was well above the 54.2% average for the city. Its percentage of elderly 65+ as of 2000 was 12.1%, slightly above the 11.6% average for the city. It was a decrease from the 13.4% figure of 1990.

Recent data indicates Manhattan, as with the rest of the city, has continued to age and Manhattan remains the oldest borough. STDB Online estimated as of 2010 there were 12.7% 65+ compared to the city which had 12.1% 65+. There are now 60.6% between the prime working age of 25-64 vs. 54.3% for the city. This indicates a very strong potential work force in Manhattan.

Income

As per the 2000 census, the median income for the borough was $47,030, the second highest borough (Staten Island was $55,039) and well above the $38,293 estimate for the city. The median household income growth of 46.5% over the 1990's far outpaced citywide growth of 28.7%. According to the census, 17.6% of the borough's population was below the poverty line compared to 18.5% for the city and 13.5% for the state. This clearly indicates Manhattan has some of the wealthiest, however, also poorest neighborhoods in the city.

Manhattan's household income has continued to increase with the 2003 census update estimating the median household income to be $50,731, again above the average for the city ($41,509) and second only to Staten Island ($57,924). However, while income has increased, poverty levels have also increased with 19% of Manhattan's population considered below the poverty line as of July 2003. It still remains slightly below the average for the city (20%). The updated 2005 Census survey indicated the median household income of the borough to have increased to $55,973 versus $43,434 for the city. However, when comparing it to the 2000 census figures adjusted for inflation, the actual median income has only increased by 1.7%. On the positive side of this is that Manhattan was the only borough to see an increase in income when adjusting for inflation (Brooklyn –0.7%, Staten Island, -2.1%, Queens, -3.1%, Bronx, -9.5%). STDB Online estimated the borough's median household income to have increased to $71,770 as of 2010 (+53%) versus $52,489 for the city. The citywide increase since 2000, +37%, was much less than Manhattan. The state median income was estimated at $58,128.

A NY Times article on 3/31/06 indicated Manhattan had 62,773 households with a net worth in excess of $1 million, ranking 13th of all counties nationally. The Department of Labor indicated that as of June 2007, Manhattan had the highest average weekly wage of all big counties in America at $1,540, up 6.4% over the prior year, above the statewide average of 5.9% and national average of 4.6%. The increase in income in was ahead of all other boroughs except Queens, which had the second highest increase of any county nationwide (Brooklyn +3.8% to $714, Staten Island +3.7% to $734, the Bronx +5.6% to $805 and Queens +12.7% to $886). Manhattan remains as being an area of great wealth. As per STDB as of 2010, the median net household worth of Manhattan's residents was $169,986, second only to Staten Island ($208,822) and well above the $55,586 for the city and $111,673 for the state.

Employment/Economy

The overall economy remains in an uncertain period. From most economists' opinions, the recession that began in December 2007 appears to be over. Although unemployment has decreased in NYC in 2010, nationally it is still an issue and most opinions are that the economy is not yet in a self-sustainable forward growth pattern. The ability to once again create jobs appears to be the key in turning around the economy and returning to the growth seen in most of the past decade.

The economy from 1997-2000 was in a very strong positive economic growth pattern, resulting in large demand and value increases for all forms of real estate, both owner-occupied and renter. The increases were seen in all areas of the borough. As with all market cycles, the trend eventually reversed. The economy and real estate market slowed in early to mid 2001 and then was significantly impacted by 9/11. The S & P 500 decreased slightly less than 15% in 2001 with the Nasdaq decreasing slightly less than 20%. The following year was one of continued decreases. The S & P 500 posted its worst year since 1974 during 2002. The index decreased 23.4% during 2002. The S & P's 3rd quarter decrease of 17.6% was its worst showing in 15 years, since the market crashed in 1987. The Nasdaq decreased 31.5% in 2002 while the Dow Jones Industrial Average decreased 16.8%. The market was hampered by the widely reported problems of large companies such as Enron and Tyco, to name a few.

The market turned around in 2003, a positive one with the Dow up 25% through year-end. The Nasdaq composite was up 50% and the S & P 500 up 26%. Consecutive gains by the stock market over the second and third quarters of 2003 were the first since the market began to decline in early 2000. The market still, however, had a long way to go before it regained its peak with the Dow 12% below peak, the S & P 500 37% below peak and the Nasdaq 152% below peak as of year-end 2003. The economy continued to improve in 2004. Due to a late surge that occurred after the November elections, the market ended 2004 on a positive note. The S&P increased 9%, the Dow was +3.1% and NASDAQ was +8.6%. The markets were fairly stable in 2005, with the DOW Industrial average decreasing slightly (–0.6%), the S&P 500 +3.0% and the Nasdaq +1.4% for the year.

The markets did improve in 2006 with the DOW ending the year +16.3%, the S&P +13.6% and the Nasdaq +9.5%. The market fluctuated the following year. After reaching a new high in mid February of 2007, the market encountered a big drop at the end of the month fueled by a sell off in China. However, the markets rebounded shortly thereafter and reached new highs in June and continued to increase through the third quarter. As of close October 12th, the Dow was up 13.1% for the year with the Nasdaq up 16.2% and the S & P up 10.0%. However, amid concerns regarding inflation, the subprime mortgage crisis and a slowing economy, there was a pull back beginning in October and a large selloff toward the end of the year erased most of the earlier gains. As of year end 2007, the Dow was only up 6.4% for the year with the Nasdaq up 9.8% and the S& P up 3.5%. This was effectively the start of the recession.

The slowing economy and market correction continued into 2008 with poor economic news, including several large corporate loss reports impacting the markets. As of close February 29, 2008, the DOW and S&P ended their worst four consecutive months since 2002 with the Dow -7.5%, Nasdaq –14.4% and the S&P -9.4% year to date. As of close 3/10/08, the markets had slid even further and were at a 19 month low amid new concerns regarding a loss in jobs. The FED countered by injecting $30 billion into the economy for low costs loans to banks to pump liquidity into the financial markets. This helped in the short term with all indexes increasing around 4% on 3/12/08. However, the market continued to decline due to ongoing economic uncertainty. The Dow ended the year -33.8%, its worst year since 1931. The S&P was -38.5% and Nasdaq -40.5% as of year end 2008. In early 2009, the market continued to decline and on March 3rd, 2009, it fell below 7,000 to its lowest level since 1996. However, the market rebounded considerably after that and as of year-end 2009, the DOW was up 10,428, +18.8% for the year while the S&P was +23.5% and the Nasdaq +43.9% for the year. The performance of the markets in the second half of the year is one of the reasons most people believe the worst of the recession is over. The markets fluctuated in 2010 but rallied over the final half with the DOW ending 2010 +11%, the Nasdaq +16.9% and the S&P 500 +12.8%.

After years of lowering rates, the FED began to increase rates in 2004 and continued to increase rates in 2005 and into 2006.  In 7/06, the FED increased them another 0.25% for the 17th time in a row.  The prime rate increased to 8.25% vs. 5.25% in January 2005 and 4% as of January 2004.  The Fed Fund rate, at 5.25% was at its highest in 5 years.  However, in an attempt to stimulate the economy, the FED finally began to decrease rates, dropping them 0.5% in September 2007, 0.25% in October and another 0.25% in December.  Due to a potential large market selloff in mid January, the FED made a fairly drastic move, cutting rates another 1.25%.  They cut rates several times since then with the most recent, a 0.75% decrease on 12/16/08 that has left the Fed Fund Rate close to 0%.  The prime rate is now 3.25% while the Fed Fund rate is 0.25%.  The prime rate dropped 4% in 1 year and remained unchanged in 2009 and 2010.

Treasury rates, which were increasing, have dropped considerably.  The rates on 5 and 10 year T-bills were above 5% in mid June 2006 but as of January 3, 2011 were between 2.03% and 3.34%, well below the beginning of 2008 when they were between 3.5% and 4.5%.  These rates had been even lower and represent an increase of around 25 to 75 basis points from January 2009 but are down 50 to 75 basis points from January 2010.  They had been even lower in 2010 but increase some over the past few months.  The low treasury rates have begun to lower commercial loan rates.  LIBOR, another lending indicator based more off the global economy had fluctuated considerably in 2008.  The 90 day LIBOR, which was around 2.8% in August 2008 was 4.64% as of October 16, 2008.  However, it has decreased considerably since then and was only 0.30% on January 3, 2011. It has remained around that level in 2010, dropping slightly over the past few months and down from around 1.10% in April 2009.

Inflation was an issue over the past few years although now the focus is on the threat of deflation.  Nationally, the CPI increased 3.7% from January 2007 to January 2008, the fastest rate of growth in more than two years, namely due to increases in food and gasoline costs.  The NYC regional market (NYC, Long Island and Northern NJ) was on the below average side in terms of inflation in 2007 compared to the nation, contrary to 2004-2006 when it was above the national average.  Overall, the CPI increased 4.1% nationally in 2007 while the NYC region increased 3.7%.  However, this reversed in 2008 and there was a threat of deflation with the fear that this would blunt the impact of the interest rates cuts, forcing policy makers to use other tools to revive the economy.  The national CPI fell 0.8% in October 2008, to an annualized rate of 3.7%, the biggest one month drop in its 61 year history.  It continued to drop, doubling the October decline, falling 1.7% from October to November and another 0.8% in December.  The NYC region had declines in line with national figures.  The CPI for the region dropped 0.7% from September to October, another 1.6% from October to November and -0.6% from November to December to an annualized rate of 1.6%.  Both the local and national CPI appears to have stabilized in 2009 with the NYC area CPI increasing 2.3% from 12/08 to 12/09 (national +2.8%).  It was relatively stable in 2010 with the NYC area CPI increasing 1.5% from 12/09 to 11/10 and +1.3% from November 2009 to 2010 (national, +1.3% Dec.-Nov., +1.4% Nov.-Nov.).

Other causes for concern during the recession were drops in consumer confidence, the increasing trade deficit, a falling dollar and the rising national debt.  Some of these areas have rebounded.  The consumer confidence report released in May 2008 was reported to be at its lowest point since October 1992 and their report as of October 2008 indicated consumer confidence was at its lowest level in 40 years, the entire time of the survey.  It was 38 in October, down from 61.4 in September based on a scale where 100 represents consumer outlook on the economy in 1985.  It continued to decline and reached an all time low of 25 as of February 2009.  It was bouncing back over the past year as the stock market rebounded with a figure of 47.7 as of October 2009 and 55.9 in January 2010 up to 63.3 in May 2010, the 3rd straight monthly increase.  However, confidence levels fell sharply in the 3rd quarter as it was reported as 48.5 in

September 2010, the low for the year. It improved slightly over the 4th quarter and was reported as 52.5 in December 2010. The report indicated consumers are still being very cautious with their assessment of the economy and labor market tepid.

The US trade deficit had been increasing considerably, reaching a record $712 billion in 2005, almost twice the level in 2001. It increased for the 5th straight year in 2006 reaching a new record of $753 billion. Due to the falling dollar and ensuing recession, the trade deficit has been decreasing and was $700 billion for 2007 and $677 billion in 2008. It decreased considerably in 2009 and was reported as $375 billion for 2009. It had been close to pre 9/11 levels when the deficit was $365 billion in 2001. However, the deficit increased again in 2010 and was reported at around $420 billion through October 2010, up from $302.5 billion for the same period in 2009.

Aside from some improvement in 2005, the dollar has been falling over the past several years. 2003 was the third worst year for the dollar since it began trading freely in the 1970's. After fluctuating throughout 2004 and ending on a low note, the dollar increased throughout 2005 against both the Euro and Yen. The dollar declined against the Euro throughout 2006, down 8.3% although up 1.6% against the Yen. The dollar continued to decrease in 2007, down approximately 10.7% against the Euro and down 3.8% against the Yen through year end. As of March 13, 2008, the dollar was at record low levels versus the Euro and 12 year low versus the Yen. It continued to increase against the Euro in early 2009, however, declined over the later part and ended 2009 down around 9.5% for the year. Due to the Euro crisis in 2010, it has rebounded considerably and ended the year +7.1%. The dollar continued to decline versus the Yen in 2008, ending the year at a low point, down 15%. It remained relatively in 2009 but it declined in 2010, down -12.7% for the year. Japan has been trying to pump up the dollar recently due to its reliance on US exports.

The increasing national debt is also concerning. The debt is reported to be at $14 trillion as of January 11, 2011, up from $13 trillion as of June 1, 2010 and $11 trillion as of March 2009. It is at record levels and has been increasing by about $500 billion each year since 2003. The $700 billion government bailout in 2009 led to a large increase in the deficit and further government bailouts would add to this staggering amount. By comparison, the deficit was only $7 trillion in January 2004 and $2.7 trillion in 1989.

Retail spending has been improving. After falling at a 0.9% rate in the second quarter of 2009, consumer spending increased 2.9% in the third quarter. Holiday sales for November-December were reported up 1.1% versus a 3.4% decline the prior year. Reported retail sales in February 2010 were +4% from the prior year versus last year's -4.7% decline. It was the strongest reported showing since November 2007. March 2010 reported even more positive results better than expected with retail spending +5.7% over the prior year. Many retailers however cautioned those results looked good partly due to the disastrous results seen in 2009 and may not necessarily mean consumer spending has turned a corner. This appeared to be the case in the middle of 2010 as the Commerce Department reported spending in May 2010 was only +0.3% from the prior year while spending in June was flat. Spending in July was +2.9% from the prior year, however, this was much less than analysts expectations, especially considering it was off of a weak year where spending had dropped 5.1% the previous July. However, the last six months of the year appear positive as the Commerce Department reported that retail spending in November was +0.8% from the prior month, the fifth consecutive monthly increase and spending was +7.7% from the prior year. Several research firms, including Thomson Reuters, The International Council of Shipping Centers and MasterCard Advisors Spending Pulse, all reported that the November to December Holiday season was the best since 2006.

A positive statistic and the main reason most economists believe the recession is over is the growth in the economy. The U.S. economy grew in the 3rd quarter 2009 for the first time in a year as the GDP grew at a 2.2% annualized rate, the fastest pace since the 3rd quarter of 2007 and a reversal of the 0.7% decline seen in the second quarter. The final estimate for the 4th quarter shows even more substantial growth with the Bureau of Economic Analysis indicating the GDP grew at an annualized rate of 5.6%, the fastest pace since the 3rd quarter of 2003. The final estimate for the 1st quarter of 2010 is +3.7%, up from the previous estimate of 2.7%. The large growth in the GDP is a positive factor for the economy. Second quarter growth slowed with an estimate of 1.7% while it improved again to an estimate of 2.6% in the 3rd quarter of 2010.

Unemployment continues to be a concern although conditions appear to have improved slightly in 2010, especially in the New York City market. Nationally, the unemployment rate for December 2009 was 10%, a slight improvement from the 10.2% figure from October, however, that figure was a 26 year high. The December 2009 rate was well above the December 2008 figure of 7.2% and well above the figures of the past 5 years (May 2007 - 4.5%, April 2005 – 5.2% and May 2004 -5.6%). As of December 2009, the number of unemployed was more than twice what it was at the start of the recession in December 2007. Total job losses during the recession amounted to around 7.5 million. The economy was losing 691,000 jobs per month in the first quarter of 2009 although on the positive side job losses during the last quarter of 2009 slowed down to about 69,000 jobs per month and unemployment appears to have stabilized in 2010. The unemployment rate has decreased slightly in 2010. It dropped some in the early part of the year to 9.7%, peaked at 9.9% in April 2010 but dropped back to 9.4% in December 2010, down from 9.8% in November and down slightly overall for the year.

New York State's employment picture also suffered in conjunction with the overall slowing of the national economy although it remains slightly lower than the national average and has improved as of late. The state figure for December 2009 was 8.9%, slightly below the national figure but up sharply from the December 2008 figure of 6.8% and the 4.6% figure of December 2007. It was more than double the 20 year low of 4.0% that was achieved in October and December of 2006. It was the highest figure in more than 26 years when the rate was 9.6% in March 1983. The rate increased initially in 2010 with an estimate of 9.2% in February, however, has since dropped and was estimated at 8.3% in November. The state added 40,500 jobs in October, the best month since April 2005.

