KEVIN J. NASH, ESQ.
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                          Chapter 11

NEW YORK SPOT INC.,                             Case No. 11-43785 (CEC)

                            Debtor.

-------------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION TO VACATE
## THE AUTOMATIC STAY, TO RETAIN A
## PRE-PETITION RECEIVER AND FOR RELATED RELIEF

**TO THE HONORABLE CARLA E. CRAIG,**
**UNITED STATES BANKRUPTCY JUDGE:**

New York Spot Inc. (the "Debtor") as and for its Opposition to motion of West 22nd LLC ("Movant") seeking (i) relief from the automatic stay, (ii) to continue the management of the Debtor's property by a pre-petition receiver appointed under state law, and (iii) to excuse compliance by that receiver with various turnover and reporting requirements of Section 543 of the Bankruptcy Code, represents and shows this Court as follows:

1.      Movant is not the original lender, but an opportunist which likely purchased the mortgage at a substantial discount and is attempting to profit on the Debtor's misfortune by prematurely seizing a potentially valuable asset.

2.    This Court has already placed this case on a fast track, with the Debtor to file a plan and disclosure statement by August 12, 2011. Despite this, Movant has moved to lift the automatic stay, and has steadfastly refused to consent to adjourn its motion for even one week, insisting on a hearing before the Debtor's plan deadline has expired.

3.    Movant's efforts to short-circuit an already tight schedule are curious, since its own appraisal is internally inconsistent, and appears to have been orchestrated to reach a pre-ordained conclusion, rather than to reflect the true stabilized value of the Property.

4.    Notably, neither of the two individuals who compiled the appraisal submitted by Movant are MAI appraisers.[1]

5.    Under the circumstances, it is simply premature to lift the automatic stay, particularly since the Debtor is preparing to file a plan by this Court's deadline. Ironically, the plan may even utilize Movant's own appraisal to bifurcate Movant's secured claim under §506(a), and treat any "under-secured" claim as a general unsecured claim, to be paid a one time lump payment with other unsecured creditors. As N.C. Caller P.C., the holder of a second mortgage on the Property, has informally indicated its willingness to support the Debtor, we believe that the Debtor can obtain the requisite votes to confirm a plan.

---

[1]  The attached qualifications of Anthony N. Troiano states that he is a "candidate for MAI designation", but this same statement is contained in another appraisal he performed for Movant in June, 2010.

2

6. In defending this motion, the Debtor seeks only a fair and reasonable opportunity to file its plan and move this case forward toward confirmation.

7. The real question is how best to balance the respective rights and interests of the Debtor and Movant, under a framework that establishes certain benchmarks and monitors the Debtor's progress, while making sure Movant's collateral is adequately protected and preserved.

8. Thus, as a compromise, the Debtor does not oppose the continued retention of the state court appointed receiver, Gregory Soumas (the "Receiver"). Indeed, the Debtor is willing to consent to the Receiver's continued involvement pending actual confirmation of the plan to be filed by the Debtor on August 12, 2011.

## BACKGROUND

9. The Debtor owns a four-story SRO building with 23 units (the "Property"). Critically important, the real value of the Property, however, is not found in its current use, but in re-development of the Property into four-unit or eight-unit condominiums.

10. In order to pursue a condominium project, the building must be emptied of existing tenants, gutted and rehabilitated. The process is complicated, but certainly manageable by sophisticated real estate investors who are attuned to what is necessary for development.

3

11.     For informational purposes, the Debtor has obtained a legal analysis as to what is required to be in a position to vacate the building. See Exhibit "A" annexed hereto. If developed, the Property has a potential value well in excess of the amount due to Movant and could be worth up to $4 million alone, if free of tenants. Indeed, the value of the Property increases significantly once the Property becomes empty of tenants.

12.     Insofar as current debt structure is concerned, Movant asserts a total secured claim in the sum of $2,263,813.11, including $358,788.45 in disputed default rate interest at 24% which is not necessarily recoverable in bankruptcy. Prior to bankruptcy, the original mortgagee did not obtain a judgment of foreclosure.