Similar to the state, the slowing of the economy impacted the local New York City market, which had been hard hit due to layoffs on Wall Street. Even with the improving stock markets of 2009, the rate continued to increase and for the first time since the start of the recession, the rate in NYC was higher than the national average. The rate was 10.4% in December 2009 the highest figure in nearly 17 years and a large increase from the 7.2% as of December 2008 and more than double the 4.8% in December 2007. However, the rate has declined in 2010 and is now below the national average again. It was estimated at 10.2% in February, down to 9.3% in May and 9.1% as of November, the lowest level since April 2009. Recent articles point to the Wall Street bailout as one reason that the recession in New York City has reportedly not been as severe as in other markets. Original projections that called for a loss of 300,000 jobs have recently been revised to a loss of just under 110,000 jobs. The recent surge of the stock market has led to some rehiring on Wall Street. However, the main sources of new jobs have reportedly been in professional and business services, as well as education and health care. The city has accounted for all of the private sector job growth in the state and has generated more than 10% of the nation's private sector job growth, a very positive sign. The growth in private sector employment in the city has been 5 times the national growth.

As per the Department of Labor, Manhattan had a labor force of 932,074 as of December 2009. This was approximately 23% of the city's labor force. Even with the economic slow down the labor force is close to its highest ever recorded level and well above the pre 9/11 figure of 866,243 from August 2001. Even with the economic slowdown, the labor force increased over the past three years, up 1.2% from December 2007 to October 2010. Manhattan historically has always mirrored the overall average employment picture when compared to other New York City counties. However, currently its employment picture is superior to the citywide average although similar to city, state and national figures, it increased from 2008-2009 but declined in 2010. Manhattan's December 2009 unemployment rate of 9.0% was below the city figure of 10.4%, however, was a large increase from the December 2008 unemployment rate of 6.2%. It was also a far cry from the 4.1% that was achieved less than three years ago at the start of the recession in December 2007. However, that figure was also close to a 40 year low. Although down slightly from a peak of 9.3% October 2009, it was the highest figure in over 16 years since it was at 10% in February 1993. Similar to the declines seen city and statewide, the rate has decreased in 2010 with a figure of 8.7% for February, down to 7.9% for April, May and June with a decrease to 7.6% for October with a preliminary 7.4% rate for November. Based on recent decreases to the state and city rates, it is likely this rate could also drop further as figures for year-end are tabulated.

The overall economic base of New York City continues its trend towards a service economy. Service providing jobs comprise 94.6% of the non-farm labor force as of October 2010 versus 5.4% for goods producing industries. This is up from a split of 87%/13% as of January 1995. Education and health service related jobs account for the highest percentage of the overall non-farm workforce, 20.4%, followed by professional and business services (15.6%), government (14.6%), financial activities (11.7%) and wholesale and retail trade (11.7%). Manufacturing only accounts for a small percentage of the non-farm workforce, 2.2%. This is well down from a percentage of 7.8% in January 2000 and now below 100,000 employees. The remaining job categories consist of smaller industries and miscellaneous categories such as construction, leisure and hospitality, information, transportation, each of which comprise between 3% and 7% of the total non-farm employees.

Most industries have seen continued declines since the start of the recession. The NYS Department of Labor reports that overall NYC lost 29,000 jobs from December 2007 to December 2008 with professional and business services showing the greatest dip with a loss of 7,000 jobs. Since peaking in December 2007, NYC lost 129,100 jobs as of October 2010. However, as noted previously, this figure is much less than originally projected and jobs have been added since October. Aside from education and health services, which saw an increase since 12/07 (+30,200 jobs, +4.2%), as well as leisure and hospitality (+10,100, +3.3%), all industries were impacted; construction (-11,500/-9%), manufacturing (-18,900/-19%), trade (-35,700/-8%), transportation (-7,400/-6%), information (-9,900/-6%), professional and business services (-31,200/-5%), financial (-40,600/-8%) and government (-23,300/-4%). Without the increases in education and health services and leisure/hospitality employment, job losses would have been more significant.

However, there appears to be some rebound in the employment market in the past few months and as noted above losses in the region may not be as severe as originally anticipated. One positive is that the loss of jobs had been more severe with 20,000 to 30,000 jobs added back to the market in 2010. As previously noted, the city has seen a large amount of private sector job growth comparatively to the state and nation.

Occupations in Manhattan are mainly white collar positions: 79.3% of the work force as of 2009 is in white collar positions as per STDB Online with 14.1% in services and 6.7% in blue collar jobs. Manhattan had much more white collar workers than the city overall, which had 64.0% in white collar positions, 21.4% in services and 14.7% in blue collar positions.

The 2002 economic census indicated that Manhattan's businesses generated total sales, shipments and receipts that account for 71% of the total for the city. The 2007 economic census indicated the total has increased to $251 billion, now 68% of total with professional services comprising the largest percentage, 29%. STDB Online estimated that as of 2010, Manhattan's households totaled approximately $79.5 billion in consumer spending in 14 major categories (35% of city total) and had spending potential indexes between 122-175 in 14 separate categories with an average of 152, well above the national average of 100. Clearly, Manhattan remains an area of great retail potential.

<u>Real Estate</u>
After a brief period of stabilization following the events of September 11th, market conditions had improved from 2002-2007 for all market segments and in all areas of the borough. There were significant new construction/renovation projects throughout the borough both in lower and upper income areas. The residential market, especially the owner-occupied sales market, saw the strongest demand. The Downtown office market underwent some uncertainty however even this market went to its strongest level in five years. However, as noted previously due to the economic slowdown, as well as changes in the credit markets and ability for investors to get financing, overall market conditions are currently in a state of flux with markets pulling back over 2009 and into early 2010 for the most part. However, much of the market has improved since mid 2010 although other areas still remain in flux. Following is an overview of Manhattan's Office, Retail and Residential market segments with some details on the hospitality industry as well.

<u>Office</u>
Manhattan's office market had rebounded from the impact of 9/11 after a few years of declining rents and increasing vacancy rates. Office rents reached record highs and vacancy rates were at their lowest levels in over six years. This market has, however, experienced pulling back over the past 2 years due to the poor economy and rising unemployment, as well as problems the large financial firms have encountered since the sub-prime mortgage turmoil. The sales market slowed considerably due to the difficulty in obtaining financing. Vacancy increased and rents decreased, which was a reverse of recent trends. However, current levels still do remain superior to where they were a few years ago and the market appeared to stabilize and bounce back some in the last part of 2010. Recent improvements in the stock market and the employment picture could continue to improve this market segment.

**<u>Rents:</u>**
As per Cushman and Wakefield (C&W), the overall average asking rent in Manhattan as of year end 2010 was $54.34, up slightly from the $54.31 of the 2Q but down some from $55.52 of the 4Q 2009 and still well below and -22.5% from the 4Q 2008 figure of $69.44/SF and -17.3% from the $65.08/SF as of 4Q 2007. It is, however, well above the 1Q 2006 figure of $43.20. The firm Jones Lang LaSalle (JLL) also showed a retraction in the overall asking rent with slightly different figures. Their estimate of overall asking rent as of 4Q 2010 was $52.18, up slightly from the 2Q 2010 figure of $52.08 but still down from the 4Q 2009 overall asking rent of $53.59 and the 2Q 2009 overall asking rent of $59.36.

Midtown had been the strongest market with rents at historic highs and vacancies near all time lows. The market retracted over 2009 but appears to have stabilized in 2010. C & W reported the overall average

gross asking rent as of the 4Q 2010 was $62.46, up slightly from the 2Q 2010 figure of $61.66 and the 4Q 2009 figure $61.82, but still -22% from the 4Q 2008 figure of $79.81. JLL also indicated a slight bounce back in Midtown rents. As per their 4Q 2010 report, the average Midtown asking rent was $59.14, up slightly from $58.55 as of the 2Q 2010 but still down some from $59.48 as of the 4Q 2009 and $65.81 from the 2Q 2009.

Similar to Midtown, the Midtown South market had also been improving but pulled back over the past two years with bounce back in the last part of 2010. C & W estimated Midtown South to have an overall gross average asking rent of $44.73 as of the 4Q 2010, up from $43.71 as of the 2Q 2010 but down from the $47.17 as of the 4Q 2009 and -17% from the $54.09 figure as of 4Q 2008. JLL again showed similar retraction with a 4Q 2010 overall asking rent of $43.01 similar to the 2Q 2010 overall asking rent of $43.11, but down slightly from the 4Q 2009 overall asking rent of $43.19, but -11% from the 2Q 2009 figure of $48.25.

The Downtown market also improved across the board in 2006, 2007 and into 2008 according to several research companies. Rents were at record highs. However, this market has also retracted but it too has rebounded some in the later part of 2010. C & W reports Downtown's average asking rents were $38.78 as of the 4Q 2010, up slightly from $37.81 as of the 2Q 2010 bit down from $40.36 as of the 4Q 2009, $47.85 as of the 4Q 2008 figure and -24% from the 2Q 2008 figure of $50.74. JLL indicated Downtown's overall average asking rent as of the 4Q 2010 was $38.22 up from the 2Q 2010 figure of $37.19 and above the $37.84 as of the 4Q 2009 but still -9% from $42.09 as of the 2Q 2009.

Both C&W and JLL as well as several other research companies, anticipate slow stabilization and possible improvement in rents in 2011 but are still concerned over the weak labor market and other economic factors as previously discussed. In addition, the Downtown market is still of most concern with Midtown anticipated to rebound the quickest.

**Vacancy:**
The effects of the slowing market were even more evident in the rise in the vacancy rate, which recently reached its highest level in years although appears to have bounced back in 2010. The overall vacancy rate in Manhattan as per C&W at the close of the 4Q 2010 was 10.5%, down from the 2Q quarter 2010 of 10.8%, down from the 1Q 2010 figure of 11.6% (highest figure in 5 years) and below the 4Q 2009 figure of 11.1%. It is still, however a large jump from the 4Q 2008 rate of 8.0% and well above the fourth quarter 2007 figure of 5.7%. JLL estimated the overall vacancy rate much higher at 11.9% as of year-end 2010, however, their figure was a drop to their estimate of 12.5% as of the 2Q 2010 and the 13.1% as of the 4Q 2009. It remains above their 10.2% as of the 4Q 2008 and well above the 7.1% as of 4Q 2007.

Midtown's vacancy rate was being impacted more than the other markets similar to its larger rent declines although it appears to have bounced back in 2010. C & W's estimate of Midtown's overall vacancy was 10.6% as of the 4Q 2010, down from 11.5% in the 2Q 2010 and 12% as of the 4Q 2009. It is, however, still well above the 8.5% as of the 4Q 2008 and 5.9% as of 4Q 2007. JLL indicated Midtown's overall vacancy rate to be 12.2% as of the 4Q 2010, down from 13.2% as of 2Q 2010 and 14.3% as of the 4Q 2009 but still above the 10.8% as of the 4Q 2008.

Midtown South has a lower vacancy than Midtown and has also shown some improvement in 2010. C & W estimated Midtown South's vacancy at 8.6% as of the 4Q 2010, down from 9.2% as of the 2Q 2010 and 10% as of the 4Q 2009 but still above the 7.1% as of the 4Q 2008 and the 4.7% as of the 4Q 2007.

JLL estimated Midtown South's overall vacancy rate to be 9.1% as of the 4Q 2010, down from 10.1% as of 2Q 2010 and 11.2% as of the 4Q 2009 although still above the 8.1% as of the 4Q 2008.

Downtown's vacancy trend is still uncertain and according to one research firm still on the rise. It had improved from 2006-2008 and finally rebounded to pre 9/11 levels but has been more significantly impacted over the past two years. C & W estimated the overall vacancy at 11.5% as of the 4Q 2010, which is below the 12.1% as of the 3Q 2010, however, still also well above the 9.9% as of 2Q 2010 and the 9.6% as of the 4Q 2009. It is up more significantly from 7.4% as of the 4Q 2008 and the 6.2% as of the 4Q 2007. JLL estimated Downtown's overall vacancy rate to be much higher, 12.8% as of 4Q 2010 and they estimated it has continued to increase; up from 12.7% as of the 3Q 2010, 12.1% as of 2Q 2010, 10.9% as of the 4Q 2009 and 9.8% as of 4Q 2008. Both firms 3Q 2010 report indicated the large jump in vacancy was mainly due to the addition of more than 2 million SF of space to the market, 1.5 million SF of which were related to Goldman Sachs relocation. The firms indicated this was high quality space and expected strong demand for it. However, C&W's 4Q report was more optimistic indicating a decline in vacancy while JLL indicated the market was still in flux with rising vacancy.

**Sales/Leasing:**
Sales records were being set through most of 2007 with some office properties selling for over $1,000/SF. Beginning in 2008 the sales market slowed considerably due to the credit crisis resulting from the sub-prime mortgage fallout. Financing was much more difficult to obtain and the required equity position increased considerably. Sales activity through the 2Q of 2008 was down 59% from the prior year. As per C&W, Manhattan property sales at the end of 3Q 2008 were $18.7 billion, less than ½ the $42.4 billion that had closed through the 3Q 2007. As per C&W's 2Q 2009 report, approximately $1.7 billion in sales closed during the 1st half of 2009, compared to $7.2 billion in the 1st half of 2008. The report indicated that properties put in contract or closed in 2009 represent more than a 60% decline from peak 2007 prices. As per their 4Q 2009 report, the total 2009 sales market activity was $3.5 billion in transaction volume, an 82% decline from 2008 and a 93% decline from 2007.

Similar to vacancy and rents, property sales are also recovering. As per C&W's 3Q 2010 report, deals closed and under contract for transactions of $10 million and higher totaled $9.4 billion, up 168% from the $3.5 billion closed and under contract for all of 2009. As per their year-end 2010 report, the total for the year was $13.6 billion, up 290% from 2009 with Midtown South up 1,311% to $3.3 billion from only $235 completed in 2009. Even Downtown sales surged, up 314% in 2010 to $808 million.

Leasing had slowed considerably but picked up towards the second half of 2009 as several large firms were reported to have acted early and renewed leases based on the current favorable rents. As per C&W, leasing in the 1st half of 2009 was been the slowest in 20 years. This was after leasing in 2008 was 19% below the prior year and the lowest figure since 2001. However, with a strong second half, leasing activity for all of 2009 wound up being only 15% down from the prior year with the second half leasing activity 56% above the first half. Their 1st Q 2010 report indicated continued renewed strength in leasing with 5.7 million SF leased, the highest since the 2Q 2008 and 84% above the same period the prior year. Conditions, continued to improve in the 3Q 2010 with 18.8 million SF leased for the year, compared to 12.6 million SF for the 1st nine months of 2009 and 16.3 million SF for all of 2009. The past two quarters saw the first positive net absorption since the 4Q 2007 and the strongest leasing since the 3Q 2006. C&W's year-end 2010 report that indicated total leasing activity for 2010 was 26.3 million SF, up 61.4% from the prior year. Fourth quarter leasing activity was the second highest quarterly total in the past five years and the highest since 3Q 2006. JLL's report was less optimistic indicating overall positive net absorption for the year but with Downtown struggling with negative absorption for the year.

The above statistics indicate a market that pulled back in 2008 and 2009 due to a slowing economy and difficult credit market. However, the market does appear to have stabilized and bounced back some in 2010. Rent declines for the most part have been nominal and vacancy has decreased and most markets bounced back from mid year when they were at a low point. Midtown and Midtown South appear to be faring better than the Downtown market. There are some continued concerns for the office market due to the uncertain economic conditions. It should, however, be noted, even with the recent drops in rents and increases in vacancy, for the most part, these were off of peaks that occurred in 2007 and 2008 and rents and vacancies still remain superior for the most part to what they were just a few years ago. In addition leasing and sales activity have picked up significantly in 2010.

The direction of the market does remain uncertain. The future of the market in the near term will be impacted based on the direction of the economy, and more specifically, the creation or loss of jobs in the city. The fact that NYC has led the nation in private job growth and that unemployment has declined is a positive factor for the office market.

<u>Retail</u>

The retail market had been improving over the past several years like the office market but over the past two years this market has also been impacted. The overall economic slowdown, especially the cut back in consumer spending, impacted rents and vacancies some although the overall market, especially the high profile areas, appears to have held up fairly well comparatively to the office market and conditions appear to be improving in 2010. The Real Estate Board of New York (REBNY) does a bi-annual survey of retail rents. As per their Fall 2010 report, average annual asking rents were $118/SF, up 4% from the Spring 2010 figure of $113/SF and above the Fall 2009 figure of $117/SF and Spring 2009 figure of $115/SF. It is, however, down -9% from the Fall 2008 rent of $129/SF and -11% from the Fall of 2007. It is well above the $106/SF as of November 2006 and $97 as of March 2004. The median asking rents have also remained fairly stable over the past year with reported figures of $85, $85 and $83 for the Spring 2010, Fall 2009 and Spring 2009. No median rent was indicated in their Fall 2010 report.