13.     The Property is also subject to a second mortgage held by N.C. Caller P.C., which made a loan to the Debtor's principal, Yehuda Nelkenbaum that is secured by mortgages on a number of parcels of real property owned by entities controlled by Mr. Nelkenbaum. $635,000 of the loan has been allocated to the Debtor, and it secured by a second mortgage on the Property filed by N.C. Caller P.C.

## THERE IS NO BASIS TO LIFT THE
## AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)

14.     Under familiar principles, 11 U.S.C. § 362(d)(2) permits the stay to be modified with respect to specific property if "(A) the debtor does not

4

have an equity in such property; and (B) such property is not necessary to an effective reorganization."

15. Movant bases its claim of a purported lack of equity, alleging that the Property only has a value of $2,150,000 based on a recent written appraisal prepared for Movant by Capital Appraisal Services, Inc. (the "Appraisal"). A copy of the Appraisal is annexed to Movant's motion as Exhibit "E".

16. While the Property has doubtless suffered some decline in value in the current financial downturn, the Debtor submits that the current fair value is still higher than suggested by the Movant.

17. The appraisal is replete with questionable assumptions and in one important area is wholly inconsistent with a prior 2010 appraisal, also performed by Mr. Troiano, without sufficient explanation or analysis of the reason for the difference.

18. Most notably, number page 1 of the Appraisal, the Highest and Best Use is stated to be "As vacant: To construct a one or two-family townhouse. As improved: Current use as a SRO building." However, on page 7, it is stated that the appraisal is focused entirely on the building as an SRO.

19. By ignoring the highest and best use, the Appraisal is therefore able to downplay the most important comparable sale, identified on page 54 of the Appraisal as "Comparable Sale #1," where an SRO of the same size, built at the same time, circa 1900, and located less than one block from the Debtor

(338 West 22nd Street, as opposed to the Debtor's address of 442 West 22nd Street), was sold on December 15, 2010 for $3,600,000.

20.     The sole difference between the two properties is that Comparable Sale #1 was delivered vacant and ready for conversion, while the Debtor needs to complete a changeover to vacancy before it can be converted. While this is a significant difference, neither the Appraisal nor Movant's motion contain any analysis whatsoever of the prospects for conversion, the costs or the time required to complete a conversion.

21.     In so doing, Movant reveals its true purpose. It seeks to value the Property for stay purposes at the lowest possible amount, focused entirely upon the current income of the Property as an SRO, and then seize title to the Property without the necessity of competing bids, so that it can perform the conversion from an SRO. Thus Movant will reap the substantial gains that would otherwise be available to the Debtor and its creditors.

22.     Besides an improper focus, the Appraisal also contains other deficiencies. For example, the Appraisal utilizes an arbitrary 25% reduction in the sale price for Comparable Sale #1. Even at that, however, the adjusted price per square foot, as shown on page 61, is $540, which gives a value of $2,700,000 to the Debtor's Property ($540 per sq. ft. x 5,000 sq. ft. = $2,700,000) or $122,727 per unit, which gives a value of $2,822,721 to the Debtor's Property ($122,727 per unit x 23 units = $2,822,721).

6

23.     The Appraisal then further masks this value by using other "comparable" sales of property as far away as the Upper East Side of Manhattan (415 East 78th Street) and the East Village (97 East 7th Street), so as to drive down the median value per square foot to only $400, for a value of $2 million ($400 per sq. ft. x 5,000 sq. ft.).

24.     As noted, the Appraisal focuses its analysis of the value of the Property as a function of the net operating income, forecasting a $2,150,000 value on page 65 of the Appraisal, based on projected annual rental income of $272,592, projected expenses of $93,992, and a Capitalization Rate of 6%.

25.     In any event, even if conversion is not feasible for the Debtor itself, the prospect alone is an inducement for investors or other buyers to back a plan. At a minimum, the Debtor should be afforded the full period until its August 12 deadline to file a plan so as to explore alternate means of funding a confirmable plan.