Many high profile areas showed improvement. Fifth Avenue rents between 49th and 59th Streets increased 3% to $2,367/SF from the Spring 2010 figure of $2,300. Rents are +15% from the Fall 2009 figure of $2,050 and are +45% from the Spring 2009 figure of $1,631. Midtown rents along Broadway and 7th Avenue from 42nd to 47th Streets increased considerably, +21% from the Spring 2010 report to $1,700/SF. They are +107% from the Fall 2009 figure of $891. West Village rents on Bleecker Street between 7th Avenue South and Hudson Streets increased 7% to $486/SF. They are +38% from the Fall 2009 figure of $352. Madison Avenue rents increased 9% to $1,049 and are +14% from the Fall 2009 figure of $919. Even the Downtown market improved with rents along Broadway from Battery Park to Chambers Street increased 11% to $150 although they are still down -21% from the Fall 2009 figure of $189.

Not all of the high profile markets improved. The largest decrease was seen along West 34th Street in Herald Square from 5th to 7th Avenue where asking rents were reported at $419/SF, -16% from the Spring 2010 figure although only -1% from the Fall 2009 report. They are still well below the Fall 2008 figure of $648. SoHo asking rents on Broadway between Houston and Broome Streets were -6% from Spring 2010 to $526/SF but are still +9% from the Fall 2009 figure of $483 and well above the Spring 2009 figure of $452. Overall retail rents in Midtown South were +4% ($103) from the Spring 2010 with a +12% increase ($67) reported for Upper Manhattan. Rents along 125th Street were reported to average $117, -8% from the Spring but +1% from the prior year. Downtown rents dropped slightly (2%) to

$99/SF while West Side asking rents remained stable at $128/SF. Eastside rents increased 9% to $180 while Midtown rents were +10% to $149.

C&W's retail reports also indicated improvement. As per their 1Q 2010 report, the market bounced back some with 4 of 7 sub-markets showing decreased availability, 2 showing stability with only 1 having increased availability. Asking rents increased in 5 of 7 sub-markets. Their 2Q 2010 report indicated positive results for 4 of the 7 markets with 2 showing decreases and no data for 1. Upper Fifth Avenue rents increased 5% year to year to $2,100, Madison Avenue increased 11.5% to $831, SoHo increased 13.1% to $268 and Times Square increased 14.4% to $691. Rents on the Upper West Side decreased -6.5% to $286 while Lower Fifth Avenue rents decreased more significantly, -23.3% to $414. Their year end 2010 report indicated the retail market continued to improve just about across the board. Upper Fifth Avenue rents increased to $2,254, Madison Avenue increased to $847, SoHo rents increased to $277, Times Square increased to $747 and Lower Fifth Avenue rebounded considerably to $538/SF.

Marcus and Millichap estimated the overall triple net retail rent in New York City was $64.90 year-end 2009, a large drop from $70.33 year-end 2008 and $70.48 in 2007. They are forecasting a drop to $62.30 by year-end 2010. With the recent slowdown in consumer spending as previously reported, it is likely that rents could be impacted going forward although the more recent Manhattan retail reports indicate a bounce back in the market.

Reported vacancy rates for retail space are less available than for office space. Most published articles and research companies indicated a decline in vacancy and available space for the past few years prior to 2008. Vacancy rates, similar to office space, have risen over the past 1-2 years. Marcus and Millichap's 3Q 2010 report indicated an average Manhattan retail vacancy rate of 7%, up from 6.5% as of the 2Q 2009, up from 4.8% year end 2008, the 5.1% as of year-end 2007 and the 5.0% for year end 2006.

Optimal Spaces, Inc., another research firm, indicated vacancies actually decreased slightly, contrary to most published reports. In addition, their estimate of vacancy is much lower than most other published reports and do appear very optimistic. Following are their estimates over the past few years.

|  | **Jan-11** | **May-10** | Feb-10 | Dec-09 | Mar-09 | Feb-08 |
|---|---|---|---|---|---|---|
| **MANHATTAN OVERALL** | 1.8% | 2.2% | 2.2% | 2.3% | 2.7% | 3.2% |
| **MIDTOWN** | 1.6% | 1.9% | 1.8% | 1.7% | 1.5% | 1.5% |
| **MIDTOWN SOUTH** | 2.1% | 2.4% | 2.5% | 2.8% | 3.7% | 5.5% |
| **DOWNTOWN** | 1.5% | 1.7% | 2.3% | 2.3% | 2.8% | 2.8% |

Overall, although some rent declines have been seen since the start of the recession in 2008, retail market demand appears to have been maintained fairly adequately compared to the office market with many areas actually showing improvement. Sales have, however, slowed considerably with some pullback in prices. M&M 3Q 2009 report indicated sales transactions have declined 57% over the past year although the median price decreased only 4% to $779/SF. Single tenant retail condominiums were reported to have decreased more considerably, down 40%, to $1,251/SF although the report did indicate that several high priced sales at the Plaza Hotel in the prior period may have skewed these numbers somewhat. Their

2Q 2010 report indicated further declines in sales prices and a slowdown in transactions. Their 3Q 2010 report indicated a slight bounce back in the market.

Residential
The residential market, especially the owner-occupied market, had been very strong prior to early 2009 with significant increases in value. The declining prices and rising inventory that plagued many of the nation's housing markets finally impacted the Manhattan market in 2009 although the downturn appeared short lived as the market appears to have bounced back some in 2010.

New construction has all but come to a grinding halt since the beginning of 2009. Many construction projects have stalled although Manhattan does not have nearly as many as the outer boroughs such as Brooklyn. As per the SOCDS Database, permits in Manhattan for 2007 amounted to 9,520, up from 8,790 in 2006 and 8,493 in 2005. Because of the expiration of the 421a tax abatement program in many areas on 7/1/08, there was a flurry of activity in June with 5,751 permits issued versus 585 for the prior year. For 2008 total permits issued were 9,700. However, for all of 2009 total permits were only **1,363**. In 2010, **505** permits were issued for the 1st 10 months, well below the 1,203 for the same period in 2009 and just a fraction of the 9,209 for 10 months of 2008. A 1/16/11 NY Times article indicates that no other permits were issued in 2010 and the 505 units was the total for the year, 95% fewer than in 2008. The article indicates that this shortage of supply may actually help the housing market and lead to more demand and increased prices going forward. However, the article also states that a large jump may not really occur until 2012 when the existing pipeline product is completed and sold or rented out. As per the NY Building Congress as of October 2010 there were 130 stalled construction projects in Manhattan, up from 66 a year prior. Not all of these projects are residential however; their report indicates 67% of the overall city total were. Regardless, the stalled and pipeline product will definitely add to the supply over the next year although based on recent improvements in the market and assuming a stable and slowing improving economy, this supply should be adequately absorbed.

As per the 2000 census data, Manhattan had 798,144 housing units, a 1.6% increase from 1990. This was below the citywide increase of 7%, which supports the fact that most of the population increases for the city occurred outside of Manhattan. In addition, there was a trend in Manhattan of combining housing units to create larger living spaces. Of the total occupied housing units, approximately 20% were owner occupied and 80% renter occupied. The percentage of owner-occupied units has increased due to the amount of new condominium construction that has occurred. The 2006 NYC Housing & Vacancy concluded an estimate of 23.5% owner occupied with an increase to 24% as of 2009. STDB Online estimated as of 2010, Manhattan had 864,761 housing units, up 8.3% from 2000, above the 6.2% increase citywide, a reverse of the trend of the 1990's and indicative of the large amount of new construction that has occurred since 2000. The increase in housing units is above the 5.1% estimated increase in households. This above average increase in housing units relative to households may finally be starting to result in an oversupply as indicated by the declines in values seen over the past few years.

As noted above, the market was impacted in 2009 but most areas are showing improvement in 2010 although the market fluctuated during the year and ended above 2009 but off highs achieved in mid 2010. Prudential Douglas-Elliman's (PDE) 4th quarter 2010 report indicated the median apartment sales price was $845,000, which is -7.5% from the prior quarter but +4.3% from the prior year. Marketing time had been increasing considerably but dropped in 2010 and was estimated at 125 days, down from 204 the prior year, which was a record. Before the recent increase, the marketing time had remained between 131 and 138 days since the 4th quarter of 2005 so the recent quarter figures are slightly superior to those of a few years ago. The listing discount has also dropped after increasing considerably and was

estimated at 8%, above the 5.8% of the prior quarter but below the 12.8% of the prior year. It is still above the 7.3% for year-end 2008 and well above the very low 2.6% of year-end 2007 when the market was at its peak. Sales transactions had increased significantly but dropped some in 2010 and were -13.8% from the prior quarter and -7.2% from the prior year.

Cooperatives continued to show some improvement. The median cooperative price as of 4Q 2010 was reported as $685,000, -11.9% from the prior quarter but +8.7% above the prior year quarter. The 1Q 2010 median was a 17% increase from the prior year. The average price per sf was $928, -6% from the prior quarter and was -6% from the prior year. Cooperative marketing time was 118 days with a listing discount of 5.8% versus 106 days/2.8% discount the prior quarter and 151 days/18.3% the prior year. The median price of a condominium was relatively flat for the year, reported at $997,885, -11% from the prior quarter and +0.3% from the prior year figure of $995,000. The average price per square foot of $1,109 is -17% from the prior quarter and -8% from the prior year. The number of condominium sales also dropped, down to 1,109 in the quarter, -17% from the prior quarter and -8% from the prior year. Marketing time for condominiums was 132 days with a 10.4% listing discount. Marketing time is down slightly from 143 in the prior quarter but is well below the 259 the prior year. The listing discount is up from 8.8% the prior quarter and 7.1% of the prior year.

Corcoran and Halstead had somewhat comparable figures although their results differed slightly. Halstead reported the 4Q 2010 average cooperative apartment price was $1,158,333, only +0.1% from the prior quarter but +17% from the prior year. The average condominium price was reported as $1,751,219, +1.6% from the prior quarter and +1.1% from the prior year. The average price/SF in new developments was rebounding but fell back and was reported as $1,099, -1.2% from the prior quarter and -11% from the prior year. They reported an average marketing time of 113 days, below the 132 from the prior year with a listing discount of 4.5%, similar to the 4.6% from the prior year.

After a large drop off in sales during 2009, Corcoran reported increased sales activity with sales in the 2Q 2010 +17% from the 1Q 2010 and +47% from the prior year. However, sales in the 3Q and 4Q dropped back and by year end were reported at around 2,900, down 17% from 4Q 2009. They reported the median cooperative price as of the 3Q 2010 was $655,000, -5% from the prior quarter but +7% from the prior year. The average price per square foot was $835, down from $856 in the prior quarter but +1% from the $828 of the prior year. The median condominium price was $1,049,000, -9% from the prior quarter but +10% from the prior year. There was an average price per square foot of $1,199, +2% from the prior quarter and +5% from the prior year. They reported 8,829 listings on the market in December 2010, down from the recent peak of 12,336, which was 1Q 2009. Clearly, Manhattan's owner occupied residential market was impacted significantly between the 4th quarter 2008 and the 4th quarter 2009 although most areas appear to have bottomed out and bounced back in the past year although they ended the year off of highs achieved in the middle of 2010.

Manhattan's housing market is still dominated by the rental apartment building. The 2006 report by the Rent Guidelines board indicates that 76.5% of all housing units in the borough as of 2005 were renter units. This amounted to 585,787 renter units for the borough. Although rent stabilized and subsidized units still account for the largest percentage of renter units, this percentage has been decreasing as rising rents and changes to rent stabilization laws permitted many to become deregulated. Of the total renter units as of 2005, 57% were rent-stabilized, 4% were rent-controlled, 2% were under the Mitchell Lama program, while 13% are classified as public housing (which includes project based Section 8 programs). Market units accounted for only 23% of the total renter units. This, however, up significantly up from

17% as of 2002 and 10% as of 1996 as approximately 40,000 more renter units are now at market versus 2002. The number of market units has continued to increase since 2005. As per the 2009 report, 30.4% are now considered market units.

Demand for rent-stabilized buildings continues to remain adequate due to the good upside potential for increasing rents and the low vacancy. They had been increasing significantly over the past few years. The rent guidelines board released a report in 2008 indicating that rent stabilized properties in Manhattan increased from an average of $1.99 million in 2003 to $4.15 million in 2007, +108%, over 25% increase per annum.

However, conditions pulled back in 2008 and 2009 with Massey Knakal, a major New York City real estate brokerage firm reporting values down considerably from the peak of 2007. Transactions slowed considerably. They reported that through the second half of 2008, sales transactions in Manhattan were down 54% from the prior year. For all of 2009, there were only 322 sales for the year (not counting Upper Manhattan), down 49% from 2008. Northern Manhattan had 92 sales, down 37%. In the 1Q 2010, there were 99 sales, up 98% from the 1Q 2009 but down 12% from 4Q 2009. Sales volume has improved in 2010 with 304 buildings sold through the 1st half, up 40% from the prior year. The $6.5 billion in transaction activity in the 1st half of 2010 already exceeded the $6.2 billion for all of 2009.

Over the past few years, cap rates have risen while GRM's have fallen. However, cap rates remain below the national average and very low historically with the changes off of peaks achieved in 2007. The market still appears to be fluctuating. On the following page is a summary of the Manhattan elevator and walk-up property apartment market over the past few years as per Massey Knakal.

| | 2H 2010 | 1H 2010 | 2H 2009 | 1H 2009 | 2H 2008 | 1H 2008 | 2H 2007 | 1H 2007 | 2H 2006 |
|---|---|---|---|---|---|---|---|---|---|
| **ELEVATOR BUILDINGS** | | | | | | | | | |
| **CAP RATE** | **5.0%** | 5.1% | 5.2% | 4.1% | 3.5% | 3.8% | 3.8% | 4.0% | 3.3% |
| **GRM** | **12.8** | 11.7 | 12.3 | 14.5 | 17.4 | 15.4 | 17.7 | 15.8 | 15.8 |
| **PRICE/SF** | **$438** | N/A | $438 | N/A | N/A | $532 | $527 | N/A | N/A |
| **WALK-UP BUILDINGS** | | | | | | | | | |
| **CAP RATE** | **5.7%** | 6.1% | 5.5% | 4.7% | 4.2% | 4.8% | 4.8% | 4.0% | 4.6% |
| **GRM** | **12.2** | 11.2 | 11.5 | 14.1 | 15.2 | 14.6 | 14.8 | 15.9 | 14.5 |
| **PRICE/SF** | **$525** | N/A | $530 | $494 | N/A | $599 | $605 | N/A | N/A |

As can be seen from the above statistics, the rent stabilized market has also been impacted with some declines in GRM and price per SF and increases in capitalization rates. However, the market appears to have improved some in 2010 and the recent drops were off the peaks of 2007 and in general remain well above those of just a few years ago. Listings, while indicating slight value declines from the peak, have not shown significant changes and they too appear to have rebounded in 2010. Demand does continue to be maintained for these buildings as most contain below market rents with good upside potential.

The overall market rental market suffered more than the owner occupied market post 9/11 but also rebounded over the past 8 years prior to 2009 with rents increasing and vacancy decreasing. The strong sales market fueled the rental market as rental unit supplies dwindled and the high cost of ownership led

many people to lease rather than buy. Marcus and Millichap's 4Q 2010 report indicated effective rents were $3,417 up 4.2% over the year and well above the $2,800 year end 2007, $2,553 as of year-end 2006, $2,399 year-end 2005 and $2,287 year-end 2004.

With a declining market some people have held off buying for now, which could help the rental market. However, if new condominiums continue to become rentals, it may impact the supply and lead to a decrease in rents. This appears to have been the case in 2009 as rents decreased although similar to the sales market, rents have rebounded in 2010. CitiHabitats is reporting that as of the 4Q 2010 studios were averaging $1,840, which is +0.6% from the prior quarter and +6.2% from year end 2009, stable from year-end 2008 but still -4% from year-end 2007. One-bedrooms were averaging $2,512, which is +0.4% from the prior quarter, +7.2% from year-end 2009 but -0.6% from year-end 2008 and -3.1% from 2007 year end. Two-bedrooms averaged $3,467, which is +0.6% from the prior quarter, +5.2% from the 4Q 2009 but -2.3% from the 4Q 2008 and -6.4% from year-end 2007. Three-bedrooms average $4,690, +1.3% from the prior quarter, +5.7% from year-end 2009, -0.5% from year-end 2008 and -0.5% from year-end 2007.