26.     Alternatively, even if one values the Property in its current use as an SRO, the Appraisal seriously understates the true worth of the Property, and takes contradictory assumptions with the appraisal performed only one year ago by the same appraiser.

27.     For example, in the appraisal which was prepared a year ago by Mr. Troiano for Intervest National Bank, instead of calculating the sale value of the Property at a cost per square foot, the appraiser used the cost per unit. As noted above, on page 61, the current Appraisal cites comparable sales leading to

7

an adjusted value per unit of between $122,727 to $199,500, with a median value per unit of $163,636, but this time does not offer any value of the Debtor's Property on a per unit basis. By this omission, the Appraisal manages to avoid having to inform the Court that the sale value of the Debtor's Property at the $163,636 median price per unit is as high as $3,763,628 (23 units x $163,636 per unit value).

28.     Another questionable set of assumptions appears in the current Appraisal's analysis of rental income. On pages 64-66, the appraisal shows the actual rent per room for those apartments where rent is currently being paid. However, for the remaining apartments, whether identified as "vacant" or marked as "occupied but non-paying", the rents are fixed at $1,100, except for two with private access to the backyard that are listed at $1,200.

29.     This contrasts with the 2010 appraisal of the Property, where the rent roll was estimated at an average rent per room of $1,220 per month. See pages 71 and 72 of that appraisal, annexed hereto as Exhibit "B".

30.     No explanation is provided for why lower amounts are used in the current Appraisal instead of the $1,220 employed in the previous appraisal. This arbitrary reduction is particularly questionable because the range of comparable rents used in the current analysis is between $350 and $1,600, so that there is no obvious reason why $1,220 is not used again.

31.     Nor is the estimated rent roll a minor point. Even if one accepts the projected expenses and the 6% Cap Rate shown on page 65 of the

Appraisal, by increasing the projected rental income to $1,220 for just those apartments currently shown at $1,100 or $1,200, the income value of the Property increases to $2.6 million, more than adequately protecting Movant's lien.

32.    Importantly, because the Receiver has been in place for an entire year, the Debtor lacks information concerning either the true rental value of these vacant and non-performing apartments, or the steps, if any, taken by the Receiver to collect back rents, removal recalcitrant tenants generate addition revenue.

33.    Counter-intuitively, the Property is worth more vacant than full.  Thus, as the Receiver has not replaced tenants, which makes conversion easier, then the Appraisal should properly focus on Comparable Sale #1 as the true indicator of the value of the Property, subject to reasonable adjustments for the costs and potential time involved with conversion.

34.    In any event, it is clear that the Appraisal as presented is contradictory, and open to serious question.  When set against a debt of less than $2.3 million owed to Movant, it is quite likely that the secured claim of Movant is fully protected.

35.    Moreover, even as the parties debate equity, there can be no disputing that the Property is essential to an effective reorganization.  It constitutes the Debtor's sole asset.  In this regard, the Debtor understands the Supreme Court admonition that an effective reorganization typically means that "there must be a reasonable possibility of a successful reorganization within a reasonable time.

United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S.365, 375-76, 180 S.Ct. 626 (1987). However, the Supreme Court also noted that when the motion is made in the early stages of the case, prior to the termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects. Id. at 376.

36.     Here, Movant argues that the Debtor cannot meet its burden that the Property is necessary to an effective reorganization because the Debtor has no equity in the Property. This is non-sequitur, and in any event is baseless, as Movant has failed to establish that there is no equity in the Property.

37.     Further, even without equity, the Debtor is still capable of negotiating a plan with other creditors and, perhaps, cramming down or stripping Movant's lien under § 506(b), or adjusting the interest on the mortgage under the rights explained by the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465, 124 S.Ct. 1951 (2004), which effectively permits a mortgage to be recast in bankruptcy to provide a reduced interest rate.

38.     All of these possibilities short of foreclosure are being vigorously explored by the Debtor for this and the other affiliates under Mr. Nelkenbaum's control, and will be presented formally in written plans and disclosure statements within the week. As such, it is premature to lift the stay at this time based upon a finding that this Debtor will never be able to confirm a plan.