In conjunction with the increase in rents, vacancy had also decreased after an increase post 9/11. The 2000 census reported the overall vacancy rate for the borough was approximately 3%. As per the 2002 NYC Rent Guidelines survey, Manhattan's vacancy rate increased to 3.86%, above the citywide average of 2.94%, indicative of the abundance of apartments available after 9/11. The vacancy rate continued to increase in 2002 with Marcus and Millichap estimating the year-end 2002 vacancy rate at 4.2%. The turnaround in the vacancy rate appears to have occurred toward the end of 2003 with Citi Habitats reporting that the overall vacancy rate in October 2003 was 1.86%, down from 2.35% six months prior. It continued to improve and was estimated at 1.55% as of year end 2004, 1.1% as of year-end 2005 and 0.82% as of year-end 2006. Vacancy began to increase in 2007 and ended the year up slightly with Citi Habitats estimating the rate at 1.13% as of year end 2007. Due to the recession, they increased more significantly in 2008 ending the year at 1.96%. However, since then the rate has dropped and was projected by the firm at 1.79% as of year-end 2009 down to 1.21% year-end 2010.

Marcus and Millichap had differing projections of vacancy, slightly higher with continued increases estimating vacancy as of the start of the 4Q 2010 to be 4.3%, up from the year-end 2009 figure of 3.5%, up from 2.6% in 2008, 2.2% in 2007 and 2.7% in 2006. Regardless of which data source is used, vacancy still remains at a very low level, below 5% or less and based on our analysis, market demand appears fairly good for the rental market at the present time.

<u>Hotel/Hospitality</u>
The hospitality industry had bounced back after 9/11 as more people are now employed in hospitality than in 2001. The weak dollar was helping tourism. However, the recession became global and tourism has also declined although similar to the other markets, the past two quarters show some improvement. In fact, Mayor Bloomberg recently reported that tourism hit a record high in 2010 with 48.7 million visitors. The NYC EDC reported that hotel occupancy was 85.1% in November 2010, up from 81.4% the year prior and 80.4% in 2008. It was 88.3% in July 2010 versus 85.2% in July 2009 and 71.5% in February 2010, up from 67.1% in February 2009. Room rates decreased more substantially but also bounced back in 2010. As of November 2010, the average room rate was $309, up 10.6% from $278 the year prior but still below the $342 as of November 2008. As of July 2010, the average room rate was $225, up 12.5% from the year prior while as of February 2010, the average room rate was $202, -5.3% from the prior year. The largest increases were seen in higher-priced hotels (those charging more than $325 per night).

<u>CONCLUSION</u>

The outlook for Manhattan, New York City and the region for the next few years is one of uncertainty due to the current political and economic climates. Most economists and published reports appear to indicate the recession, or at least the worst of the recession is over. However, the economy is not yet considered self sustaining and there are many concerns. On the positive side, the GDP is growing again, inflation remains low, retail spending has improved and unemployment has decreased. The stock market has also rebounded. Even with improvement, the primary concern continues to be unemployment although there are also concerns regarding the poorly performing dollar, the weak economy in Europe and our rising national debt and trade deficit. Consumer confidence is still uncertain and GDP growth has also slowed.

The real estate market tends to lag behind the economy. Many published reports at the beginning of 2010 were projecting this year to be one of a continued decline for commercial real estate. There has and continues to be an upheaval in the credit and financial markets which has lessened both owner's and developer's ability to finance purchases and new construction. However, many areas of the market showed stabilization and bounce back in 2010. In the office market, rents have bounced back off their recent lows that occurred in mid 2010 however still remain below 2009 are prior year levels. Vacancy has also improved and for the most part is below year-end 2009 although Downtown still appears to be faring worse than Midtown and Midtown South. Leasing and sales activity has also increased considerably. The retail market also saw some improvement in most market segments although some areas are still being impacted. The recent improvement in consumer spending and unemployment may continue to improve this market.

The residential market has improved considerably in 2010 with appreciation over last year in just about all market segments although sales values decreased year-end from peaks achieved mid year. Market rents decreased in 2008 and 2009, however, though decreases were off of historic highs and rents have increased in 2010. Apartment vacancy remains very low and has decreased over the past year. The rent stabilized market had also pulled back in 2008 and 2009 although these pullbacks were also off of historic highs and this segment appears to have also stabilized and improved some in 2010.

Although there is some uncertainty, demand still appears adequate at the present time. It is uncertain at this time how the economy and real estate market will continue to be impacted in the short term although historically real estate has had the ability to bounce back in the long term. Although there is uncertainty, demand still appears adequate at the present time. The city maintains a strong and diversified economic base. Its excellent transportation network allows for national and international trade. Its stature as a national and international financial center should continue to provide for positive growth in real estate as long as economic conditions and job creation continue to improve.

# IMMEDIATE AREA MAP



# NEIGHBORHOOD ANALYSIS

The subject is located in the Chelsea section of Manhattan. This immediate area is bordered by West 34th Street on the north, West 14th Street on the south, the Avenue of the Americas (Sixth Avenue) on the east and the Hudson River/West Street on the west. The subject is situated on a good residential side street location in the southwestern section of the area. The subject is located in Manhattan Community District #4, which includes Clinton and parts of Greenwich Village.

On the subject block are residential buildings similar to the subject. Adjacent to the subject on each side is a four-story rental building. Across the street is the Frederic Fleming House, a seven-story residence for the elderly. At the end of the street on the corner of 22nd Street and Ninth Avenue is small local park. The buildings along the avenues are typically mixed-use with commercial on the ground floors and residential on the upper floors. Public transportation to the subject area is good. There are numerous subway stations within five blocks of the subject. Buses run in north/south directions along the avenues as well as the major east/west routes, and bus stops are within one block of the subject. There is alternate side of the street parking along the side streets which is typical to the area.

The subject is located in Manhattan Community District #4 which showed an overall increase in area population of 3.6%, growing from 84,431 in 1990 to an estimated 87,479 in 2000. This was slightly above the 3.3% growth for Manhattan (1,487,536 to 1,537,195) but below the population growth for New York City of 9.4% during the same period (7,322,564 to 8,008,278). The total population of subject area zip code, 10011, as of the 2000 Census was 45,873, a 5.6% drop from 1990. It was projected to increase 10.3% to 50,587 in 2010. STDB Online estimated Manhattan's population to be 1,643,382 as of 2010, up 6.9% from 2000 with a population estimate of 8,398,347, up 4.9% for New York City. As per the 2000 Census, there were 51,279 households in District #4 and the median household income was $50,580. The number of households for the subject's zip code was 28,132 as of the 2000 Census, a 2.1% decrease from 1990. However, it was projected to increase 7.9% to 30,348 in 2010. The median household income for the subject's zip code was $62,538 as of the 2000 Census, a 62% from 1990. It was projected to increase 48% to $92,702 as of 2010. STDB Online estimated Manhattan's median household income to have increased 53% to $71,770 as of 2010, versus $52,489 for New York City.

The residential market has improved significantly as many loft buildings in the area have converted from previous manufacturing and industrial uses to retail, commercial and residential use. Most mid and high rise buildings along the avenues in the area have retail at grade with some office or commercial space on the lower floors and office or apartments above. As a result, the population is expected to continue to increase into the near future. In addition, the City has been granting variances and changing zoning districts from manufacturing to residential use in the Chelsea neighborhood over the past 2-3 years. As of 2008, approximately 63% of the land use was devoted to residential use, with slightly more than 9% utilized for industrial purposes, and about 13% utilized for commercial purposes.

As previously mentioned, the neighborhood is characterized by a mix of residential, office and loft style buildings. The avenues are primarily improved with commercial and mixed-use buildings that have retail use at the grade level. The side streets change character from block to block due to the varying uses. Some blocks contain commercial uses while others are strictly residential and still others contain a mix of commercial and residential with some retail use. The varying uses were partially established by the many different zoning districts in the area. In addition, buildings constructed at the turn of the century were built prior to current zoning regulations and solely with the specifications of the owner in mind.

There are several public and private grade and high schools located throughout the area. Hospitals servicing the neighborhood include St. Clare's Hospital & Health Center with 250 beds at 415 West 51st Street and St. Luke's Roosevelt Hospital with 574 beds at 428 West 59th Street. Police and Fire Departments are located throughout the area. At one time, Chelsea was considered a place to live when no other places were affordable. Most residents lived in this location with the expectation of moving to a more desirable community. The area was considered a middle ground between Midtown and Downtown Manhattan. Recently, the demand for housing has revitalized the neighborhood. Many buildings are under taking renovation projects and converting to residential use as prices in Greenwich Village and SoHo have increased drastically and housing in the subject's area is more affordable.

Residential rents in the area generally range from $1,400 to $2,500 per month for studios, $2,000 to $3,000 per month for one-bedroom units and $3,000 to $4,500 per month for two-bedroom units. Larger units can exceed $5,000 per month. These rents are generally between $35 and $50/SF annually. The overall vacancy rate in the area was estimated at less than 1.0%.

There are numerous converted lofts and apartment buildings in the area in the form of condominium and cooperative ownership. The price of an average cooperative is from $700 to $1,200/SF, and the price of an average condominium is from $900 to $1,500/SF. Condominiums are fewer in number compared with cooperatives however, they are in greater demand. Most new construction over the past decade has been condominiums or rentals, as opposed to cooperatives.

The range of ground floor retail rents in the area along the avenues is generally from $60 to $150/SF, modified gross. The low end of the range is typically for the side streets and the upper end for the avenues. Some prime spaces are obtaining rents somewhat above this range. The subject's location would command a commercial rent at the low end or somewhat below the range, as it's predominantly a residential block. Office rents generally range between $30 to $55/SF with some Class A buildings achieving rents slightly above this range.

<u>CONCLUSION</u>

Chelsea is a mixed residential/commercial section of Manhattan. The subject is located in a desirable residential block in the southwest section between Ninth and Tenth Avenues. It has convenient access to the Downtown and Midtown business and employment centers, as well as to recreational and cultural facilities throughout the City. The strong residential component of the subject's immediate area promotes a reasonably stable environment, with a good mix of long-term older residents as well as young singles, couples and families. Over the past several years, there has been a steady increase in demand and values However, the current economic crisis has had a negative impact. The overall market declined somewhat between 2008 and 2009. However, all market indicators indicate that the market stabilized in 2010. Some reports have actually indicated a slight increase. The short-term outlook for the area is one of uncertainty due to current economic conditions but the long-term future is one of stability to slow growth.

# MARKET TRENDS

<u>An Overview</u>

SROs are one of the most traditional forms of affordable private housing available for single and elderly low-income people and for new arrivals to an area. It is found that many homeless and transient people often find SROs an affordable entry point into the housing market.

According to the Housing Maintenance Code of the department of Housing Preservation & Development (HPD), "single room occupancy is the occupancy by one or two persons of a single room, or of two or more rooms which are joined together, separated from all other rooms within an apartment in a multiple dwelling, so that the occupant(s) reside separately and independently of the other occupant(s) of the same apartment".

The terms "SRO" or "SRO-type units" are most often used by HPD and others as generic terms to cover three types of residences, namely, apartment hotels, SROs and rooming houses. New York Rent Guidelines Board terms the same categories as "hotel-type units" for the purpose of setting rent guidelines for residential "class A" (apartment) hotels, rooming houses ("class B" buildings containing less than 30 units), "class B" hotels, single room occupancy buildings (MDL Section 248 SROs) and lodging houses. SROs are between the two extremes – apartment hotels and rooming houses but appear to be more akin to rooming houses than hotels.

Under the New York State Multiple Dwelling Law (MDL), HPD assigns a structure class designation to all "multiple dwellings," that is, all buildings that have three or more residential dwelling units. A "class A" multiple dwelling is used, as a rule, for permanent residence purposes. A "class B" multiple dwelling is used, as a rule, transiently, as the more or less temporary home of individuals or families who are lodged without meals.

Most SRO units in New York City are found in SRO hotels, classified as "class A" multiple dwellings built before 1929 that have hotel-type amenities such as front desk, maid service, or linen service, and in tenement buildings used for SRO purposes. These are "class A" multiple dwellings with units that are being used for single room occupancy pursuant to Section 248 of the MDL, which specifies the conditions under which "class A" multiple dwellings may be used for single room occupancy.

The supply and distribution of units within the sector of "SRO-type" or "hotel-type" units has substantially changed in the past 15 years. The percentage breakdown of these units, according to "Single Room Occupancy in New York City", a study commissioned by HPD in 1985 to determine the number of SRO-type units, was: Hotels (42%), Rooming Houses (42%) and SROs (15%). And according to HPD, in 1990, the breakdown was: Hotels (33%), Rooming Houses (50%) and Section 248 SRO (16%). According to the recent figures available from HPD, approximately 38,000 units fall within the hotel stabilized group which presently includes (as detailed in the 1999 Housing & Vacancy Survey -- HVS) class "B" hotels (8,100, or 21% of the total), single room occupancy units (9,200, or 24%), rooming houses (8,700, or 23%), lodging houses (few units/no data and less than 2% of the total) and "apartment hotels" (11,500, or 30%).

The decline in the number of units in the past 20 years is largely due to deterioration of buildings, demolition and conversion of buildings from hotels and SROs to luxury hotels or coops/condominiums in the mid-1980's to early 90's.

Inventory

Rent stabilized units that fall under the current hotel proviso can be organized by Community District. Just over 70% of these units are located in Manhattan, with nearly 40% of the units in two community districts (CD): CD #4 (Clinton/Chelsea) and CD #7 (Manhattan Valley/Upper West Side/Lincoln Center).

There are enormous differences in building size among the three categories of residences in this sector. Rooming houses contain an average of 13 units per building, hotels have an average of 162 units and SRO's are in between with an average of 72 units. A rooming house, by regulation, cannot have more than 23 one-room units whereas hotels have a minimum of 30 units.

An SRO room usually is small, mostly between 80 and 250 square feet. Generally, in SRO residential housing properties, some or all dwelling units do not contain their own or attached bathroom or kitchen facilities. Often all rooms have shared kitchens and bathrooms. An SRO unit typically has a closet and may have a sink or a toilet. But generally, SRO units share a bathroom, shower, and kitchen with other rooms. The units are often furnished and rent is usually paid weekly or monthly.

**Number of Registered Hotels by Building Size, All Hotel Types, 2008**

| # of Total Units in Building | # of Buildings | Percentage | Cumulative % |
|---|---|---|---|
| 1-5 | 55 | 11.65% | 11.65% |
| 6-10 | 138 | 29.24% | 40.89% |
| 11-15 | 52 | 11.02% | 51.91% |
| 16-20 | 35 | 7.42% | 59.32% |
| 21-30 | 24 | 5.08% | 64.41% |
| 31-50 | 67 | 14.19% | 78.60% |
| 51-100 | 39 | 8.26% | 86.86% |
| 101-200 | 31 | 6.57% | 93.43% |
| More than 200 | 26 | 5.51% | 98.94% |
| Unknown | 5 | 1.06% | 100.00% |
| **Total** | **472** | **100.00%** | **100.00%** |

Source: 2008 DHCR Building and Apartment Registration filings

Transient / Short-term Rental Housing Market

New York City remains one of the most expensive rental markets in the nation. Today, the rental market appears to be stabilizing, although rents have continued to increase for particular offerings in specific locations. The rental market continues to be affected by the increasing supply of available rental units caused by the increasing number of new constructions. The outlook for the immediate future is for overall stability, with rents expected to remain at current levels or increase marginally.

In New York City, historically, SRO housing provided relatively inexpensive transient and short-term housing for single individuals and transient families. In the mid-1950's the City banned the creation of new SRO units on a for-profit basis, which apparently is the root cause for some of the low-income housing shortage in New York City today. In the past few years, HPD has stepped up efforts in various ways to increase the SRO housing stock by providing incentives to private developers and not-for-profit organizations to create more SRO units from rehabs or new developments.

During recent years, factors which have contributed to consistent demand for permanent and transient rental units include an increase in jobs in New York City; corporate relocations and an increase in

employees in the improving economy. At the present time, due to various factors such as the past government decisions to encourage and support for-profit housing, redevelopment of older buildings, conversion of existing buildings into market rentals and coop/condo units, the supply of SRO units is far below the current demand.

While many non-profit agencies have been actively creating more stock of SRO units, partly with the collaboration of the City and HPD, there seems to be ample opportunity for private enterprise (or for-profit corporations) to venture into this sector and exploit the current demand for SRO housing. There has been a recent change in the types of tenants, however, as many SRO hotels are illegally converting more and more permanent-housing units for short-term visitors, especially tourists.

Due to the fact that many of the SRO-type and hotel-type properties derive a substantial portion of their revenue from New York City contracts to house transient individuals and families, and the City's current shortage of low-cost housing for its residents, the appraisers expect the average occupancy in these properties to remain fairly high or even higher than the national average in any given period.