WHEREFORE, for all of the reasons set forth herein, Movant's motion should be denied consistent with the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
August 5, 2011

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By:    /s/ Kevin J. Nash, Esq.
       A Member of the Firm

# EXHIBIT A

# SIDRANE & SCHWARTZ-SIDRANE, LLP
## ATTORNEYS AT LAW

STEVEN D. SIDRANE*
KAREN SCHWARTZ-SIDRANE
———————
HADASSAH KWESTEL

1427 STURL AVENUE
HEWLETT, NY 11557
516-569-9539
FAX 516-
569-9560
Email:
Sidranelaw@yahoo.com

Via First Class Mail and Email

August 5, 2011

New York Spot, Inc.
3317 Avenue N
Brooklyn, New York 11234
Attn: Mr. Nelkenbaum

Dear Mr. Nelkenbaum:

Pursuant to your request, I have outlined here the salient features of the New York State Division of Housing and Community Renewal's ("DHCR" or "Agency") process for substantial demolition of a seriously deteriorated building. Should you have any questions about how this works or concerning details of its application to the Agency.

## I. INTRODUCTION

The DHCR has issued an Operational Bulletin[1] outlining the procedures and policies concerning the substantial demolition of a deteriorated Building. For the layman, the term "substantial demolition" can be thought of as being able to stand in the basement of a building and see the sky. It does not require the demolition of the exterior walls of a structure, but simply the removal of everything else, short of the floor beams and other rough support structure which keeps the exterior walls erect. You are, in essence, building a new building.

The Tenant Protection Regulations[2] provide that an owner shall not be required to offer renewal leases to tenants and may maintain an action or proceeding to recover possession in court, after the expiration of the existing lease, where DHCR has granted the owner's application to demolish all of the apartments located in the subject building. Certain eligibility, notice, order, relocation and other requirements relating to the demolition application process are outlined below.

---

[1] pursuant to Sections 2504.4(1) and 2507.1 of the Emergency Tenant Protection Regulations ("TPR"), Sections 2524.5(a)(2) and 2527.11 of the Rent Stabilization Code ("RSC"), and Sections 2204.8(c) and 2209.8 of the New York City Rent and Eviction Regulations ("CRER").

[2] TPR Section 2504.4(f) and RSC Section 2524.5(a)(2)

## II. ELIGIBILITY & APPLICATION

The term "owner" is specifically defined in TPR Section 2500.2(g) and RSC Section 2520.6(I), which, as is relevant here, includes fee simple ownership and a demolition proceeding must be instituted by the filing of an application in the name of the owner.[3]

The stated purpose of the application must be that the owner seeks the recovery of the apartments for the purpose of demolishing them. No demolition application will be accepted by DHCR unless the owner has submitted proof to the DHCR of financial ability to complete such undertaking, and that plans for the undertaking have been approved by the NYC Dept. of Buildings.

Evidence of financial ability to complete the project may include a Letter of Intent or a Commitment Letter from a financial institution (other proof may also be considered).

The DHCR then serves each tenant with a copy of the Owner's application, giving the tenants twenty days to answer.[4]

## III. NOTICE PROVISIONS

Once an application has been filed, an owner may refuse to renew tenants' leases until a determination of the owner's application has been made. Tenants may remain in occupancy during such period, and the owner may not increase the rents. Should the application be denied or withdrawn, the owner must again offer prospective renewal leases to the tenants, as directed in the DHCR's order of denial or withdrawal.

Pursuant to TPR Section 2504.3(c)(3), after filing a demolition application, an owner **must** serve each tenant in a NYC apartment with a Termination Notice at least 90 and not more

---

[3] An owner may file, either personally or by mail, an Owner's Application for Order Granting Approval to Refuse Renewal of Lease and/or to Proceed for Eviction (Form RA-54). At the time the owner files the application, a sufficient number of copies of the application for each tenant to receive a copy must also be submitted.