## CONCLUSION

SRO-type housing is an important segment of the local economy. Also, there are many socio-economic benefits to a community in preserving, rehabilitating and constructing new affordable SROs. Residential hotel units, such as SROs, can become affordable to low-income individuals and households, often with or without government subsidies. With subsidies, they become affordable to very low-income persons. Availability of low-cost SROs also protects some people from becoming homeless or becoming nuisances at public places. Preservation and creation of SRO housing that is affordable, centrally located, reasonably secure and that offers a social environment of independence and dignity can positively benefit a community.

The current market for SRO units in Manhattan is reasonably stable. It is expected that demand for rental units in general will remain consistent, and that rents for unregulated, new, or renovated apartment units will hold steady in light of the slow economy. Continued construction of housing units, including SROs, may have a more stabilizing affect on the overall rental market. It is noted that SROs are the most economic residential units and in a recession may experience higher than usually occupancy levels.

## SANBORN MAP



# TAX MAP



# FLOOD MAP





# PROPERTY DESCRIPTION - SITE ANALYSIS

The subject is known as Block 719, Lot 66 and has 25' of frontage and depth of 98.75' for a plot area of 2,469$\pm$ SF.   The site is improved with concrete sidewalks, storm and sanitary sewers for adequate drainage, street lighting and a rear garden that can be privately accessed via two rooms.  The site is a few steps below grade in the front and rear.  Streets are macadam-paved and there is limited curb side parking.  Utilities available to the site include NYC water and sewer, Con Edison electricity and gas, and various telephone providers. West 22nd Street is a 60' wide, single-lane traffic route in the eastbound direction.  According to the enclosed Federal Emergency Management Agency Flood Hazard Map, cited on Community Panel #360497-0182F, effective 9/5/07, the subject is situated in a Zone X district, which is not a Flood Hazard Zone.

Restrictions/Encumbrances
The appraiser is not aware of the existence of any adverse easements, encroachments, or violations of restrictions which may affect the economic viability of the subject property and assume that none have been entered into. Without the benefit of an engineering study or a detailed subsoil report, the appraisers cannot comment on whether any factors exist which may impair the site.  If further information is required, we recommend an additional inspection from a firm specializing in hazardous materials in order to ascertain environmental risk.

## CONCLUSION

The subject site is a well-situated parcel in the Chelsea section of Manhattan.  The physical characteristics of the site, including size and shape, support the existing improvements. It is easily accessed, adequately serviced by public utilities and assumed to be environmentally sound. Since the improvements have existed for +/-100 years, it is reasonable to assume that there are no adverse elements which might threaten the continued existence of the building, as well as its foundation and framing. The utility and amenity value of the site is average as it is a typical interior lot with adequate frontage and typical depth. It meets the standards of builders and developers active in the marketplace.

# ZONING MAP



# ZONING ANALYSIS

Zoning is defined as "the public regulation of the use of private land through application of police power; accomplished by establishing districts or areas with uniform requirements relating to lot coverage, setbacks, type of improvement; permitted activities, signage, structure height, minimum lot area, density, landscaping, and other aspects of land use and development".[1]

## R7B Residential Districts

The subject is situated in an R7B residential zoning district. The zoning regulations generally produce six- to seven-story apartment buildings rather than the row houses typical of R6B districts. The maximum Floor Area Ratio (FAR) in R7B districts is 3.0 times the lot size for residential or community facility development. Parking is required for 50% of dwelling units, but waived if less than five or fewer spaces are required. The Quality Housing Program is mandatory in R7B districts and other regulations are as follows:

| | |
|---|---|
| Maximum Lot Coverage: | Corner Lot: 80% |
| | Interior or Through Lot: 65% |
| Base Wall Height: | 40-60 feet |
| Maximum Building Height: | 75 feet |
| Rear Yard Minimum: | 30 feet |
| Required Parking: | 50% of new dwelling units |
| Quality Housing Program: | Mandatory |

## Chelsea Historic District

The subject is also located in the Chelsea Historic District, which was established on September 15, 1970 by the Landmarks Preservation Commission. The goal of the commission is to preserve the characteristics of the neighborhood. Any alterations or renovations to a building's exterior facing the street are subject to the commission's approval.

## Conclusion

The subject site contains a total of 2,469+ square feet and is based upon the above, the zoning allows for a residential structure or a community facility with a maximum gross building area of 7,407+ square feet above grade.

The existing improvements consist of 5,000+ square feet above grade within the current zoning allowance. However it does not meet parking requirements and was not built under Quality Housing. Therefore, the improvements represent a pre-existing legal structure that is non-conforming. The subject has valid Certificate of Occupancy. If vacant, the site would allow a larger residential development that must conform to current zoning restrictions and also subject to the Landmarks Preservation Commission's approval.

---

[1] Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, fifth edition, 2010, Pg. 212.

# INTERIOR PHOTOGRAPHS
## View of SRO Rooms





## INTERIOR PHOTOGRAPHS
### Views of SRO Rooms





# **INTERIOR PHOTOGRAPHS**
## View of Shower Stalls

 

# **INTERIOR PHOTOGRAPHS**
## View of Lavatories

 

# INTERIOR PHOTOGRAPHS
## View of Common Areas





# INTERIOR PHOTOGRAPHS
## View of Boiler and Electric





# INTERIOR PHOTOGRAPHS
## Rear View and View of Garden





# IMPROVEMENT ANALYSIS

The subject is improved with a four-story and cellar, walk-up, SRO building with 5,000+ SF of GBA constructed circa 1900. Each floor is 1,250+ SF. There are 5 rooms on the first floor and 6 rooms each on the upper floors for a total of 23 rooms. At the time of inspection, there were ten vacant units. The client estimates a cost of +$100,000 to renovate the vacant units, which appears reasonable.

The building has concrete foundations with brick and concrete footing and load-bearing walls. The facade consists of brick and double-hung windows. There is a single swing wood and glass door in wood frame that leads the vestibule. The vestibule contains the recessed mailboxes. The interior door is also a single swing wood and glass door that leads to the first floor lobby and stairway. Every floor contains one shower room and one lavatory. The common areas are clean and well maintained.

The rooms are typically rectangular in shape and have sinks and ranges. They are typically finished with hardwood floors, painted plaster walls and ceilings. The appraiser inspected most vacant units which were in very average condition and in need of repairs/upgrades. We have made the extraordinary assumption that the rooms not inspected are in rentable condition.

The building has a flat, built-up roof with composition cap sheets that is in average condition and is +20 years old. The building has a sprinkler system with a sprinkler in each room and hallway. There is one stairway that services the cellar to the top floor and an engineer's ladder to the roof. The stairway is of wood construction with marble treads, wood risers and handrails.

The cellar houses the electric and gas meters, boiler and storage areas. Illumination is via incandescent lights which were not functioning at time of inspection. There is one central electric meter and two gas meters. The building is heated via a central gas-fired Weil McLain boiler under a steam system with steel radiators within rooms and hot-water is included in the heating system. Electricity and gas is supplied by ConEd. Electric is centrally metered and included in the tenants rent and there is a 200 amp main. Plumbing consists of cast iron soil and waste lines and cooper lines for domestic water supply, which appeared in average condition although an older waste line needs to be capped or removed.

Comments: At the time of inspection on June 16, 2011, the building was in average, older condition and the vacant rooms were in need of upgrades and removal of excess debris. The subject building was constructed circa 1900 and is +/- 100 years old. Due to average maintenance and renovations, the subject property has an effective age of 30 to 40 years. The estimated remaining economic life is 30 to 40 years.

Environmental Hazards: The appraisers are not aware whether there are any toxic substances, hazardous waste, radon gas, or asbestos-containing materials, etc., in the subject property or its vicinity. We recommend additional inspections from firms specializing in hazardous materials in order to minimize environmental risk as we are not specialists and do not present ourselves as such.

# REAL ESTATE TAXES

The following are the assessments for the 2011/12 fiscal year, which begins July 1st. The subject is a Class II property and the 2010/11 tax rate is \$13.353/\$1,000. Since the 2011/12 is not yet known, taxes are estimated using the 2010/11 tax rate.

|  | Actual | Transitional |
|---|---|---|
| LAND | \$100,800 | \$100,800 |
| IMPROVEMENTS | \$336,600 | \$255,240 |
| TOTAL | \$437,400 | \$356,040 |

Estimated 2010/11 Taxes: \$356,040 x \$.13353 = \$47,542/year (\$9.51/SF)

| Comparable | Taxes/SF | Assessors Value Estimate vs. Selling Price |
|---|---|---|
| #1 | \$6.27 | \$777,000 vs. \$3,600,000 (22%) |
| #2 | \$5.67 | \$472,000 vs. \$2,000,000 (24%) |
| #3 | \$12.10 | \$1,252,000 vs. \$2,310,000 (54%) |
| #4 | \$8.53 | \$1,622,000 vs. \$3,525,000 (46%) |
| #5 | \$3.30 | \$1,299,000 vs. \$2,100,000 (62%) |

The subject taxes are at the middle to upper end of the comps used in the sales approach, which ranged between \$3.30 and \$12.10/SF. The actual assessed value for Class II properties represents a ratio of 45% of market value of the subject, based on the assessor's formula. This equates to current estimated assessor's market value of \$972,000 for the subject, which is below true market value. The total assessors' market value estimated is 45% (\$972,000 vs. \$2,150,000) of our estimate of market value. This ratio falls within the middle to upper end of the typical range of comparables (22% to 62% for the comparables used in the sales approach). It is concluded from the above that the subject is assessed below true market value but at the middle to upper end of the comparable range.

When the transitional assessment is lower than the actual, it represents an increase in taxes for the upcoming years. Therefore the subject taxes will be increasing up to \$58,406 over the next few years assuming a stable tax rate and assessment. Any increases in assessments on Class II properties are phased in over five years. For example, if the actual assessment increases 100% in a year, it is phased in at 20%/year for five years. Decreases in assessments are realized immediately. It should be noted that properties are not typically drastically reassessed unless they are sold. Also, the reassessment is generally not based on the sales price, rather, on income/expense statements provided by the owner to the city each year and adjusted by the assessor.

Historic changes in tax rates also have to be considered. The tax rate for Class II properties increased 23%, an average of 2.3%/annum over the past ten years. The Class II tax rate increased 1% and 5% over the past two years and NYC is faced with financial stress and expected budgetary shortfalls. All of the above has been considered throughout our analysis.

# HIGHEST AND BEST USE

The Highest and Best Use is defined as: "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value."[2]  The concept of Highest and Best Use represents the premise upon which value is based and is the most fundamental and important stage of the valuation process.  Highest and Best use analysis centers around the use of the site as if vacant and unimproved.  This can be different from the current improvements existing on the site.  The property is then appraised on the basis of the interim use, as long as the value of the current realty is greater than the value of the land under its highest and best use. The Dictionary of Real Estate Appraisal, fifth edition 2010, page 93, further states: "The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability." Uses that are in the realm of possibility, but speculative in nature or otherwise improbable, are not considered.  Each condition in the definition is examined to determine which use returns the highest value to the site.

Legally Permissible: The legally permitted uses are defined by zoning ordinances to which a property is subject.  As discussed in zoning, the subject is located within an R7B zoning district, which permits a combination of residential or community facility use. Commercial uses are not permitted as of right. The maximum FAR is 3.0 times the lot size and parking is typically required. Community facilities can be constructed however this would not be the highest and best use based on overall demand and returns.

Physically Possible: The physically possible uses of a site are determined by its physical characteristics, including the size, shape, topography, soil-bearing capabilities, etc. All of the attributes of a site may affect the uses that may be supported on that site. Uses, which are incomparable with the characteristics of a site, are not considered as physically possible uses. The subject was constructed circa 1900 and is still standing in average physical condition with no signs of structural damage. The subject and surrounding blocks contain other structures built to or above (due to pre-existing use) the current maximum allowable building area. Therefore, it is reasonable to assume that there are no adverse elements, which might threaten its continued existence. Since it is physically possible to construct a property to its maximum allowable FAR on the subject site, the highest and best use of the subject, as vacant, would take this into account.

Financially Feasible: To determine whether or not a use is financially feasible, the costs of construction are compared to the returns of sale. Based on Marshall & Swift's Cost Construction manual and local contractors, a town house (Class A/B) would cost +/-$250/SF to construct. This does not include site acquisition, soft costs and profit. When considering land value ($200+/- SF of FAR), soft costs ($75/SF of FAR) and profit ($100/SF), the total cost approaches $625/SF. Due to the size and layout of the site a townhouse building would maximize the return versus a condominium.  Although condominiums sell between $800 and $1,200/SF on a net saleable area basis, townhouses are sold on a gross basis with prices over $1,100/SF.  Therefore, a townhouse would be more feasible to build than a condominium.

Maximally Productive: The next step will analyze other allowable uses to determine if any provide a higher return to the site. The anticipated revenues as a rental are now compared to the cost of construction. Typically residential buildings rent between $40 and $60/SF.  Assuming a rent of $50/gross SF is reasonable. If a typical 30% vacancy and expense percentage is applied, the net income equals $35. In order to achieve construction costs of $625/SF, the property would have to sell at a

---

[2] Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, fifth edition, 2010 Pg. 93.

capitalization rate of +/-5.6%. This is not feasible in today's market where typical capitalization rates for these types of buildings range between 6.0% and 7.0%. Therefore, it would not be feasible to construct a rental apartment building at the present time. No other uses are more productive therefore a townhouse would be the most productive use.

## CONCLUSION

All legal uses of the subject site as vacant were examined to determine which use would provide the highest return to the land. After considering the above definition and all factors affecting the Highest and Best Use of the subject, including location, market demand, neighborhood influences, physical and economic factors, and zoning, **the Highest and Best Use of the subject site, <u>as vacant</u>, is to construct a one-to-two-family townhouse.**

The subject property, <u>as improved</u>, is now compared to the highest and best use of the site, as vacant. The highest and best use, as vacant, is for a different use however it would be extremely difficult to legally vacate rent stabilized tenants. Therefore, **the highest and best use of the site, <u>as improved</u>, is "as is" as an SRO building and to renovate all vacant units into habitable condition.**

Note: Although speculative in nature the highest and best use as improved would be to relocate all the existing tenants onto two floors and to gut renovate the remaining two floors into an owner occupied duplex. However, this may not be possible if the existing tenants do not want to be relocated as they are protected under rent regulation laws.

# THE APPRAISAL PROCESS

The estimating of market value involves basic steps that must be followed in a systematic procedure. The appraiser must first define the problem to be solved, than the proper data must be obtained from public records and reliable sources. Once obtained, the appraiser must classify, analyze, and then reconcile this data into an estimate of value. There are three traditional approaches utilized in determining the estimated market value for the real property. These approaches; the Cost Approach, the Direct Building Sales Comparison Approach and the Income Capitalization Approach, are all considered in the analysis. After estimating a value in each approach, the data is reconciled and a value conclusion is formulated.

The Cost Approach is based upon the principle of substitution, whereas no person would pay more for a property than the amount for which he can obtain a vacant site and construct a building of equal utility and equal desirability without undue delay. The Cost Approach involves an analysis of the land value of the subject site, as if vacant and available for development. This value is determined by using vacant land sales that are comparable to the subject site. Second, the reproduction cost new of the improvements is calculated by using various construction cost manuals and/or estimates from general contractors. The amount of all sources of depreciation and obsolescence is then calculated and deducted from the reproduction cost new of the improvements to arrive at a depreciated value of all improvements. Once calculated, this value is added to the value of the land to arrive at an indicated value via the Cost Approach. This approach is most reliable when the subject is recently constructed since depreciation and obsolescence estimates are difficult to quantify as the age of a building increases. The subject was built circa 1900 and this approach was considered to be unreliable and not utilized.

The Sales Comparison Approach involves researching the sales of similar properties within the influencing area and then analyzing these sales with a reliable indicator. In the subject's case, an apartment building, the most widely used indicators are the price per square foot, price per unit and the Gross Income Multiplier (GRM). The price per square foot was utilized in formulating a value via this approach. The GRM was used as supporting indicators. Primarily caused by differences in economic profiles and location, building sales often display a wide range of values. Recent sales in the area are gathered here and analyzed in comparison to the subject property. Adjustments are made for differences, which are dictated by the market. Categories that affect the subject property are items such as location, building and market conditions, among others. After all adjustments are made, the range of values is reconciled into an indicator which best represents the subject. The Market Approach is considered to be a reliable indication of value in this case since it is a direct reflection of market activity.