[4] "Tenant" means all persons named on the lease, treated as a single entity, or in the case of a housing accommodation subject to CRER Section 2204.8(c), any person entitled to the possession or to the use or occupancy of the housing accommodation, treated as a single entity. The DHCR will also mail a copy of its operation bulletin 2009-1 to each tenant, advising that tenant of the owner's obligations concerning Termination Notice requirements pursuant to TPR Section 2504.3(c)(3) or RSC Section 2524.2(c)(3), the owner's obligation pursuant to TPR Section 2504.4(f)(2) or RSC Section 2524.5(c) to pay certain moving expenses and relocation benefits, and the owner's other obligations, the tenants' rights and procedural issues.

than 150 days prior to the expiration of the lease term ("window period")[5]. Provided, each tenant whose "window period" occurs prior to the issuance of the order is served with a timely Termination Notice, the order granting the application may be issued. If a Tenant does not have a lease, then the Owner must serve the Tenant with a lease and wait for that lease to come near expiring to serve the non-renewal notice in the window period. We have seen cases where the DHCR will allow a short grace period if the filing of the application is a few weeks beyond the window period, but this is not an exception that is routinely granted - in our experience.

The Termination Notice shall state:

(1)    that the owner will not renew the tenant's lease because the owner has filed an application for permission to recover possession of all housing accommodations in the building for the purpose of demolishing them, for which plans and financing have been obtained, as stated in the application;

(2)    that while the application is pending, the tenant may remain in occupancy;

(3)    that the tenant shall not be required to vacate until the DHCR issues a final order approving the application and setting forth the time for vacating, stipends and other relocation conditions;

and

(4)    that the tenant must be offered a prospective renewal lease if the application is withdrawn or denied.

Additionally, be aware that tenants who elect to vacate prior to the dates provided in the order, will, if stipends are applicable, be eligible to receive an enhanced stipend.

IV. ADMINISTRATIVE ORDERS

If the Owner fails to comply with the submission of proof of its financial ability to complete the substantial demolition, or fails to submit approved plans the application will not even docketed.

In addition, on 30 days notice the DHCR may dismiss an application because of the owner's failure to proceed in a timely fashion. If after review the Agency denies an application renewal leases must be offered to all affected tenants as directed in the order of denial or

---

[5] The Termination Notice may be served either personally or by regular or certified mail, but a contemporaneous affidavit of service must be kept as proof of service. When service is by registered or certified mail the stamped post office receipt constitutes sufficient proof of service and once such proof of service has been submitted to the DHCR, the burden of proving non-receipt shall be on the tenant.

withdrawal.

An order granting the application will be conditioned upon the owner's compliance with such terms as shall be set by the DHCR, including the payment of stipends and moving expenses, and with service of Termination Notices.

In no event may any tenant be required to move out of an apartment before the expiration date of that tenant's lease, or the vacate date indicated when the owner's application is approved, whichever is later. Where the DHCR determines that an owner's failure to timely serve a Notice of Termination occurred, but was not willful, and where such owner does not pay an additional one-year stipend, the affected tenant may remain in occupancy for the "deemed" one-year lease term, if later than such periods.

## V. STIPENDS AND OTHER RELOCATION CONDITIONS

The Owner must pay all reasonable moving expenses and the tenant shall also be afforded a reasonable period of time within which to vacate the apartment. If the tenant vacates the apartment on or before the date provided in the DHCR final order, such tenant shall be entitled to receive all stipend benefits pursuant below in subparagraphs (i) or (ii) or (iii). If the tenant does not vacate the apartment on ov before the date upon which a final order authorizes the owner to obtain possession of the apartment, the stipend shall be reduced by one-sixth of the total stipend for each month the tenant remains in occupancy after the vacate date indicated in the final order. The order granting the owner's application shall also provide that, at the owner's option, the owner may:

(i) Relocate the tenant to a suitable housing accommodation at the same or lower regulated rent in a closely proximate area, or in a new residential building if constructed on the site, in which case suitable interim housing shall be provided to the tenant at no additional cost; plus, in addition to reasonable moving expenses, payment of a $5000 stipend shall be made to the tenant, provided he or she vacates on or before the vacate date set forth in the DHCR Order; or