The Income Approach derives a value for the subject as an investment property. It is based on the assumption that there is a definite relationship between the income a property will earn and its value. The theory is that the value of a property is the present worth of the net income it will produce during its remaining economic life. It is analyzed in this case by utilizing the subject's rent roll to compute the potential gross income. Market rents are also utilized to determine vacancy estimates and risk factors associated with the capitalization rate development. A certain percentage of the potential gross income is then deducted to allow for vacancy and non-collection to yield an effective gross income. After deducting the operating expenses of the building from the effective gross income, the net operating income is derived. The net operating income is then reduced to an indication of value by a process known as capitalization. A capitalization rate is derived by market activity. These properties are most often purchased for their cash flow therefore this approach is considered the best indicator of value and is given most weight.

# SALES COMPARISON APPROACH

<u>Methodology</u>

The Sales Comparison Approach is the process of deriving a value indication for the subject property by comparing similar properties that have recently sold with the property being appraised, identifying appropriate units of comparison and making qualitative comparisons with or quantitative adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison.[3]

Inherent in this approach is the principle of substitution which states: "when several similar or commensurate commodities, goods or services are available, the one with the lowest price attracts the greatest demand and widest distribution."[4]

By analyzing sales, which qualify as arms-length transactions between willing knowledgeable buyers and sellers with reasonable market exposure, we can identify price trends from which value parameters may be extracted. Comparability in physical, location and economic characteristics is an important criteria in evaluating the sales in relation to the subject property. The basic steps involved in the application of this approach are as follows:

(1)     Researching recent relevant property sales and current offerings throughout the competitive area.

(2)     A selection process to focus on properties considered most similar to the subject, and hence, most meaningful. Analyzing the selected comparable properties concerning time of sale and any change in economic conditions which may have occurred to the date of value; location factors such as ease of access and proximity to public transportation and highways; age; condition; physical, functional and economic characteristics and any other relative factors of comparison.

(3)     Reducing the sales price to common units of comparison (i.e., price per square foot, price per unit, Gross Income Multiplier).

(4)     Making appropriate analysis of variations between the comparable properties and the property appraised.

(5)     Interpreting this data and drawing a valid conclusion.

Five sales were uncovered that were most similar to the subject. Due to the extreme lack of SRO sales, the appraiser utilized one sale of a SRO building and four sales of walk-up buildings comprised of smaller studios and one-bedroom units. The appraiser was also forced to expand the search area to include sales from the Upper East Side and East Village. This has no adverse affect. On the following pages are the sales utilized with the adjustments and valuation of the subject under this approach.

---

[3] Source: Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u>, fifth edition, 2010, pg. 175
[4] Source: Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u>, fifth edition, 2010, pg. 190

# COMPARABLE SALE #1



| | |
|---|---|
| Location: | 338 West 22nd Street |
| Date of Sale: | December 15, 2010 |
| Document #: | 2010122400211001 |
| Block/Lot: | 745/58 |
| Grantor: | 338 West 22nd Street LLC |
| Grantee: | Vadim Khazatsky |
| Description: | Four-story and cellar walk-up SRO building built circa 1900. |
| Lot Size: | 25' x 98.75' = 2,469+ SF |
| Estimated G.B.A.: | 5,000+ SF |
| Number of Units: | 22 SRO's |
| Sales Price: | $3,600,000 |
| Financing: | None recorded, assumed all cash or conventional |
| Price/SF: | $720 |
| Price/Unit: | $163,636 |
| Verification: | Comps Inc., Sanborn Map, Exterior Inspection, Deed, Building Dept., C/O |

Comments: This property is located one block east of subject in a similar Chelsea location. Its condition appears similar to the subject. It has much superior tenancy as at the time of sale the building could be delivered vacant and converted from a SRO to a single-family residence. It has similar average unit sizes of 227 SF vs. 217 SF for the subject.

# COMPARABLE SALE #2



Location:              354 West 20th Street
Date of Sale:          December 16, 2010
Document #:            2010121700329001
Block/Lot:             743/76
Grantor:               Mildred LaGuardia
Grantee:               Seth and Matthew Weissman
Description:           Four-story and basement walk-up building built circa 1900.
Lot Size:              16.67' x 92' = 1,533+ SF
Estimated G.B.A.:      5,000+ SF
Number of Units:       11 apartments
Sales Price:           $2,000,000
Financing:             $1,300,000 (65%) w/ Mildred LaGuardia, other terms unknown
Price/SF:              $400
Price/Unit:            $181,818
Verification:          Comps Inc., Sanborn Map, Exterior Inspection, Deed, Building Dept., C/O,
                       Mortgage

Comments: This property is located three blocks southeast of subject in a similar Chelsea location. Its overall condition appears slightly superior. The building consists of an owner's duplex and ten rent regulated studios and is slightly superior in overall appeal. It has larger average unit sizes of 455 SF vs. 217 SF for the subject.

**COMPARABLE SALE #3**



| | |
|---|---|
| Location: | 415 East 78th Street |
| Date of Sale: | May 28, 2010 |
| Document #: | 2010060800281001 |
| Block/Lot: | 1473/11 |
| Grantor: | 415 E. 78 Street, LLC |
| Grantee: | Minuit 415E78, LLC |
| Description: | Four-story and cellar walk-up building built circa 1910. |
| Lot Size: | 25' x 102.17' = 2,554± SF |
| Estimated G.B.A.: | 6,215± SF |
| Number of Units: | 16 apartments |
| Sales Price: | $2,310,000 |
| Financing: | $628,657 (27%) w/ Signature Bank, other terms unknown |
| Price/SF: | $372 |
| Price/Unit: | $144,375 |
| Verification: | Comps Inc., Sanborn Map, Exterior Inspection, Deed, Building Dept., C/O, Mortgage |

<u>Comments:</u> This property is located approximately 3 ¼ miles northeast on the Upper East Side of Manhattan in an inferior location. Its condition appears slightly superior. The building consists of sixteen studio units each with private bath and kitchen and is slightly superior in overall appeal. It has larger average unit sizes of 388 SF vs. 217 SF for the subject. Per Real Estate Weekly, the gross annual income was $277,644 and the NOI was $145,530, which equates to an 8.3 GRM and a 6.3% cap rate.

# COMPARABLE SALE #4



| | |
|---|---|
| Location: | 97 East 7th Street |
| Date of Sale: | March 8, 2010 |
| Document #: | 2010031100097001 |
| Block/Lot: | 435/55 |
| Grantor: | 97 East 7th Equities LLC |
| Grantee: | Pyrgos 1926, LLC |
| Description: | Five-story and cellar walk-up building built circa 1920. |
| Lot Size: | 24.17' x 97.50' = 2,356+ SF |
| Estimated G.B.A.: | 9,245+ SF |
| Number of Units: | 22 apartments |
| Sales Price: | $3,525,000 |
| Financing: | None recorded, assumed all cash or conventional |
| Price/SF: | $381 |
| Price/Unit: | $160,227 |
| Verification: | Comps Inc., Sanborn Map, Exterior Inspection, Deed, Building Dept. |

<u>Comments:</u> This property is located approximately 1 ½ miles southeast in the East Village in an overall inferior location. Its overall condition appears similar to the subject. The building consists of studio and small one-bedroom units each with private bath and kitchen and is superior in overall appeal. It has larger unit sizes of 420 SF vs. 217 SF for the subject.

# COMPARABLE SALE #5



| | |
|---|---|
| Location: | 356 West 20th Street |
| Date of Sale: | September 13, 2010 |
| Document #: | 2010091400787001 |
| Block/Lot: | 743/77 |
| Grantor: | 356 West 20th Street Realty, Inc. |
| Grantee: | 356 W. 20th St. Associates, LLC |
| Description: | Four-story plus basement and cellar walk-up building built circa 1900. |
| Lot Size: | 16.67' x 92' = 1,533± SF |
| Estimated G.B.A.: | 5,000± SF |
| Number of Units: | 10 apartments |
| Sales Price: | $2,100,000 |
| Financing: | None recorded, assumed all cash or conventional |
| Price/SF: | $0 |
| Price/Unit: | $210,000 |
| Verification: | Comps Inc., Sanborn Map, Exterior Inspection, Deed, Building Dept., C/O |

Comments: This property is located three blocks southeast of subject in a similar Chelsea location. Its condition appears similar to the subject. The building consists of studio and small 1-bedroom units each with private bath and kitchen and is superior in overall appeal. It has larger average unit sizes of 500 SF vs. 217 SF for the subject. At the time of sale, it had a gross annual income of $184,754 and a NOI of $141,043, which equates to an 11.4 GRM and a 6.7% cap rate.

Additional sales/listings analyzed by the appraiser:

140 East 16<u>th</u> Street is a five-story and cellar, walk-up, SRO building located 1 ¼ miles southeast in a similar location. It contains 33 residential units. The gross building area is 8,190± SF. It sold 1/08 for $2,600,000, which equals $317/SF and $78,788/unit.

174 Delancey Street is a five-story and cellar, walk-up building located 2 ¼ miles southeast in an inferior location. It contains 17 residential units, all one bedroom and studio layouts. The gross building area is 9,575± SF. It sold 3/11 for $2,500,000, which equals $261/SF and $147,059/unit.

486 East 74<u>th</u> Street is a five-story and cellar, walk-up building located 3 miles northeast in an inferior location. It contains 20 residential units. The gross building area is 8,400± SF. It sold 7/10 for $2,300,000, which equals $274/SF and $115,000/unit.

Gross Rent Multiplier (GRM) & Capitalization Rate Information:

331 East 81<u>st</u> Street sold in 8/10 for $2,438,000 with 8 units. The gross annual income was $215,752 and net operating income was $144,573, which equals a GRM of 11.3 and a capitalization rate of 5.9%.

426 East 9<u>th</u> Street sold in 7/10 for $4,500,000 with 20 units. The gross annual income was $380,389 and net operating income was $283,500, which equals a GRM of 11.8 and a capitalization rate of 6.3%.

333 West 18<u>th</u> Street sold in 3/10 for $2,600,000 with 4 units. The gross annual income was $187,332 and net operating income was $143,213, which equals a GRM of 13.9 and a capitalization rate of 5.5%.

115 East 37<u>th</u> Street sold in 3/11 for $3,000,000 with 5 units. The gross annual income was $278,400 and net operating income was $176,312, which equals a GRM of 10.8 and a capitalization rate of 5.9%

%.

# MAP OF COMPARABLE SALES



# COMPARABLE SALES GRID

| # | Address | Sales Price | Sale Date | SF | Units | $/SF | $/Unit | Cash Equiv. | Adj. Price | Adj. $/SF | Adj. $/Unit | Loc. | Cond. | App'l | Total Adj. | Adj. $/SF | Adj. $/Unit |
|---|---------|-------------|-----------|-----|-------|------|--------|-------------|------------|-----------|-------------|------|-------|-------|------------|-----------|-------------|
| 1 | 338 West 22nd St | $3,600,000 | Dec-10 | 5,000 | 22 | $720 | $163,636 | $0 | $3,600,000 | $720 | $163,636 | 0% | 0% | -25% | -25% | $540 | $122,727 |
| 2 | 354 West 20th St | $2,000,000 | Dec-10 | 5,000 | 11 | $400 | $181,818 | $0 | $2,000,000 | $400 | $181,818 | 0% | -5% | -5% | -10% | $360 | $163,636 |
| 3 | 415 East 78th St | $2,310,000 | May-10 | 6,215 | 16 | $372 | $144,375 | $0 | $2,310,000 | $372 | $144,375 | 10% | -5% | -5% | 0% | $372 | $144,375 |
| 4 | 97 East 7th St | $3,525,000 | Mar-10 | 9,245 | 22 | $381 | $160,227 | $0 | $3,525,000 | $381 | $160,227 | 10% | 0% | -5% | 5% | $400 | $168,239 |
| 5 | 356 West 20th St | $2,100,000 | Sep-10 | 5,000 | 10 | $420 | $210,000 | $0 | $2,100,000 | $420 | $210,000 | 0% | 0% | -5% | -5% | $399 | $199,500 |

|  | $/SF | $/Unit |  |  | $/SF | $/Unit |
|---|------|--------|---|---|------|--------|
| HIGH: | $720 | $210,000 |  | HIGH: | $540 | $199,500 |
| LOW: | $372 | $144,375 |  | LOW: | $360 | $122,727 |
| MED.: | $400 | $163,636 |  | MED.: | $399 | $163,636 |

# ANALYSIS OF ADJUSTMENTS

According to <u>The Appraisal of Real Estate, thirteenth edition, 2008, page 309</u>: "The basic elements of comparison that should be considered in sales comparison analysis are as follows. 1) real property rights conveyed, 2) financing terms, 3) conditions of sale, 4) expenditures made immediately after purchase, 5) market conditions (time), 6) location, 7) physical characteristics, 8) economic characteristics, 9) use and 10) non-realty components of value."

All of the above components were considered in the adjustment process. Based upon the relationship between the subject and comparable sales, adjustments were considered necessary under the categories of location, condition and appeal. The sales are considered to have sold in Leased Fee similar to the subject. There were no atypical financing conditions that warranted adjustments. All sales were either conveyed on an all cash basis or via typical financing terms. No specific conditions of sale were evident that warranted adjustment. All sales appear to have been arms length transactions. All comparable sales also had similar economic characteristics, use and had no non-realty components of value or expenditures after purchase. Following are the adjustments applied.

<u>LOCATION:</u> The subject is situated in an overall good Chelsea location similar to Sales 1, 2 and 5. Sales 3 and 4 are located in inferior residential locations and were adjusted up 10%.

<u>CONDITION:</u> The subject and Sales 1, 4 and 5 are considered similar in overall condition. The remaining sales appeared in slightly superior condition and were adjusted down 5%. The adjustment considers the typical cost of renovations and the return on these costs in the marketplace as well as the subject's need for repairs/upgrades.

<u>APPEAL:</u> All units in subject building are SRO units which share common baths and are rent regulated. All comparables have slightly superior appeal and were adjusted down 5%. Though Sale 1 was an SRO residence, the building at the time of sale could be delivered vacant and converted into a single family residence. It was adjusted down an additional 20%. The remaining sales had some rent regulated tenants at the time of sale; however, they had larger unit sizes and private bath and kitchen.

## CONCLUSION

The appraisers researched the market for the past two years and uncovered five sales that were most similar to the subject. In addition to the sales analyzed, the appraisers researched transactions of several other properties. The range of prices for the comparables ranged from $372 to $720/SF and $144,375 to $210,000/unit. Adjustments were made for salient differences and afterwards the range becomes $360 to $540/SF with an adjusted median of $399/SF and $122,727 to $199,500 with an adjusted median of $163,636/unit. On a per square foot basis four sales were closely grouped between $360 to $400 (two of which were at $399 and $400) and one sale was at $540/SF. In formulating a value conclusion, the appraisers considered all sales, the overall condition of the subject, its smaller average gross unit sizes and the subject's overall income performance. Based on the above and the current demand in the subject's area, we have concluded a value of $400/SF at the median due to subject's inferior tenancy appeal, small average unit sizes and average income performance. Therefore, 5,000 SF x $400/SF = $2,000,000.

**"AS IS" VALUE VIA THE SALES APPROACH IS:**          **$2,000,000 (rounded)**

Based on the subject's PGI of $253,392, the above value equates to a GRM of 7.9, which is below the previously shown comparable range of 8.3 to 13.9 and considers the subject's overall inferior condition.

# INCOME APPROACH

The Income Approach is based on the premise that certain types of property are purchased as investments and can be valued based on their income potential. An investor considering such a purchase estimates the projected gross income that an investment will generate over a forecasted holding period less typical vacancy, credit loss, and various operating expenses associated with the prudent operation of the building. The resultant income is the profit an investor can expect. In formulating a purchase price for a property an investor determines his expected rate of return and pays a price commensurate with that return. In this approach, the appraiser attempts to mirror the rationale of a typical investor by following these same steps.

The first step in the Income Approach is to analyze all of the income components of the building on a stabilized basis. The second step is to determine a market-oriented vacancy and credit loss. From the resultant effective gross income are subtracted the projected expenses for the coming year of operation. This yields the Net Operating Income. The final step is the capitalization of the Net Operating Income into value. A Direct Capitalization Approach was utilized in this case. This approach considers the subject's current stable income stream. The overall capitalization is a weighted average and considers the return of and return on the investment.

The subject has 23 rentable units, 7 which are paying rent, 6 which are in arrears and 10 are vacant. We have estimated market rent for fifteen units (5 in arrears and 10 vacant units) and forecasted an allowable rent for one unit in arrears (#14). We have utilized the current rent roll and adjusted market rents in order to estimate our Potential Gross Income (PGI). See the attached rent roll for further information on each unit. An analysis of comparable market rents is utilized to determine if the tenant-occupied units are leased within market as well as for vacancy estimates and risk factors in the capitalization rate development. On the following pages is the subject's rent roll, projection of the subject's stabilized income and expenses along with our value estimate.