(ii) Where an owner provides relocation of the tenant to a suitable housing accommodation at a rent in excess of that for the subject housing accommodation, in addition to the tenant's reasonable moving expenses, the owner may be required to pay the tenant a stipend equal to the difference in rent, at the commencement of the occupancy by the tenant of a new housing accommodation, between the subject housing accommodation and the housing accommodation to which the tenant is relocated, multiplied by 72 months (6 years), provided the tenant vacates on or before the vacate date set forth in the DHCR order; or

(iii) Pay the tenant a stipend which shall be the difference between the tenant's current rent and an amount to be calculated using the demolition stipend, per room per month, multiplied by the actual number of rooms in the tenant's housing accommodation, but no less than three rooms. This difference is to be multiplied by 72 months (6 years).

The current stipend level is $526.

4

For orders issued during the period commencing October 1, 2008, and on or after October 1st of each subsequent year, the $526 per month base stipend will be raised by the applicable guidelines increase available for a one year renewal lease[6]. This means that as of the date of this letter the per room stipend amount is $578.90, having been increased from $526.00 to $549.67 (4/5%) for periods commencing 10/1/08, then to $566.16 for periods commencing 10/1/09 and then to $578.90 for period (orders) commencing 10/1/2010. This is applicable to all housing accommodations. We have sent a formal request for an opinion letter to Deputy Counsel M. Rosenblatt to clarify that this stipend and 3 room minimum also applies to SRO units as well.

In addition, wherever a stipend would result in any tenant losing a subsidy or other governmental benefit which is income dependent, at the tenant's option, the tenant may elect to waive the stipend and have the owner at its own expense, relocate the tenant to a suitable housing accommodation at the same or lower regulated rent in a closely proximate area.

In the event that the tenant, dies prior to the issuance by the DHCR of a final order granting the owner's application, the owner shall not be required to pay such stipend to the estate of the deceased tenant.

## VI. COMPARABLE APARTMENTS AND RELOCATION

In the event a comparable apartment is offered by the owner, a tenant may file an objection with the DHCR challenging the suitability of an apartment offered by the owner for relocation, within ten (10) days after the owner identifies the apartment and makes it available for the tenant to inspect and consider the suitability thereof.

The apartment will then be inspected by the staff of the DHCR within 30 days, on notice to both sides, so that the DHCR may determine whether the offered apartment is suitable. The DHCR will make such determination as promptly as practicable thereafter. In the event the DHCR determines that the apartment is not suitable, the tenant shall be offered another apartment, and shall have ten (10) days after it is made available by the owner for the tenant's inspection to consider its suitability.

If the Agency determines that the offered apartment is suitable, the tenant shall have fifteen (15) days thereafter within which to accept it. A tenant who refuses to accept relocation to any apartment determined by the DHCR to be suitable shall lose the right to relocation by the owner and to receive payment of moving expenses or any stipend.

"Suitable housing accommodations" shall mean apartments which are similar in size and features to the apartment now occupied by the tenants. Such apartments shall be freshly painted

---

[6] The $526 per month base, plus annual adjustments, remains in effect until the release of a new Housing and Vacancy Survey for the City of New York, at which time the base rent, per room, shall be adjusted to reflect the mean asking rent, per room, for all vacant rental units in that next Survey.

5

before the tenant takes occupancy and shall be provided with substantially the same required services and equipment the tenants received in their prior apartments. The building containing such accommodations shall be free from violations of law recorded by the governmental agency having jurisdiction, which constitute fire hazards or conditions dangerous or detrimental to life or health, or which affect the maintenance of required services. The DHCR will consider apartments proposed for relocation which are not presently subject to rent regulation, provided the owner submits a contractual agreement, between the tenant and the owner of such proposed apartment, that places the tenant in a substantially similar housing accommodation at no additional rent for a period of six years, unless the tenant voluntarily requests in writing a shorter lease period.