**RENT ROLL**

| FLR# | UNIT | ROOM COUNT | MONTHLY RENT | LEASE EXPIRES |
|------|------|------------|--------------|---------------|
| 1 | 1 | 1.0 | $1,100 | VACANT |
| 1 | 2 | 1.0 | 800 | |
| 1 | 3 | 1.0 | 1,200 | NON-PAYMT |
| 1 | 4 | 1.0 | 1,100 | VACANT |
| 1 | 5 | 1.0 | 1,200 | VACANT |
| 2 | 6 | 1.0 | 1,100 | VACANT |
| 2 | 7 | 1.0 | 1,100 | VACANT |
| 2 | 8 | 1.0 | 271 | |
| 2 | 9 | 1.0 | 1,100 | NON-PAYMT |
| 2 | 10 | 1.0 | 740 | |
| 2 | 11 | 1.0 | 1,100 | VACANT |
| 3 | 12 | 1.0 | 1,100 | NON-PAYMT |
| 3 | 14 | 1.0 | 1,100 | NON-PAYMT |
| 3 | 15 | 1.0 | 850 | |
| 3 | 16 | 1.0 | 750 | |
| 3 | 17 | 1.0 | 1,100 | NON-PAYMT |
| 3 | 18 | 1.0 | 1,100 | VACANT |
| 4 | 19 | 1.0 | 1,100 | VACANT |
| 4 | 20 | 1.0 | 1,100 | VACANT |
| 4 | 21 | 1.0 | 875 | |
| 4 | 22 | 1.0 | 1,100 | NON-PAYMT |
| 4 | 23 | 1.0 | 1,100 | VACANT |
| 4 | 24 | 1.0 | 630 | |
| | 23 | 23.0 | $22,716 | |

**ANNUAL RENT:  $272,592**

All units are rent regulated SRO's
All vacant units forecasted to be renovated and
leased at market.

# PROFORMA

POTENTIAL GROSS ANNUAL INCOME

| | | | |
|---|---|---|---|
| Potential Residential Rent: | $22,716 /month | | $272,592 |
| Total Potential Gross Income: | | | $272,592 |
| LESS: Vacancy/Collection Loss: | 15.0% Residential | | ($40,889) |
| TOTAL EFFECTIVE GROSS INCOME | | | $231,703 |

ESTIMATED ANNUAL EXPENSES

| | | $/SF | $/UNIT | FORECASTED EXPENSES | CLIENT'S ESTIMATE |
|---|---|---|---|---|---|
| Real Estate Taxes | | $9.51 | $2,067 | $47,542 | $47,066 |
| Water & Sewer Charges | | 0.80 | 174 | 4,000 | 4,000 |
| Insurance | | 1.00 | 217 | 5,000 | 6,000 |
| Heat, Hot Water & Cooking Gas | | 1.80 | 391 | 9,000 | 9,000 |
| Electric | | 1.30 | 283 | 6,500 | 6,500 |
| Payroll | | 0.96 | 209 | 4,800 | 5,100 |
| Repairs and Maintenance | | 0.50 | 109 | 2,500 | 4,000 |
| Supplies and Miscellaneous | | 0.15 | 33 | 750 | 750 |
| Legal and Professional | | 0.46 | 100 | 2,300 | 2,500 |
| Replacement Reserves | 1.5% | 0.70 | 152 | 3,500 | 4,000 |
| Management | 3.5% | 1.62 | 352 | 8,100 | 3,850 |
| TOTAL EXPENSES | 41% | $18.80 | $4,087 | ($93,992) | ($92,766) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME (NOI): | | | $137,711 |

CAPITALIZATION

| | | | |
|---|---|---|---|
| $137,711 CAPITALIZED AT | 6.00% | = | $2,295,187 |
| LESS COST TO CURE 10 VACANT UNITS | | = | ($100,000) |
| | | | $2,195,187 |

| | |
|---|---|
| "AS IS" VALUE VIA THE INCOME APPROACH: (round) | $2,150,000 |

*We rounded the value down to consider rent loss factors while renovating the vacant units as well as rent loss while attempting to evict the non-paying tenants.

# DISCUSSION OF INCOME/EXPENSES

<u>Income:</u> The subject units are rented from $271 to $875/room/month. The following is the analysis leading to a conclusion of market rent. All leases were verified through the leasing agents or principals involved with the transaction.  Due to the lack of SRO comparables, most rentals are of typical, small self-contained studio units.  Also considered were hotel type units, however they are typically leased furnished with high turnover and additional expenses such as high management and cleaning/supplies.

<u>310 West 20th Street:</u> This is a four-story walk-up SRO with 34 units located three blocks southeast in a comparable location. 28 units were decontrolled in good condition and 7 units were controlled. The market-rate units are currently leased between **$1,000 and $1,600/room with the higher end of the range reportedly having private baths.**

<u>49 West 11th Street:</u> This is a five-story walk-up rental building with 26 units located ¾ mile southeast in a comparable location. Unit #25, a 1.5/0/1-room unit was leased in October 2010 for $1,100 per month, or **$733/room/month**. The unit size is comparable to the SROs in the subject; however this unit has a private bathroom.

<u>451 West 22nd Street:</u> This property is a five-story walk-up coop building with 9 units located on the same block as subject. Unit #2-R, a 1.5/0/1-room unit was leased in December 2010 for $1,695 per month, or **$1,130/room/month**. Unit #4-F, a 1.5/0/1 300 SF room unit was leased in February 2011 for $1,800 per month or **$1,200/room/month**.

<u>266 West 21st Street:</u> This property is four three-story walk-up mixed-use building with 18 units located three blocks southeast in a comparable location. Units #3-E and #3-W, a 1.5/0/1-room unit, each were leased in December 2010 for $1,400 per month or **$933/room/month**.. The unit size is comparable to the SROs in the subject; however these units have a private bathroom.

<u>243 West 21st Street:</u> This property is a five-story walk-up rental building with 19 units located three blocks southeast. Unit #1-A, a 1.5/0/1-room unit was leased in November 2010 for $1,699 per month, or **$1,133/room/month**.

<u>239 West 20th Street:</u> This property is a six-story walk-up rental building with 24 units located four blocks southeast. Unit #14, a 1.5/0/1-room unit was leased in October 2010 for $1,750 per month, or **$1,167/room/month**.

<u>364 West 19th Street:</u> This property is a four-story walk-up mixed-use rental apartment building with 17 units located four blocks southeast. Units #2-B, 3-B, 1-A and 2-A, 1.5/0/1-room unit were leased in February 2011 for $1,600, $1,650, $1,700 and $1,800 respectively per month, or **$1,067, $1,100, $1,133 and $1,200/room/month.**

<u>Conclusion of Rent:</u> The rental market in the area was surveyed and market rents within these buildings ranged from $350 to $1,600/room/month with most between $933 and $1,133/room/month. Given the subject's location, condition and size, we forecasted a rent of $1,100/room/month for thirteen of the units and $1,200 for two units which have private access to the rear yard (#3 and #5). We estimated an allowable market rent for one unit (#14) which is in arrears assuming the tenant would be vacating the premises. Permanent SRO tenants are subject to annual guideline increases set by the NYC Guidelines Board whether a tenant has a lease or not. The total allowable increase in the past five years has been 6.5% or 1.3% per annum. An owner may not charge a permanent tenant more than the most recent

rent charged the prior permanent tenant. Thus, there may be some upside potential for the occupied SRO units but it is stymied by the low allowable rent increases. We have accepted the subject's SRO rents in our projection of gross income and the subject's upside potential is considered in our final value conclusion.

<u>Vacancy & Non-Collection:</u> A SRO vacancy and non-collection factor of 15% was utilized in determining the effective gross income (EGI). There is very little data in regards to SRO occupancy or vacancy. The demand for residential space in the area is stable. Based on all analysis, which included interviews with owners, brokers and managing agents, and considering the subject's overall rent levels and current status of non-paying tenants, we conclude an overall vacancy and collection of 15%.

<u>Effective Gross Income (EGI):</u> This equates to the PGI less vacancy and collection loss.

<u>Estimated Expenses:</u> Our expenses are based on historical data, public records, comparable expenses and industry standards. The expense ratio is 41% of the EGI, within the typical 30% to 50% range for similar properties.

<u>Real Estate Taxes:</u> We have based this expense on the actual taxes for the current year. As noted in the tax analysis, the subject property is assessed below market and at the middle to higher end of the comparable property range of the sales utilized in the sales approach.

<u>Water and Sewer:</u> Per DEP, the subject is billed for water and sewer based on a meter charge, which was $2,450 for 2010/11. We have estimated an expense of $4,000, or $174/room which is higher than the actual as many units are vacant and our estimate considers the building to be fully occupied.

<u>Insurance:</u> Estimated at $1.00/SF, which is at the high end of the typical $0.50 to $1.00/SF comparable ranges. Our estimate considers the rising costs since 9/11 and type of occupancy. Our estimate is similar to the client's estimate and within market.

<u>Heating/Hot Water & Cooking Gas:</u> Estimated at $9,000, or $1.80/SF, which is slightly above the typical range of $0.75 to $1.50 as owner is responsible for all utilities. This is similar to the client's estimate and within market.

<u>Electric:</u> The owner is responsible for common area electric as well as the electric use for the 23 SRO units. We have estimated an expense of $6,500 or $1.30/SF, which is similar to the client's estimate of $6,500 and within market.

<u>Payroll:</u> A 23 unit SRO building does not require a full-time superintendent. We have estimated an expense of $4,800/annum for the subject, a typical amount for a part-time super whose responsibilities would be garbage and snow removal and general maintenance.

<u>Repairs/Maintenance:</u> Estimated at $2,500 or $0.50/SF which is within the comparable property range of $0.40 to $1.00/SF. It is slightly below the client's estimate and considers that we have deducted a $100,000 cost to cure the 10 vacant units (see below).

<u>Supplies/Miscellaneous:</u> This expense is estimated at $750 or $0.15/SF. Typical contingency figures are $0.10 to $0.20/SF. Our estimate is a typical figure for this type of property.

Legal/Professional: We estimated this expense at $2,300 per annum or $100/unit, within the typical $50 to $250/unit comparable range.

Replacement Reserves: This is for the reserve items such as the roof, boiler and appliances. It is estimated at 1.5% of the EGI, within industry standards of 1% and 2%. It is a sufficient amount for the annual reserves of the above mentioned items and considers the subject's overall condition.

Management Fees: Three and a half percent of the EGI income is considered appropriate to manage this type of building. This would include leasing costs, advertising costs, etc. This is a typical number for this type and size of building. Typical management costs range between 3% and 5%. We have chosen a rate at the low end of the range based on all factors affecting the subject property including the subject's overall EGI. Our estimate of $8,100 is above the client's estimate of $3,850, which appears low.

Net Operating Income (NOI): This is equal to the Total EGI minus the Total Estimated Expenses.

## CAPITALIZATION RATE

The Income Approach to value involves the capitalization of the projected net operating income utilizing a rate known as the overall capitalization rate. In developing the overall rate, we have utilized the Ellwood Mortgage-Equity Formula, which is a typical investor's outlook. The Ellwood Mortgage-Equity Formula is based upon five components: 1) the mortgage constant; 2) the equity yield rate; 3) the build-up of equity through amortization; 4) the appreciation/depreciation in property value over the holding period; 5) the expected increases in operating income.

Selection of Mortgage Interest Rate
Based on our survey of local commercial mortgage lenders and our analysis of the comparable sales, most commercial loans are ranging between 4.5% and 5.5% for the typical investor loans on properties similar to the subject. Five and ten year treasuries, an indicator these mortgages are priced from, have been between 1.75% and 3.20% over the past few months. Typical basis points over these indicators for buildings of the subject type are 250 to 300. Based on this data and our knowledge of the local market it is our opinion that a loan with a 75 percent loan-to-value ratio at an interest rate of 5% would likely be applied to the subject property. Loan to value ratios generally fall between 70% and 75%. We have chosen an LTV at the upper end of the range based on our market analysis and comparison to similar apartment buildings. Typical amortization periods are 20 to 30 years with 5 to 10 year payouts. We choose a 30-year amortization period for the subject with a 10-year payout based upon lender surveys for these property types. The indicated mortgage constant is .0644.

Selection of the Equity Yield Rate: Selection of this rate is based on the rates sought by private and institutional investors in commercial real estate, as well as rates of return achieved by long-term securities. According to The New York Times, the following yield rates are quoted as of July 7, 2011:

| Instrument | Yield |
|---|---|
| PRIME RATE | 3.25% |
| LIBOR 90 DAY | 0.25% |
| U.S. 5 YEAR TREASURY | 1.75% |
| U.S. 10 YEAR TREASURY | 3.16% |
| U.S. LONG TERM TREASURY | 4.40% |
| MUNICIPAL BONDS (AVERAGE) | 2.51% |
| FEDERAL FUNDS | 0.25% |

According to data supplied by the Price Waterhouse Coopers Investor Survey for National Apartment Buildings, equity yield rates for the 1Q'11 were forecasted to range from 5.25% to 14.0% with an average of 8.8% for investment grade properties. This is a slight decrease from the previous quarter (8.9%) and one year ago (10.2%). In addition, the stock market must be considered with historical annual returns of +/-10%. Real estate does have some income tax benefits that stocks do not have; however, it is also not as liquid. Based on all factors, including the quality, location, rent levels of the subject, we have selected an equity yield of 12%, above the national average. Two additional considerations given in the utilization of the Mortgage-Equity Capitalization Technique are as follows:

1. Equity build-up through amortization - The weighted average mortgage-equity rate is adjusted downward to reflect the payment of principal over the holding period.
2. Change in equity based upon the expected appreciation/depreciation in property value over the stipulated holding period.

We have estimated this change in equity based upon past history, the current state of the market and future anticipated rent increases, expense increases and real estate tax increases. The residential units at the subject are forecasted at market excluding eight stabilized units. There is some upside potential for rent increases. Taxes will be increasing as NYC is going to be faced with huge budget deficits over the next several years due to the crises on Wall Street and large loss of jobs and taxes. Based on all factors, including the overall demand for real estate in the subject's location and its current rent levels, we have estimated a 2%/annum appreciation rate for the subject over the ten-year holding period.

## MORTGAGE-EQUITY CAPITALIZATION

Assumptions:
1.      75% mortgage ratio at a 5.0% interest rate and 30-year payout schedule - .0644 constant
2.      12% equity return on a 25% equity investment
3.      10-year holding period - .0570 sinking fund factor
4.      2% appreciation over a 10 year holding period.

|  | Ratio | X | Rate | = | Weighted Rate |
|---|---|---|---|---|---|
| Mortgage | .75 | X | .0644 | = | .0483 |
| Equity | .25 | X | .1200 | = | .0300 |
| Weighted Average | | | | = | .0783 |
| Less Equity Build-up (mortgage amortization) | | | | | |
| | 75% | X | .1866 X .0570 | = | (.0080) |
| | | (18.66% amortized) | | | |
| Less Appreciation | 20% | X | .0570 | = | (.0114) |
| | | | | | .0589 |

**CAPITALIZATION RATE**                                                **6.00% (rounded)**

As support of our cap rates, we have analyzed some investor surveys. Price Waterhouse Coopers' survey forecasts a range of 4.0% to 10.0% for equity capitalization rates on apartment buildings with an average of 6.3% for the 1Q'11, which is below the previous quarter (6.5%) and one year ago (7.9%). As noted before, the survey is for trophy properties however it is an inferior national survey. The six market derived capitalization rates provided in the sales approach were 6.3%, 6.7%, 5.9%, 6.3%, 5.5% and 5.9%. In concluding a final capitalization rate for the subject, weight is given to the subject's upside potential, to the investor survey, the mortgage-equity technique and the market derived cap rates. Based

on all information and the quality of the subject in relation to the market, we have concluded that a 6.0% rate is appropriate for the subject property.

| | |
|---|---|
| NET OPERATING INCOME: | $  137,711 |
| CAPITALIZED AT 6.00%: | $2,295,187 |
| Less cost to cure units | 100,000 |
| | $2,195,187 |

**"AS IS" VALUE VIA THE INCOME APPROACH:**     **$2,150,000 (rounded)**

## RECONCILIATION & CONCLUSIONS OF VALUE

The subject realty is located on the south side of West 22nd Street between Ninth and Tenth Avenues, in the Chelsea section of Manhattan, City, County, and State of New York. The total lot area is 2,469+ square feet (SF) and the site is improved with a four-story and cellar, walk-up single room occupancy (SRO) building constructed circa 1900. The building is currently utilized as a rooming house and contains 5,000+ square feet of gross building area with 23 one-room units. There are five single rooms on the first floor and six single rooms on the second, third and fourth floors. At the time of inspection there were ten vacant units and six of the remaining thirteen units are occupied by tenants who are in arrears. The improvements are in average condition although the vacant rooms are in need of repairs and upgrades. According to the zoning regulations in relation to the subject property, the current improvements are a legal and conforming use.