## VII. ADMINISTRATIVE REVIEW

Any party aggrieved by the Administrator's determination may file a Petition for Administrative Review (PAR) and this shall stay such order until the final determination of the PAR by the Commissioner. Upon a showing that there are equitable grounds, the Commissioner may entertain requests for expedited processing of the PAR.

If the Building contains rent controlled Statutory Tenants, then the Sound Housing Act applies, which imposes additional requirements on the Owner in regards to the type and size of housing accommodations which must be built to replace the ones being demolished.

An analysis of the application of the Sound Housing Act to any particular building is fact specific and beyond the scope of this outline.

If additional information or clarification is needed, feel free to contact the undersigned.

Very truly yours,

Steven D. Sidrane, Esq.

Appraisal, by increasing the projected rental income to $1,220 for just those apartments currently shown at $1,100 or $1,200, the income value of the Property increases to $2.6 million, more than adequately protecting Movant's lien.

32.     Importantly, because the Receiver has been in place for an entire year, the Debtor lacks information concerning either the true rental value of these vacant and non-performing apartments, or the steps, if any, taken by the Receiver to collect back rents, removal recalcitrant tenants generate addition revenue.

33.     Counter-intuitively, the Property is worth more vacant than full. Thus, as the Receiver has not replaced tenants, which makes conversion easier, then the Appraisal should properly focus on Comparable Sale #1 as the true indicator of the value of the Property, subject to detailed adjustments for the costs and potential delays of conversion.

34.     In any event, it is clear that the Appraisal as presented is contradictory, and open to serious question. When set against a debt of less than $2.3 million owed to Movant, it is quite likely that the secured claim of Movant is fully protected.

35.     Moreover, even as the parties debate equity, there can be no disputing that the Property is essential to an effective reorganization. It constitutes the Debtor's sole asset. In this regard, the Debtor understands the Supreme Court admonition that an effective reorganization typically means that "there must be a reasonable possibility of a successful reorganization within a reasonable time.

United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S.365, 375-76, 180 S.Ct. 626 (1987). However, the Supreme Court also noted that when the motion is made in the early stages of the case, prior to the termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects. Id. at 376.

36. Here, Movant argues that the Debtor cannot meet its burden that the Property is necessary to an effective reorganization because the Debtor has no equity in the Property. This is non-sequitur, and in any event is baseless, as Movant has failed to establish that there is no equity in the Property.

37. Further, even without equity, the Debtor is still capable of negotiating a plan with other creditors and, perhaps, cramming down or stripping Movant's lien under § 506(b), or adjusting the interest on the mortgage under the rights explained by the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465, 124 S.Ct. 1951 (2004), which effectively permits a mortgage to be recast in bankruptcy to provide a reduced interest rate.

38. All of these possibilities short of foreclosure are being vigorously explored by the Debtor for this and the other affiliates under Mr. Nelkenbaum's control, and will be presented formally in written plans and disclosure statements within the week. As such, it is premature to lift the stay at this time based upon a finding that this Debtor will never be able to confirm a plan.

WHEREFORE, for all of the reasons set forth herein, Movant's motion should be denied consistent with the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
      August 5, 2011

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____

      Kevin J. Nash, Esq.
      A Member of the Firm

# EXHIBIT B

# PROFORMA

|  |  |  | TOTAL ANNUAL |
|---|---|---|---|
| POTENTIAL GROSS INCOME |  |  | $336,811 |
| VACANCY AND COLLECTION LOSSES |  | 20% | ($67,362) |
| EFFECTIVE GROSS INCOME |  |  | $269,449 |