An inspection of the site and neighborhood was conducted, and all available data affecting the property's value was analyzed. In valuing the subject realty, all approaches were considered, however, only the Sales and Income Approaches are reliable and used in valuing the building. The Cost Approach is not applicable due to the older age of the building and subject depreciation estimates. In the Sales Approach, an analysis of within the market area was conducted. The sales analyzed had adjusted values of $360 to $540/SF with an adjusted median of $399/SF and $122,727 to $199,500 with an adjusted median of $163,636/unit. The appraisers considered all sales, the location, overall condition of the subject, its small gross unit sizes and the subject's overall income performance. We concluded a value of $400/SF. The rounded value of the subject according to the Sales Approach is $2,000,000.

The Income Approach provides the most reliable indicator of value for the subject since these properties would typically be purchased based on their cash flow. The subject's rents were compared to market and most rents were below market. The current rent roll and market rent was utilized to estimate the PGI. The subject's overall rent levels were considered in our estimates of vacancy and development of the capitalization rate. Appropriate expenses were deducted to arrive at a net operating income of $137,711 This income was capitalized at 6.0% and $100,000 was deducted as a cost to cure to arrive at an "as is" value which was rounded down due to the potential rent loss in attempting to evict or collect rent on the six non-paying tenants and while renovating the vacant units. The rounded value of the subject via the Income Approach is $2,150,000.

In formulating a value conclusion, the Income Approach is typically given the most weight since there properties are generally purchased for the cash flow they produce. In this case, the value via the Sales Approach concluded a similar value and was given some weight. As a result of the examination and study made, it is our opinion that the "as is" Market Value of the Leased Fee Interest of the subject as of June 16, 2011, is:

### TWO MILLION ONE HUNDRED FIFTY DOLLARS - ($2,150,000)

The report was prepared to meet the specific requirements of the client for the purposes stated herein. No reliance is to be placed upon it for any other purpose.

**<u>ADDENDA</u>**

<u>**QUALIFICATIONS OF ANTHONY N. TROIANO, SRA**</u>

**EXPERIENCE**

*Actively engaged in real estate valuations since 1986, Mr. Troiano is a Principal in Capital Appraisal Services Inc. and is responsible, along with his partner, for overseeing the day-to-day operations of the Company. He is experienced in testifying as a real estate expert in various NYS courts. Appraisal reports include various types of commercial and residential properties.*

*Commercial experience encompasses valuations of a multitude of property types including rental apartment buildings, cooperative and condominium complexes, industrial facilities, new construction and retail shopping strips. Valuations have also been completed on Manhattan office buildings, nursing homes and other special use type properties. Various reports are completed using ARGUS software.*

*Residential valuations consist of one to four family properties, condominium and cooperative units and other unique property types throughout the New York Metropolitan Area. The reports have included many premier Manhattan cooperatives, condominiums and townhouses, several with valuations of over ten million dollars.*

*Both the commercial and residential valuations are used for the purposes of mortgage financing, tax certiorari work, estates, gift tax, mortgage insurance reviews, employee relocation and insurance.*

**EDUCATION**

**Hofstra University**
*Masters of Business Administration - Banking and Finance – May 1997*

**St. John's University**
*Masters of Business Administration - Finance - (21 credits)*

**Manhattan College**
*Bachelors Degree in Civil Engineering - May 1986*
*Member of Chi Epsilon - Civil Engineering Honor Society*

**Appraisal Institute**
*Completed all requirements towards the SRA designation.*
*Completed all levels of specialized experience credits towards MAI Designation.*
*All educational requirements of the Appraisal Institute and New York State are upheld. The Uniform Standards of Professional Appraisal Practice (USPAP) course is completed every two years as required.*

**DESIGNATIONS**

*SRA Designated Member of the Appraisal Institute*

**CERTIFICATIONS**

*New York State General Real Estate Appraiser - ID #46-4937*

**AFFILIATIONS**

*Appraisal Institute - Candidate for MAI Designation*

**EXPERIENCE**

*Her experience has included reports of residential properties for the purposes of mortgage financing, estates, tax certiorari, and insurance.*

*Commercial experience has included valuations of a multitude of property types including rental apartment buildings and cooperative and condominium complexes in New York City.*

*Residential experience has included valuations of one to four family properties and individual condominium and cooperative units in New York City.*

**EDUCATION**

*Fordham Business School – MBA*

*Courses included a wide range of subjects including valuation analysis and other real estate subjects, such as real estate law, finance, economics and accounting.*

***Appraisal Education Network School***
*Introduction to Real Estate Appraisal (R1)*
*Valuation Principles and Procedures (R2*
*Applied Residential Property Valuation (R3)*
*One-Family Income Capitalization (R4)*
*Appraiser Qualification: Fair Housing, Fair Lending, and Environmental Issues (AQ1)*
*Uniform Standards of Professional Appraisal Practice*
*Introduction to Income Property Appraisal (G1)*
*Principles of Income Property Appraisal (G2)*
*Applied Income Property Evaluation (G3)*
*7-Hour USPAP Update Course*
*Mechanical Systems and Equipment for Buildings*

**LICENSES**

*New York State Certified Real Estate Appraiser #45-48535*

# CAPITAL APPRAISAL SERVICES, INC.

### *Real Estate Appraisers and Consultants*

*Arthur Chiaramonte, MAI*
*Anthony N. Troiano, SRA*

June 13, 2011

Mr. David Godbout
West 22nd LLC.
770 Broadway, 2nd Floor
New York, NY 10003

RE:  442 West 22nd Street
New York, NY 10011

Dear Mr. Godbout:

Pursuant to our conversation, the following serves as our engagement for an appraisal of the above captioned property. The purpose of the appraisal is to estimate the "As Is" Leased Fee Market Value of the subject realty as of our date of inspection and the report will be prepared in Self-Contained report format. It will conform to USPAP and FIRREA requirements and will be prepared in accordance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. The intended use is for internal purposes and/or court proceedings and the intended user of the report is the client, West 22nd LLC. The fee for the above mentioned report will be:

-  **$3,200** -

Half of the fee is due upon engagement with the remainder due upon completion and prior to delivery of the report or any value discussions. The report will be completed within three weeks, assuming no unforeseen circumstances and it is our understanding that complete income and expense information may not be available to the appraiser, however interior access will be. Our fee is not contingent upon any requested minimum/maximum valuation and/or the approval of a loan. The undersigned agrees to be responsible for the payment of said fee. If the above is agreed upon, sign and return and please call if there are any questions. Thank you for the opportunity to serve your appraisal needs.

Sincerely yours,

Anthony N. Troiano, SRA
Principal

Agreed and Accepted by Mr. David Godbout, West 22nd LLC.

19-02 Whitestone Expressway, Suite 304, Whitestone, NY 11357 (718) 746-7063 Fax: (718) 746-3301

96 Scholes Street

442 West 22nd Street; Block 719, Lot 66
**Mortgagee: West 22nd, LLC**
Prepared for Capital Appraisal Services, Inc

| Unit Numbers (23 Units total) | Rooms | DHRC Rent 2007* | Actual Rent Paid 2007** | Rents Received for April 2011 | Vacancy/ Non-Payment Status as of 6/15/11 |
|---|---|---|---|---|---|
| 1 | 1 | 1237 | | | Vacant |
| 2 | 1 | 1418.68 | 755 | 800 | Non-payment |
| 3 | 1 | 1555.96 | 927.33 | | Vacant |
| 4 | 1 | 1149.39 | 238.68 | | Vacant |
| 5 | 1 | 1519.83 | | | Vacant |
| 6 | 1 | 1619.2 | | | |
| 7 | 1 | 1387.85 | | | |
| 8 | 1 | 1216.87 | 270.97 | 270.92 | |
| 9 | 1 | 1173 | | | Non-payment |
| 10 | 1 | 928.5 | 710 | 740 | |
| 11 | 1 | 1450 | | | Vacant |
| 12 | 1 | 1252.87 | | | Non-payment |
| 14 | 1 | 700.02 | | | Non-payment |
| 15 | 1 | 1339.17 | 810 | 850 | |
| 16 | 1 | 960.78 | 835 | 750 | |
| 17 | 1 | 1339.17 | 600 | 600 | Non-payment |
| 18 | 1 | 800.91 | | 900 | |
| 19 | 1 | 1700 | | | Vacant |
| 20 | 1 | 1206.81 | 660.21 | | Vacant |
| 21 | 1 | 1071.91 | 825 | | Vacant |
| 22 | 1 | 981.99 | 880.54 | 875 | Non-payment |
| 23 | 1 | 1194.84 | | | Vacant |
| 24 | 1 | 630 | | 630 | |
| | | | | | |
| Totals | 23 | 27,835 | 7,512.73 | 6,415.92 | **10 units vacant** |
| | | | | | **6 units in Arrears** |
| | | | | | |
| | | | | | **7 Units Paying rent** |

* 2007 was the last year DHCRs were filed. There may be unknown rent overcharges.
** As per DHCR records

96 Scholes Street

**Gross Rent as of 4/11**    76,991
Vacancy & Collections    (15,398)    20%
Effective Gross Income    61,593

**Operating Expenses**
Taxes 2010-2011    (47,066)
Insurance    (6,000)
Electric    (6,500)
W&S    (4,000)
Heating Gas    (9,000)
Super    (5,100)
Repairs    (4,000)
Supplies    (750)
Legal & Accounting    (2,500)
Management    (3,850)    5%
Reserves    (4,000)
Total Expenses    (92,766)

**Current NOI**    (31,173)

## BARGAIN AND SALE DEED

**THIS INDENTURE,** made the 5th day of March, 2007, between **442 West 22nd Street LLC,** a New York limited liability company having an address c/o Newcastle Realty Services, 163 West 23rd Street, 4th Floor, New York, New York 10011 ("Grantor") and **New York Spot Inc.,** a New York corporation, having an address c/o Aaron M. Feinberg, Esq., 1777 East 10th Street, Brooklyn, New York 11223 ("Grantee").

**WITNESSETH,** that Grantor, in consideration of ten dollars and other valuable consideration paid by the Grantee, does hereby grant and release unto Grantee, the heirs or successors and assigns of Grantee forever,

**ALL,** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, being more particularly bounded and described in Schedule A annexed hereto and made a part hereof (the "Premises").

**TOGETHER,** with all right, title and interest, if any, of Grantor in and to any streets and roads abutting the above-described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of Grantor in and to said Premises; **TO HAVE AND TO HOLD** the Premises herein granted, or mentioned and intended so to be, with the appurtenances, unto Grantee, the heirs or successors and assigns of Grantee forever.

**AND,** Grantors, in compliance with Section 13 of the Lien Law, covenants that Grantors will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

[SIGNATURE APPEARS ON THE FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed the day and year first above written.

In Presence of:

_____

**442 WEST 22nd STREET LLC**

By: **CHELSEA XXII 400S LLC**
    its sole member

    By:  **CHELSEA XXII LLC**
       its sole member

    By: _____
       Margaret Streicker Porres
       Managing Member

**STATE OF NEW YORK**   )
**COUNTY OF** New York   ) ss:

On the 5th day of March in the year 2007, before me, the undersigned a notary public in and for said state, personally appeared Margaret Streicker Porres, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SEAL

STEVEN WEINREB
Notary Public State of New York
No. 02WE6076238
Qualified in Kings County
Commission Expires 08/24/2010

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situated in the 16th Ward of the City of New York, known and distinguished on a map of certain lands belonging to Clement C. Moore at Greenwich, in the City of New York, recorded in the Register's Office of the City and County of New York, in Liber 235 of Conveyances Pages 556 and 557 by the number 389 and bounded northeastwardly in front by 22nd Street, southeastwardly by Lot number 390 on said map, southwestwardly by the center line of the block between 21st and 22nd Street, and northwestwardly by lot number 388 on said map. Containing in width, in front and rear 24 feet 9 inches, more or less, and in length on each side, 98 feet 8 inches more or less, said premises being distant 375 feet northwestwardly from 9th Avenue.

BEING known as 442 West 22nd Street and designated as Block 719 Lot 66.

Also known as:

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point distant 400.4 feet southeasterly from the corner formed by the intersection of the Southerly side of West 22nd Street and the Easterly side of 10th Avenue;

RUNNING THENCE southeasterly on West 22nd Street, 25 feet;

THENCE southwesterly parallel with 10th Avenue, 98.9 feet

THENCE northwesterly parallel with West 22nd Street, 25 feet;

THENCE northeasterly parallel with 10th Avenue, 98.9 feet to the point or place of BEGINNING.

ec

# DEPARTMENT OF BUILDINGS

### BOROUGH OF   MANHATTAN   , THE CITY OF NEW YORK

Date   January 11, 1968 ·   No. 65373

# CERTIFICATE OF OCCUPANCY

### NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT

This certificate supersedes C. O. No.   34852

THIS CERTIFIES that the new—altered—existing—building—premises located at
442 West 22nd Street   Block   719   Lot   66

That the zoning lot and premises above referred to are situated, bounded and described as follows.

BEGINNING at a point on the   side of
distant   feet   from the corner formed by the intersection of
and

running thence   "SEE STATEMENT "A"   feet; thence   feet;
thence   of Alt. 1161-1967   feet; thence   feet;
running thence   feet; thence   feet;

to the point or place of beginning, conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646F of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.   Class 3

New Alt. No.— 1161-1967   Construction classification—   Nonfireproof

Occupancy classification—   Heretofore Converted Height   4   stories,   43½   feet.

Date of completion—   Class "B" Mult. Dwell. Located in   R 7-2   Zoning District.
November 28, 1967

at time of issuance of permit.

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:   } (Calendar numbers to
and The City Planning Commission:   be inserted here)

## PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces

Off-Street Loading Berths

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| Cel. | | | Boiler room and storage. |
| Bsmt. | | | Five (5) furnished rooms. |
| 1st to 3rd Incl. | | | Six (6) furnished rooms on each story. |
| | | NOTE: | All rooms to be occupied by one (1) person in each room regardless of size of room except basement front west room which is to be occupied by two (2) persons. |
| | | | FIRE DEPARTMENT APPROVALS: Fuel Oil Installation System— November 4, 1948. Sprinkler System–July 22, 1946. |

THIS CERTIFICATE SHALL ALSO BE CONSIDERED A CERTIFICATE OF COMPLIANCE UNDER SECTION 301 OF THE MULTIPLE DWELLING LAW

Sec. C1.21 sub-4 Building Code, C26-273.0 Adm. Code. Prior to the occupancy of a structure erected or altered after June 1, 1938, the authorized occupancy of each floor of said structure as stated in the certificate of occupancy shall be permanently posted in a legible manner and maintained in the main entrance hall of such structure.

Borough Superintendent

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                              Chapter 11

New York Spot, Inc.,                                    Case No.  11-43785

                              Debtor.
--------------------------------------------------------x

## ORDER

       Upon the application of West 22nd, LLC (the "Lender"):  (a) for an order pursuant to 11 U.S.C. §362(d) vacating the automatic stay of actions against New York Spot, Inc. (the "Debtor") to permit the continuation of the foreclosure action against the Debtor's real property known as 442 West 22nd Street, New York, New York (the "Property") presently pending in the New York County Supreme Court, Index No. 650877/10 (the "Foreclosure Action"), and (b) for an order pursuant to  11 U.S.C. §543(d) excusing Gregory Soumas, as receiver (the "Receiver") of the Property, from compliance with his obligations under 11 U.S.C. §543(a) and (b); and upon the hearing held before this court on August 10, 2011, and upon the entire record of this case, and after due deliberation and sufficient cause appearing thereafter, it is

       ORDERED, that the automatic stay under 11 U.S.C. §362 be, and it hereby is, vacated to permit the Foreclosure Action and all related matters therein to proceed; and it is further

       ORDERED, that the Receiver be, and he hereby is, excused  from compliance with his obligations under 11 U.S.C. §543(a) and (b).


Dated: Brooklyn, New York
       August ___, 2011

                              _____

                              **UNITED STATES BANKRUPTCY JUDGE**