| ESTIMATED EXPENSES |  | (5,000) $/SF | (23) $/UNIT | APPRAISER ESTIMATED |
|---|---|---|---|---|
| Real Estate Taxes |  | $8.62 | $1,874 | $43,107 |
| Water and Sewer |  | 0.69 | 150 | 3,450 |
| Insurance |  | 1.00 | 217 | 5,000 |
| Payroll and Taxes |  | 1.20 | 261 | 6,000 |
| Heating Costs |  | 1.50 | 326 | 7,500 |
| Electric |  | 1.00 | 217 | 5,000 |
| Repairs/Maintenance/Reserves |  | 1.30 | 283 | 6,500 |
| Supplies/Miscellaneous |  | 0.15 | 33 | 750 |
| Legal and Accounting |  | 0.50 | 109 | 2,500 |
| Management/Leasing | 5.0% | 2.70 | 587 | 13,500 |
| TOTAL EXPENSES: |  | (18.66) | (4,057) | (93,307) |

| OPERATING EXPENSE RATIO |  | 34.6% |  |  |
|---|---|---|---|---|

| NET OPERATING INCOME (NOI) |  |  |  | $176,142 |
|---|---|---|---|---|

CAPITALIZATION

| $176,142 | Capitalized | @ | 7.50% = | $2,348,557 |
|---|---|---|---|---|

**VALUE VIA INCOME APPROACH (Rounded):**     **$2,350,000**

| Value Per Sq. Ft., Above-Grade: | $470 |
|---|---|
| GRM: | 7.0 |

# DISCUSSION OF INCOME/EXPENSES

The following room rates were obtained from other appraisers, web sites of the facilities, or real estate articles from within the subject's general market area.

| COMPARABLE SRO / BUDGET ROOMING HOUSING RENTALS | | |
|---|---|---|
| Facility | Address | Daily Rates |
| The Whitehouse Hotel of NY | 338 Bowery | $30 |
| The Pioneer | 341 Broome Street | $119 - $199 |
| Big Apple Hostel | 119 West 45th Street | $36 - $54 |
| Chelsea Center | 313 West 29th Street | $35 |
| Chelsea International Hostel | 251 West 20th Street | $40 - $80 |
| Chelsea Star Hotel | 300 West 30th Street | $75 - $159 |
| Central Park Hostel | 19 West 103rd Street | $45 |
| Guesthouse | 63 Audubon Avenue | $30 |
| International Student Center | 38 West 88th Street | $30 - $35 |
| Dexter House | 345 West 86th Street | $30 |
| Chocolate Hostel | 850 West End Avenue | $75 |
| Candy Hostel | 315 West 94th Street | $23 - $32 |
| Hostel Fresh | 330 West 95th Street | $70 |
| The Kopling House | 165 East 88th Street | $65 |
| Hostelling Intl NY Youth House | 891 Amsterdam Avenue | $29 |
| Vanderbilt YMCA | 224 East 47th Street | $105 |
| West Side YMCA | 5 West 63rd Street | $102 |

The above survey indicates a range between $23 and $199/room/day with most between $30 and $80/room/day. Given the subject's location, condition and size, we estimate the market rate for the subject to be $50/room/day or $1,500/room/month. It is noted that no current rent roll was provide and a historic rent roll from 2007 was utilized. Some of the rents from 2007 exceed the current market estimate and were adjusted down to $1,500/room/month. Other rents that were less than $1,000/room/month were adjusted up by 6.5%, which was the total allowable rent increase for SRO's since 2007. The other rents that were over $1,000 and less than $1,500/month were deemed competitive with the market and were accepted. After adjusting the overall rent roll to the present, the average rent per room per month was $1,220 or $41/room/day, which is within the range of the market.

Vacancy & Non-Collection: A SRO vacancy and non-collection factor of 20% was utilized in determining the effective gross income (EGI). There is very little data in regards to SRO occupancy or vacancy. These factors were derived from an analysis of the hotel market, since they are somewhat similar to SROs. Hotels reported to have occupancy of between 70% and 80%. Therefore, we have utilized the 20% since SRO tend to do better than hotels in a slow economy with its lower rates.

Effective Gross Income (EGI): This equates to the PGI less vacancy and collection loss.

Estimated Expenses: Our expenses are based on historical data, public records, comparable expenses and industry standards. The expense ratio is 35% of the EGI, within the typical 30% to 50% range for similar properties.